Westlaw.



**H**
Williams v. HealthReach Network
D.Me.,2000.

United States District Court, D. Maine.
Lorraine M. WILLIAMS, Plaintiff
v.
HEALTHREACH NETWORK, Defendant
**No. Civ. 99-0030-B.**

Feb. 22, 2000.

Jed Davis, Jim Mitchell & Jed Davis, P.A., Augusta, ME, John E. Nale, Nale Law Offices, Waterville, ME, for Lorraine M Williams, plaintiff.
Peter H. Jacobs, Byrne J. Decker, Pierce, Atwood, Portland, ME, for Healthreach Network, defendant.

ORDER AND MEMORANDUM

BRODY, J.

*1 Plaintiff, Lorraine M. Williams ("Williams"), brings a claim under Title I of the Americans with Disabilities Act ("ADA"), 42 U .S.C. § 12101 *et seq.,* and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4571 *et seq.,* against her former employer, HealthReach Network ("HealthReach"). She also brings claims for negligent infliction of emotional distress and intentional infliction of emotional distress. Before the Court are Plaintiff's Motion to Reconsider the magistrate judge's denial of her motion to amend her complaint and Defendant's Motion for Summary Judgment. For the following reasons, Plaintiff's Motion to Reconsider is DENIED and Defendant's Motion for Summary Judgment is GRANTED.

I. MOTION FOR RECONSIDERATION

A motion to amend a complaint is a "pretrial matter not dispositive of a claim or defense of a party" and is thus within the purview of Fed.R.Civ.P. 72(a). *See Pagano v. Frank,* 983 F.2d 343, 346 (1 st Cir.1993). Under Rule 72(a), "the district judge can set aside the magistrate's ruling if he finds it to be ' clearly erroneous or contrary to law." ' *Id.* (quoting 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a)).

On August 16, 1999, the last day of discovery, Williams moved to amend her complaint in order to add a claim under the Family Medical Leave Act (" FMLA"), 29 U.S.C. §§ 2601-2654. Before the magistrate judge, Williams, a registered nurse ("RN "), asserted that she wanted to add this claim to her complaint because she learned "new and unexpected " information during the depositions of her supervisors on July 22, 1999. According to Williams, she discovered that her supervisors at HealthReach held a meeting on January 21, 1997, while she was out on a two-month leave for depression, and decided to: (1) abandon an "action plan," which would have allowed Williams to ease back into work upon returning in early February 1997 from her leave; and (2) instead adopt a plan to evaluate her ability to perform her job on her first day back to work.

In denying the motion to amend, the magistrate judge decided that the information alleged in Williams' very own complaint demonstrated that the information that she allegedly uncovered in the July depositions was not "new and unexpected." Specifically, the magistrate judge pointed out that Williams' complaint asserts that her supervisors met on January 21, 1997, and decided that on her "first day back to work, she would be accompanied by and evaluated by HealthReach's new Quality Assurance Supervisor, and that, if her work performance did not meet their expectations, she would be terminated." (Pl.'s Compl. ¶ 28). In addition, he noted that her original complaint acknowledges that she "was informed of her supervisors' decision [on] January 30, 1997, just a few days before she was to return to work on February 3, 1997." (Id.¶ 29). The magistrate judge concluded that any additional information that Williams gleaned from the July 1999 deposition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GOVERNMENT EXHIBIT 7

was not "new and unexpected," since she knew that the "action plan" had been abandoned in January 1997. Therefore, he denied the motion to amend.

***2** Williams now argues to this Court that she did not know that the "action plan" had been abandoned at the January meeting in favor of the planned one-day evaluation. For support of this contention, Williams cites the July deposition of her supervisor, Cathleen Crawford ("Crawford"), who stated that she did not tell Williams of the one-day evaluation prior to Williams' return to work. Neither this fact nor any of the material and arguments that Williams submits to this Court, in what now amount to her fourth memorandum on this issue, address the real issue: that Williams knew that HealthReach subjected her to this one-day evaluation many months, if not two and a half years, before the proposed amended complaint. Indeed, Williams recounted to the Maine Human Rights Commission, in a document received by that Commission on August 14, 1998, that HealthReach adopted the one-day evaluation at this meeting on January 21, 1997, and that she did not know that she would be facing such an evaluation upon her return to work. Furthermore, given what Williams states to this Court in her original complaint, dated February 3, 1999, it is hard to take seriously her contention that the information that she and her attorney supposedly learned at the July 1999 deposition was "new and unexpected."

In support of her proposed amendment, Williams also asserts that HealthReach waited until July 29, 1999, to disclose an important letter. This letter, which was addressed to Williams and *originally received by her* in December of 1996 or in January of 1997, merely stated that Williams had a right under the FMLA to take three months off of work. It did not provide Williams with a single fact demonstrating that HealthReach violated her rights under that Act. Rather, in Williams' own words, the letter "spurred ... counsel's thought process in the direction of plaintiff's FMLA claim ." The fact that Williams' attorney realized that she may have a claim under the FMLA is not a sufficient reason to find that the magistrate's decision was clearly erroneous. More importantly, any delay by HealthReach in disclosing *a second copy* of this letter to Williams does not account for her failure to amend her complaint when she knew the facts underlying her proposed amendment on or before February 6, 1997, the day HealthReach terminated Williams as a home care nurse. Stripped to its essence, Williams appears to argue that HealthReach is under a duty to inform Williams of possible claims that she might file. HealthReach is under no such duty. For the foregoing reasons, the Court finds that the magistrate judge's ruling was not clearly erroneous or contrary to law. Therefore, Plaintiff's Motion for Reconsideration of Decision on Motion to Amend Complaint is DENIED.

## II. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A material fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida-Gonzalez v. Tirado-Delgado,* 990 F.2d 701, 703 (1st Cir.1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). "Fed.R.Civ.P. 56 does not ask which party's evidence is more plentiful, or better credentialled, or stronger." *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). Rather, for the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

## III. STATEMENT OF FACTS [FN1]

FN1. Plaintiff did not submit an Opposing Statements of Material Facts as required by Local Rule 56(c). Instead, Plaintiff claims that the following three "facts" are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

material and in dispute:
(1) Williams had a mental impairment that substantially limited one or more of her major life activities.
(2) Williams was able to perform the essential functions of the job with or without reasonable accommodation.
(3) HealthReach discharged her because of her disability.
These three "facts" are actually legal conclusions that constitute the elements of an ADA claim. Therefore, Plaintiff's submissions provide the Court with no assistance in determining whether or not these elements are satisfied by the facts of this case. Having failed to file an Opposing Statement of Material Facts, Defendant's Statement of Material Facts is deemed admitted pursuant to Local Rule 56(e).
Not only has Plaintiff failed to comply with Local Rule 56, which could result in sanctions, Plaintiff has also failed to provide a fact section in her memorandum in opposition to the motion for summary judgment. In short, Plaintiff's failures have made construing the facts in the light most favorable to Plaintiff a difficult task.

*3 In 1992, Williams started working as home care nurse for HealthReach, a not-for-profit home health care agency. In this position, Williams handled her own caseload of patients with acute illnesses. Her performance evaluations reflected that she adequately performed her job until the summer of 1996. Nonetheless, throughout Williams' tenure at HealthReach, her supervisor generally attempted to assign more acute patients to other nurses, and Williams had ongoing problems with the paperwork required to recertify patients for ongoing care. HealthReach made attempts to improve her performance in the area of documentation, which all parties admit is an essential duty of home care nurses.

In 1996, Williams' performance deteriorated. In the spring of that year, HealthReach decided to restructure its home care operations in order to improve its services. Williams found the changes to be difficult and considered leaving HealthReach. Susan Barton ("Barton"), HealthReach's Clinical Director, encouraged her to stay by saying that things would get better. Barton, in the meantime, asked how she could help, and Williams responded with a request that she be allowed to work three or four "long" days each week, instead of five days per week. Although it is unclear from the record how Barton responded to this request, Williams' immediate supervisor after the restructuring, Cathleen Crawford, had previously told Williams that her request could not be granted until "the [post-restructuring] team is stable." In July of 1996, shortly after meeting with Barton, Williams met again with Crawford. After stating that she was overwhelmed with work, Williams reiterated her request for a shorter work week. In response, Crawford said that she would consider any proposal that Williams put into writing. According to Williams, she "didn't get around to [putting the request into writing]." Instead, in late August of 1996, she adjusted her schedule, without obtaining permission from anyone at HealthReach, so that she could work four days each week.

In the months that followed, Williams found it difficult to keep up with the demands of her job despite her reduced schedule. Concerned about her performance, HealthReach provided Williams with educational counseling to help her improve the quality of her work. Nonetheless, Williams continued to feel "overwhelmed, stressed and burned out." As a result, her work continued to suffer, especially her paperwork. HealthReach was on the verge of terminating Williams in late November of 1996, when Crawford informed Williams that she would be discharged unless her work performance improved significantly within a short period of time.

On December 3, 1996, Crawford and Williams met again to discuss Williams' problems and, in hopes of alleviating them, reviewed an "action plan" for improvement. This plan proposed to remove Williams from "primary" care of patients, and instead called on her to visit other nurses' patients and to work closely with multiple supervisors in order to improve her recertification documentation. In order to reduce her stress, this plan also authorized Williams to work three days per week.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The "action plan" specifically warned that "failure to meet expectations will result in termination."

*4 At this December meeting, Williams, in response to an earlier request by Crawford, gave Crawford a plan of patient care based on the problems of a hypothetical patient in a textbook. When Crawford read Williams' plan that evening she found it so deficient that she concluded that Williams did not understand what she had read. Crawford later recalled thinking, "Oh my God, she's going to kill someone." Additionally, Crawford began to have concerns about her own RN license, since she thought she may have engaged in supervisory negligence by allowing Williams to work with acute patients. Based on this review of Williams' plan, Crawford envisioned modifying the "action plan" she had developed with Williams earlier that day. Under this modified "action plan," Williams would accompany a specially assigned preceptor, named Martha Coleman, for the purpose of observing proper patient care and would not perform billable work herself. According to a memorandum Crawford drafted on December 4, 1996, Crawford planned on having Williams work with Coleman for four weeks. Crawford intended to discuss this modified plan with Williams as soon as possible, but the discussion never took place because Williams went out on leave.

Continuing to feel overwhelmed at work, Williams saw her regular doctor, Doctor Henry M. Glover, on December 6, 1996. Dr. Glover diagnosed her with depression on that day and prescribed an anti-depressant medication, which Williams began taking immediately. On December 9, 1996, Williams informed HealthReach of her diagnosis and sought a one-month leave. HealthReach immediately granted her the leave. She later asked HealthReach to extend her leave for a second month, and HealthReach readily approved of the extension. With the help of the medication, Williams began to feel better by the beginning of January of 1997. It was around this time that Williams also began to see Doctor Fred A. Bloom, a psychiatrist. Her doctors released Williams to return to work, with no medical restrictions, on February 3, 1997. Neither Williams nor her doctors provided HealthReach with any medical information or a request for accommodation prior to her return to work.

On January 21, 1997, HealthReach management met to discuss Williams' impending return. Given Crawford's concerns about patient safety following her review of Williams' written plan of patient care, management decided that, upon her return, Williams should not merely accompany other nurses and perform no billable work. Instead, they decided that Jackie Fournier ("Fournier"), Director of Clinical Services and in charge of quality control, would supervise Williams on her first day back.

After supervising Williams on that day, Fournier concluded that she could no longer perform her job as a home care nurse without threatening the safety of patients. Given Fournier's conclusions, HealthReach terminated Williams' employment as a home care nurse on February 6, 1997. At the same time, HealthReach offered her the choice of resignation and a severance check or continued employment as a per diem nurse in long-term care. FN2

FN2. Long-term care, as opposed to home care, enables nurses to work with fewer patients, allowing them to become well-oriented to the needs of these patients. Therefore, HealthReach believed that it would be less hectic and easier for Williams to handle such a position, as opposed to a home care position, where she would see roughly twenty-five different patients each week. Since long-term care nurses see so few patients, HealthReach also believed that it could provide Williams with the support and supervision necessary to handle this position.

*5 Crawford and Barton offered to meet with Williams a week later to discuss her options further. Before any such meeting was to take place, Williams agreed to call them on February 11th, but failed to do so. Crawford then called Williams, who stated that she would call back. When Williams called back the next day, she said that her attorney

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would be in touch with HealthReach. Having failed to hear from her attorney as of February 18, 1997, Crawford again called Williams and repeated her offer, which Williams rejected. Crawford then offered Williams continued employment as a regular, fully benefitted nurse in long-term care with the same pay, benefits, and hours she enjoyed as a home care nurse. Crawford reiterated this proposal the following day, February 19, 1997, and Williams rejected it as a "demotion." On February 20, 1997, Crawford wrote Williams a letter, expressing that the long-term care offer "doesn't represent a demotion, but rather a change in duties. The job is in the same labor grade, has the same wages and the same benefits." Williams never responded to this letter.

Williams agreed that, throughout her dealings with management, everyone at HealthReach conducted themselves toward her in a polite, kind, and solicitous way. Williams also agreed that management's perception of her performance was sincere and honest, and she acknowledged that almost all of her performance problems noted by management were grounded in fact.

Both of Williams' doctors stated that her condition was temporary in so far as it limited her ability to function. Dr. Bloom surmised that Williams' depression had been developing gradually over the course of several months prior to the December diagnosis. Williams claims that she felt better by the start of January 1997, halfway through her two-month leave, and Dr. Bloom stated that she was doing "quite well" and "had an optimistic and confident outlook as of March 25, 1997." [FN3] After leaving HealthReach, Williams started to work as a nurse again on April 1, 1997, and, by the end of May 1997, she claimed that she felt herself again. With the help of medication, Williams has functioned successfully in various kinds of nursing jobs, and continues to do so. Her only employment problems since leaving HealthReach have been her difficulties in coping with the paperwork requirements as a home care nurse for the Bowen Agency .[FN4] Despite these improvements, Williams describes herself as a chronic depressive.

FN3. The parties stipulated "that with respect to liability issues in this case and the communications that took place between the parties and witnesses regarding Plaintiff's status at HealthReach, evidence and testimony shall be limited to the time period up to and including February 20, 1997. Apart from the February 20, 1997 letter from Kathy Crawford to the Plaintiff, which letter the parties stipulate Plaintiff did not respond to, evidence of communications between the parties and/or their representatives or between witnesses and parties, after February 20, 1997 relating to Plaintiff's status at HealthReach, shall not be admissible at trial." The Court interprets this stipulation to exclude all party communications after February 20, 1997, but does not interpret this stipulation to exclude evidence of Plaintiff's health after this date. Such evidence is necessary for the Court to determine whether Plaintiff has a disability for the purposes of the ADA. Additionally, both parties, in their briefs on the motion for summary judgment, cite evidence of Plaintiff's health after the stipulated date.

FN4. These difficulties led Williams to reject an offer for a permanent position as a home care nurse with the Bowen Agency, and she instead opted to work as a nurse in long-term care at the Ursuline Sisters Care Center.

## IV. DISCUSSION

### I. The ADA Claim [FN5]

FN5. Since "interpretation of the ADA and of the Maine Human Rights Act have proceeded hand in hand," the Court's discussion of the ADA is also applicable to and conclusive of Williams' claim under the Maine Human Rights Act. *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 14

(1st Cir.1997).

To prove her ADA claim, Williams must establish by a preponderance of the evidence: "(1) that she suffered from a "disability" within the meaning of the ADA; (2) that she was able to perform the essential functions of her job, either with or without reasonable accommodation; and (3) that her employer discharged her in whole or in part because of that disability." *Tardie v. Rehabilitation Hospital of Rhode Island,* 168 F.3d 538, 541 (1st Cir.1999) (citations omitted). A. Does Williams have a Disability within the Meaning of the ADA?

***6** The ADA defines disability as:
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Williams only argues that subsection (A) applies to her case. Therefore, "to make out a prima facie case of discrimination based on the definition of disability, [Williams] must establish three elements: (1) that [she] had a physical or mental impairment that (2) substantially limits (3) a major life activity." *Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 15 (1st Cir.1997) (internal quotation marks omitted).

Depression is an impairment under the ADA. *See* 29 C.F.R. § 1630.2(h)(2). In addition, there is little doubt that depression can substantially limit a major life activity. *See Criado v. IBM Corp.,* 145 F.3d 437, 442 (1st Cir.1998) (recognizing "that in some circumstances depression can constitute a disability under the ADA"). Nonetheless, the Court must conduct an individualized inquiry to determine whether a reasonable jury could conclude that Williams' depression substantially limited a major life activity. *See Sutton v. United Air Lines, Inc.,* 119 S.Ct. 2139, 2147 (1999) (holding that disability determinations must be made on a case-by-case basis).

Williams claims that her depression substantially limited her major life activities of sleeping, working, and learning and remembering. According to Equal Employment Opportunity Commission (" EEOC") regulations, major life activities include " functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. 1630.2(i). For the purpose of summary judgment, the Court assumes that sleeping and remembering, along with working and learning, constitute major life activities, but will examine whether Williams' depression substantially limited any of these activities.

EEOC regulations define "substantially limits" as " unable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at 1630.2(j). To determine whether an individual's impairment substantially limits a major life activity, EEOC regulations provide courts with the following factors to consider:
(i) The nature and severity of the impairment;
(ii) The duration or expected duration of the impairment; and
(iii) The permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2); *see also Criado,* 145 F.3d at 442 (applying these factors).

1. Duration of the Impairment and its Impact

***7** Williams relies on the First Circuit's opinion in *Criado* to support her claim that her depression was of sufficient duration to constitute an ADA disability. In that case, the First Circuit ruled that the adequate treatment of Criado's depression through therapy and the expected success of medication in treating her depression did not foreclose the finding that Criado had an ADA disability. *See Criado,* 145 F.3d at 442 (citing *Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 859 (1st Cir.1998) (holding that courts must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

examine the plaintiff's impairment "without considering ameliorative effects of medication ... or other mitigating measures.")). The Supreme Court, however, recently ruled in *Sutton v. United Air Lines, Inc.,* 119 S.Ct. 2139 (1999), that "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment." *Id.* at 2143. Therefore, in determining the duration of Williams' impairment, the Court must view *Criado* through the lens of *Sutton* and consider the success that medication has had in treating her depression. *See Spades v. City of Walnut Ridge,* 186 F.3d 897, 900 (8th Cir.1999) ("Under *Sutton* ... a determination of whether [plaintiff's] depression is a disability must be made with reference to any mitigating measures he employs.").

*Criado* involved a woman who demonstrated to a jury that her depression was an ADA disability. Without considering measures that may have mitigated Criado's impairment, the First Circuit found sufficient evidence to uphold the jury verdict finding that she had a permanent impairment. *Criado,* 145 F.3d at 442. Specifically, Criado was periodically depressed for seven years, during which she received psychiatric care and periodically took medication. *Id.* at 439-40. She also had Attention Deficit Disorder, which the court labeled as a permanent disability. *Id.* at 442.

Williams, unlike Criado, had one bout of major depression, which lasted at most for a few months before medication mitigated her impairment and allowed her to engage in all life activities without substantial limitation. Both Dr. Bloom and Dr. Glover believe that Williams' impairment only temporarily limited her ability to function.[FN6] In the opinion of Dr. Bloom, her depression developed gradually over the course of several months prior to Dr. Glover's diagnosis on December 6, 1996. According to Dr. Glover, the medication Williams began taking in early December of 1996 worked " very well", and her doctors released her to work with no medical restrictions on February 3, 1997, less than two months after her diagnosis. Additionally, Williams herself stated that felt " normal" again by May. On this evidence, a reasonable jury could not conclude that Williams' impairment was permanent or long-term. Rather, this evidence demonstrates that Williams' depression was temporary, and temporary depression generally does not amount to an ADA disability. *See, e.g., Soileau,* 105 F.3d at 16 (upholding a grant of summary judgment for the employer in part because the employee "failed to adduce any evidence that his impairment-the acute, episodic depression-[was] long-term"); *Sanders v. Arneson Products, Inc.,* 91 F.3d 1351, 1354 (9th Cir.1996) (holding as a matter of law that depression of three and a half months, with no residual side effects, was too short to fall within the protections of the ADA); *Brown v. Northern Trust Bank,* No. 95 C 7559, 1997 WL 543098, at *5 (N.D.Ill. Sept. 2, 1997) (holding as a matter of law that depression that began in late 1993, was diagnosed in July 1994, when the plaintiff went out on leave, and lasted until November of 1994, when the plaintiff returned to work, was of insufficient duration to constitute a disability under the ADA); EEOC, Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities Q & A 7 (dated Mar. 25, 1997) <http://www.eeoc.gov/docs/ psych.txt> [hereinafter "EEOC Psychiatric Guidance"] ("A mental impairment is substantially limiting if it lasts for more than several months and significantly restricts the performance of one or more major life activities during that time."). In addition, Williams has put forward no evidence of any significant long-term impact from this period of depression. Since this time she has worked successfully, and none of the limitations on her major life activities, discussed below, have continued.

FN6. Williams' only offer of evidence showing that she has a permanent disability comes from her own statement in her deposition, in which she described herself as a "chronic depressive." This assertion, however, does not establish that she has a permanent impairment for the purposes of the ADA. First, no reasonable jury could conclude, on the basis of plaintiff's statement alone, that she has a permanent disability. Second, and more importantly, she has been able to function

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with no substantial limitations since the winter of 1996-97.

2. The Nature and Severity of the Impairment

***8** The duration of an impairment, as well as the length of its impact, are not the only factors that the EEOC regulations call on courts to consider when making a disability determination. *See Katz v. City Metal Co.,* 87 F.3d 26, 31 (1st Cir.1996) (" Although short-term, temporary restrictions generally are not substantially limiting, an impairment does not necessarily have to be permanent to rise to the level of a disability.") The regulations also call on courts to consider the severity and nature of the impairment. *See* 29 C.F.R. § 1630.2(j)(2). In this case, the Court considers the nature and severity of Williams' depression on her ability to work, sleep, and learn and remember.

a. Working

With regard to the major life activity of working, EEOC regulations define "substantially limits" as: " significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* Additionally, "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Tardie,* 168 F.3d at 542 (quoting *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994), *cert. denied,* 513 U.S. 1147 (1995)).

Williams was only limited with regard to her job as a home care nurse at HealthReach, as demonstrated by both her later success in nursing jobs after leaving HealthReach as well as HealthReach's offer to her of a long-term care position, which they believed she could perform.[FN7] Such a narrow limitation is not sufficient to show that she was substantially limited in the major life activity of working.

FN7. HealthReach's concerns about Williams' ability to continue as a home care nurse, and its belief the she had the ability to perform as a long-term care nurse, were borne out by Williams' post-HealthReach job experiences. Williams decided to leave her position as a home care nurse with the Bowen Agency after deciding that she could not handle the paperwork. Instead, she decided to accept a position in long-term care with the Ursuline Care Center.

b. Sleeping

Williams only provides two examples to demonstrate that she was substantially limited in her ability to sleep. First, in her Memorandum of Law Opposing Summary Judgment, Williams asserts that she "slept inordinate amounts," but the citation from Williams' deposition used to support this assertion states only that she fell asleep on the couch at night. The second piece of evidence Williams cites is a statement of Dr. Bloom, which, in contrast to Williams' deposition testimony, provides that she "had not been sleeping well" during her depression.

Both of these examples reflect only a short period of time when she had such sleeping problems, and the duration of such troubles, not their severity, is the only factor to consider when determining whether one's ability to sleep is substantially limited. The EEOC, in its Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, provides that sleeping limitations "*must* be long-term or potentially long-term as opposed to temporary to justify a finding of ADA disability." EEOC Psychiatric Guidance at Q & A 11 (emphasis added).

***9** Even if the Court was to consider the severity of Williams' sleeping troubles, as opposed to their duration, they would still not amount to a substantial limitation. With regard to her falling asleep on the couch at night, it is safe to say that the millions of Americans who go through this routine on a nightly basis do not consider it a severe limitation on their sleeping. Dr. Bloom's statement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

also does not demonstrate a substantial limitation. The EEOC provides that "sleeping is not substantially limited just because an individual has some trouble getting to sleep or occasionally sleeps fitfully." EEOC Psychiatric Guidance at Q & A 3 n16. Given the Dr. Bloom's conclusory statement and the contradictory evidence of Williams falling asleep on the couch at night, no reasonable jury could conclude that Williams' sleeping limitations were severe.

Given the temporary nature of Williams' sleeping limitations, as well as the scant evidence demonstrating the severity of those limitations, the Court concludes as a matter of law that Williams was not substantially limited in the major life activity of sleeping.

c. Remembering and Learning

Williams also claims that her depression hampered her major life activities of remembering and learning. In support of her contention, Williams cites the testimony of Doctors Glover and Bloom, both of whom testified that she had trouble focusing on matters for a period of time during her depression. Even assuming her limitations in learning and remembering, unlike her limitations in sleeping and working, were significant, no reasonable jury could conclude that these limitations were substantial, since they were so short-lived.

In short, the Court finds that the temporary duration of Williams' impairment, its short-term impact, and its lack of severity fail to demonstrate a substantial limitation as a matter of law. Therefore, the Court concludes that Williams did not have a disability as defined by the ADA.

B. Was Williams a Qualified Individual for the Job?

Even assuming that Williams' depression could qualify as an ADA disability, she would still have to generate a genuine issue of material fact as to whether she was a "qualified individual with a disability" in order to defeat HealthReach's Motion for Summary Judgment. 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability " as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." Id. § 12111(8). It is the employee's burden to show that she can perform the essential functions of the job. *See E.E.O.C. v. Amego, Inc.,* 110 F.3d 135, 144 (1st Cir.1997). In the specific instance where the essential functions of the employee's job implicate the safety of others, that employee must show "that she can perform those functions in a way that does not endanger others." *Id.* (holding that a nurse's ability to perform her functions safely is governed by the "qualified individual/essential functions" prong of the ADA, and is not an affirmative defense under the "direct threat" analysis).

1. Without Accommodation

***10** From the evidence submitted, no reasonable jury could find that Williams could perform her job as a home care nurse at HealthReach without accommodation. HealthReach has put forward evidence that Williams performance deteriorated after the restructuring in 1996, evidence which Williams does not dispute. In late November of 1996, before anyone knew that Williams had depression, Crawford informed Williams that she would be terminated unless she turned around her performance in a short period of time. Following that November ultimatum, but before Williams' diagnosis, Williams provided Crawford with an inadequate plan of patient care based on a hypothetical question in a textbook. When Williams returned to work following her two-month leave, Jackie Fournier accompanied her on the job and found that she could not provide services without risking the safety of patients. Given this information, HealthReach concluded that it was no longer safe for Williams to serve as a home care nurse.[FN8] Although Williams does not contest these facts, she argues that her performance before the summer of 1996 is sufficient to show that she can perform the essential functions of the job. Williams, however, "may not rely on past performance to establish that she is a qualified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

individual without accommodation when the employer has produced undisputed evidence of diminished or deteriorated abilities." *Mole v. Buckhorn Rubber Prod., Inc.,* 165 F.3d 1212, 1217 (8th Cir.1999); *see also Soto-Ocasio v. Federal Express Corp.,* 150 F.3d 14, 18 (1st Cir.1998) (stating that it is the "plaintiff's burden to prove that, at the time she sought to resume her job, she had the ability to perform the essential functions"). Having failed to put forward evidence disputing HealthReach's conclusions about her abilities as a home care nurse after the restructuring, the Court concludes that Williams has failed to meet her burden to show that she could safely perform the essential functions of her job without accommodation.

FN8. The Court gives reasonable deference to HealthReach's conclusions about Williams' ability. Williams put forward no evidence that HealthReach's reasons for terminating her were a mere pretext to discriminate against her because of her depression. As the First Circuit has warned, "[W]here the plaintiff has presented no evidence of discriminatory intent, animus, or even pretext, we think that there should be a special sensitivity of the court becoming a super-employment committee." *Amego,* 110 F.3d at 145.

2. With Reasonable Accommodation

Even though Williams could not perform the essential functions of the job without accommodation, the Court must still inquire into whether she could perform the job with a reasonable accommodation. The ADA provides that it is discrimination for employers to not make " reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). According to the statute, reasonable accommodations may include "job restructuring; part-time or modified work schedules; [and] reassignment to a vacant position." 42 U.S.C. § 12111(9). In order to determine appropriate accommodations, the employer and the employee should engage in an "informal, interactive process." 29 C.F.R. § 1630.2(o)(3). Ultimately, "cases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties." *See Soto-Ocasio,* 150 F.3d at 20 (affirming a grant of summary judgment for the employer where the plaintiff failed to demonstrate that she could perform the essential functions of the job with or without reasonable accommodation).

***11** Even though the reasonableness of accommodations generally requires a fact-specific inquiry, this Court, like the court in *Soto-Ocasio,* concludes that no reasonable jury could determine that HealthReach failed to offer Williams a reasonable accommodation. No one doubts that HealthReach offered Williams reasonable accommodations prior to February 3, 1997. Before Williams' diagnosis on December 6, 1996, she had only complained about the stress of the job. Until that time, no one, including Williams, knew that she suffered from depression.[FN9] Upon discovering on December 9, 1996, that Williams had depression, HealthReach immediately granted Williams' request for a one-month leave. When Williams later asked that her leave be extended for a second month, her employer again complied with the request.

FN9. Even before anyone knew that Williams suffered from depression, HealthReach effectively allowed Williams to reduce her schedule to four days per week. As part of the "action plan" developed in early December, HealthReach, in order to reduce Williams' stress, proposed reducing her requirements and her schedule to three work days per week. Although the "action plan" was never implemented because Williams went out on leave and because HealthReach determined it was no longer appropriate, these actions, as well as the leave itself, demonstrate an employer who was willing to provide reasonable accommodations.

Williams argues that HealthReach denied her a reasonable accommodation when it withdrew the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

modified "action plan" upon her return from the two-month leave. The parties formulated this plan before Williams' diagnosis and subsequent leave. It was only after her diagnosis, Williams points out, that HealthReach decided to subject her to the one-day evaluation upon her return to work. Williams claims that the withdrawal of the "action plan" demonstrates that HealthReach failed to offer her a reasonable accommodation, and thus discriminated against her in violation of the ADA. [FN10]

FN10. Williams only cites one case, *Criado,* in support of her contention that she was a qualified individual if she had been offered a reasonable accommodation. *Criado,* however, is factually distinguishable. In that case, Criado, unlike Williams, was offered only a three-week leave and was fired when she failed to return to work, despite her requests for a longer leave. The Court cited testimony of Criado's doctor, who stated that if "she was given a significant leave, she could adjust to her situation and after she experimented with medication she might return to her previous level of functionality." *Criado,* 145 F.3d at 443. HealthReach granted Williams a one-month leave, and later extended it for a second month. Williams then returned to work with no medical restrictions, and neither she nor her doctors requested a reasonable accommodation. Furthermore, the only other accommodation that she claims is acceptable-the modified "action plan" for two months-is not a reasonable accommodation. *See infra* pp. 22-25.

The failure of HealthReach to institute the modified "action plan" does not mean that HealthReach failed to offer Williams a reasonable accommodation. First, the plan called on Williams to perform almost no essential functions of her job as a home care nurse. Under that plan, she would not have had her own caseload of patients, she would have performed little or no billable work, and she would not have been solely responsible for the necessary paperwork. "The ADA does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." *Feliciano v. State of Rhode Island,* 160 F.3d 780, 785 (1st Cir.1998) (citations omitted). In addition, HealthReach did not concede that performing billable work, safely maintaining one's own caseload of patients, and adequately filling out necessary paperwork were not essential functions of home care nurses when it discussed implementing the "action plan" with Williams. *Cf. Laurin v. The Providence Hospital,* 150 F.3d 52, 60-61 (1st Cir.1998) ("An employer does not concede that a job function is " non-essential" simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous.")

Second, HealthReach's decision to abandon the " action plan" came after further concerns were raised about Williams' ability to perform her job safely. These concerns grew out of Crawford's review of Williams' patient care plan on the night of December 3, 1996, when Crawford determined that Williams' assessment of the hypothetical patient was wholly inadequate. Therefore, HealthReach decided that it was essential to assess Williams' ability to perform her job as soon as possible.[FN11] When Jackie Fournier reviewed Williams' performance upon her return to work on February 3, 1997, she confirmed Crawford's concerns that Williams' work as a home care nurse threatened patient safety. These concerns led HealthReach to terminate Williams' position as a home care nurse.

FN11. Williams returned to work under no medical restrictions, and neither Williams nor her doctors requested any form of accommodation at that time. Under these circumstances, it was reasonable for HealthReach to conduct an evaluation of Williams immediately upon her return to work. Williams argues that she returned to work under the presumption that she would be working under the "action plan," not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

under a one-day evaluation. Therefore, given her presumption, she contends that she should not have had to request any accommodation upon her return to work. However, the ADA, as discussed below, does not require an employer to either provide an employee an accommodation of the employee's choice, *see infra* pp. 25-26, or make an accommodation by foregoing the essential functions of the job.

***12** Third, HealthReach did offer Williams various reasonable accommodations in addition to the two months of leave. HealthReach did not terminate Williams' employment altogether. Instead, on the day HealthReach terminated her from her position as a home care nurse, it offered her either a per diem position in long-term care or a severance package. When Williams failed to respond to these proposals, HealthReach offered her a position in long-term care, which provided the same pay, hours, and benefits as her home care position. Although reassignment is not the most preferable form of accommodation,[FN12] it is certainly a reasonable one where the employee could no longer perform the essential functions of the job with or without reasonable accommodation. *See Dalton v. Subaru-Isuzu Automotive, Inc.,* 141 F.3d 667, 677 (7th Cir.1998) ( "It is well established that under the ADA, the employer's duty reasonably to accommodate a disabled employee includes reassignment of the employee to a vacant position for which she is qualified. The option of reassignment is particularly important when the employee is unable to perform the essential functions of his or her current job, either with or without accommodation or when accommodation would pose an undue hardship for the employer.") (citations omitted). Indeed, the ADA itself provides that reasonable accommodations "may include ... reassignment to a vacant position." 42 U.S.C. § 12111(9). Therefore, the Court concludes that, given the evidence that Williams could no longer perform the essential functions of her home care job with a reasonable accommodation, HealthReach's offer to Williams to work in long-term care was a reasonable accommodation.

FN12. The EEOC provides in its enforcement guidance on reasonable accommodation that "[b]efore considering reassignment as a reasonable accommodation, employers should first consider those accommodations that would enable an employee to remain in his/her current position. Reassignment is the reasonable accommodation of last resort and is required only after it has been determined that: (1) there are no effective accommodations that will enable the employee to perform the essential functions of his/her current position...." Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (dated March 1, 1999) <http://www.eeoc.gov/docs/accommodation.html>.

Having determined that HealthReach offered Williams a reasonable accommodation,[FN13] HealthReach cannot be held liable under the ADA. The EEOC interpretive guidance on the ADA provides that the employer is not required to provide the best possible accommodation, or the accommodation that the employee requests. 29 C.F.R.App. § 1630.9. The employer has the " ultimate discretion to choose between effective accommodations." *Id.* A "plaintiff's refusal to accept available reasonable accommodations precludes her from arguing that other accommodations should have been provided." *Hankins v. The Gap, Inc.,* 84 F.3d 797, 802 (6th Cir.1996).

FN13. Even assuming that the accommodations that HealthReach offered Williams were not reasonable, HealthReach would still not be liable under the ADA. EEOC regulations envision an interactive and informal process between employers and employees as necessary for the parties to arrive at a reasonable accommodation. If the employer is responsible for the breakdown of this process, the employer violates the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ADA; if the employee is responsible for the breakdown, the employer is not liable for failing to provide a reasonable accommodation. *See, e.g., Loulseged v. Akzo Nobel, Inc.,* 178 F.3d 731, 736 (5th Cir.1999); *Templeton v. Neodata Servs., Inc.,* 162 F.3d 617, 619 (10th Cir.1998); *Beck v. University of Wisconsin Board of Regents,* 75 F.3d 1130, 1135 (7th Cir.1997) . "Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Beck,* 75 F.3d at 1135.

Other than rejecting the reassignment as a " demotion," Williams did not respond in any other way to HealthReach's proposed accommodations. Therefore, the Court determines that Williams is responsible for the breakdown of this informal and interactive process, and HealthReach cannot be held liable under the ADA for failing to provide Williams with a reasonable accommodation. *See Gerdes v. Swift-Eckrich, Inc.,* 949 F.Supp. 1386, 1405 (N.D.Iowa 1996) ("The question of who bears the responsibility for breakdown of the interactive process is one that may be decided on a motion for summary judgment.") (citation omitted).

In summation, the Court concludes that a reasonable jury could not find that Williams has a disability under the ADA. In addition, even assuming that Williams did have an ADA disability, the Court determines that no reasonable jury could find that Williams was qualified for the position of home care nurse, with or without accommodation. Finally, the Court concludes as a matter of law that HealthReach offered Williams a reasonable accommodation. With these conclusions, the Court finds as a matter of law that HealthReach did not discriminate against Williams in violation of the ADA.

II. The Negligent and Intentional Infliction of Emotional Distress Claims

*13 Both of Williams' claims for infliction of emotional distress are barred by the immunity and exclusivity provisions of the Maine Workers' Compensation Act ("the Act"). *See* 39-A M.R.S.A. §§ 104, 408.[FN14] State and federal courts applying these provisions to claims for intentional and negligent infliction of emotional distress have determined that such claims are barred when they arise out of and in the course of employment. *See Reed v. Avian Farms, Inc.,* 941 F.Supp. 10, 14 (D.Me.1996) ("Common law tort claims such as intentional infliction of emotional distress fall within the exclusivity and immunity provisions of the Act."); *Caldwell v. Federal Express Corp.,* 908 F.Supp. 29, 34 (D.Me.1995) (barring plaintiff's claims for emotional distress to the extent that those claims arose out of and in the course of employment); *Li v. C.N. Brown Co.,* 645 A.2d 606, 608 (Me.1994) (holding that intentional torts fall within the exclusivity and immunity provisions of the Act); *Knox v. Combined Ins. Co. of America,* 542 A.2d 363, 365-66 (Me.1998) (holding that claims of intentional or negligent infliction for emotional distress arising from sexual harassment and assault fall under the Act). Since it is undisputed that HealthReach has secured payment of workers' compensation benefits in accordance with Maine law, and since Williams' claims clearly arise out of and in the course of her employment with HealthReach, the Court concludes that Williams' claims for intentional and negligent infliction of emotional distress are barred by the Maine Workers' Compensation Act.

FN14. These two provisions state that:
[a]n employer who has secured the payment of compensation in conformity with sections 401 to 407 is exempt from civil actions, either at common law or under sections 901 to 908; Title 14, sections 8101 to 8118; and Title 18-A, section 2-804, involving personal injuries sustained by an employee arising out of and in the course of employment....
39-A M.R.S.A. § 104. The Act goes on to state that:
an employee of an employer who has secured the payment of compensation as provided ... is deemed to have waived the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> employee's right of action at common law .. . to recover damages for the injuries sustained by the employee.
> *Id.* at § 408.

CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Reconsideration of Decision on Motion to Amend is DENIED. Defendant's Motion for Summary Judgment on all claims is GRANTED.

*SO ORDERED.*

D.Me.,2000.
Williams v. HealthReach Network
Not Reported in F.Supp.2d, 2000 WL 760742 (D.Me.), 18 NDLR P 197

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.