**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ROSEZOLA SELLERS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C. A. No. 05-381S** |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF DEFENSE AND ROBERT M. GATES,** | ) | |
| **SECRETARY OF THE DEPARTMENT** | ) | |
| **OF DEFENSE,** | ) | |
| **Defendants.** | | |

**DEFENDANTS' CORRECTED MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, United States Department of Defense and Robert M. Gates, Secretary of the Department of Defense, through undersigned counsel, and submit this Corrected Memorandum in Support of their Motion for Summary Judgment.

## I. Introduction

Plaintiff Rosezola Sellers is a former Commissary Management Specialist ("CAO") Trainee for the Defense Commissary Agency ("DeCA") in Newport, Rhode Island. Plaintiff contends that she was discriminated against and harassed on the basis of race and that she was retaliated against because she engaged in protected activities. Plaintiff brings her claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Plaintiff maintains that she was discriminated against and harassed based on her race with respect to promotions, pay, work hours, time off, and work assignments. (Amended Compl. ¶ 11.) Plaintiff also asserts that she was subjected to retaliation after complaining about harassment and discrimination when Defendants disciplined her for no legitimate reason. (Amended Compl. ¶¶ 12-13 .) Plaintiff seeks compensatory and punitive damages, and

GOVERNMENT EXHIBIT A

attorney's fees. (Amended Compl. at 3.) Notably, Plaintiff's Complaint does not identify the names of the alleged employees who discriminated and/or retaliated against her or the time frames for the alleged employment actions which give rise to her claims. However, Plaintiff's Equal Employment Opportunity ("EEO") complaint filed at the administrative level alleged race discrimination and retaliation claims concerning Plaintiff's denial of annual leave, denial of a request for restoration of leave, a Letter of Reprimand issued in February 2004, and her change in work schedule in December 2004.

Plaintiff's claims of race discrimination, harassment based on her race, and retaliation for engaging in protected activities are without merit and summary judgment should be granted in its entirety. First, Plaintiff failed to exhaust her claims of denial of her application of annual leave submitted in July 2003, her denial of promotion/pay, and her fourteen-day suspension issued in April 2005. Second, with respect to the claims alleged in her EEO complaint concerning the denial of her annual leave application submitted in November 2003, denial of her request for restoration of leave submitted in March 2004, a Letter of Reprimand issued in February 2004, and her change in work schedule in December 2004, Plaintiff cannot establish her prima facie case for any of these claims. Third, with respect to her hostile work environment claim, Plaintiff cannot meet the burden of her establishing her prima case. Finally, even assuming that she has established her prima facie case for all these claims, Plaintiff cannot demonstrate that Defendants' legitimate non-discriminatory reasons are pretext and that Defendants intentionally discriminated against her because of her race and/or for engaging in EEO activity.

## II. Facts and Procedural History

Plaintiff, a black employee, was a Commissary Specialist Management ("CAO") trainee

at DeCA. (Amended Compl. ¶ 8-9.) The Defense Commissary Agency is an independent Agency within the Department of Defense that operates a worldwide chain of commissary stores. (Ex. 1, DeSantis Decl. ¶ 3.) The Defense Commissary Agency provides groceries to military personnel, retirees and their families through their stores. (Ex. 1, DeSantis Decl. ¶ 3.) John Blythe, Mary Gibson, and Stephen Furtado were Plaintiff's supervisors at the Newport Commissary whom Plaintiff claims discriminated, harassed, and retaliated against her. (Ex. 2, Pl. Dep. 19:3-20:22.) Plaintiff also claims that William McCollum and Mary Bucolo, who were her co-workers, harassed her. (Ex. 2, Pl. Dep. 19:3-20:22.)

Plaintiff began working as a Laborer for the Navy Branch Commissary Store in Newport, Rhode Island in 1988.[1] (Ex. 1a at D-0370.) Sometime thereafter, she went to work at the Commissary Store in New London, Connecticut. ( Ex. 2, Pl. Dep. 8:13-18.) In 1993, Plaintiff was reassigned to the Newport Commissary. (Ex. 1a at D-0275.) In 1994, Blythe became the Store Director at the Newport Commissary. (Ex. 3, Blythe Decl. ¶ 2.)

In 1997, Plaintiff was promoted to Store Worker. (Ex. 1a at D-0325.) In 2000, Steve Furtado became the Store Administrator at the Newport Commissary. (Ex. 4, Furtado Decl. ¶ 1; Ex. 5 at D-0152.)

### A. Plaintiff's Promotion To CAO Position

In 2003, Plaintiff applied for and was selected above two other applicants for the CAO

---

[1] Prior to 1990, each of the armed services ran its own Commissaries. See http://www.commissaries.com/history.cfm. The Defense Commissary Agency, under the Department of Defense, was established on May 15, 1990. See http://www.commissaries.com/history.cfm. After a transition period, DeCA then assumed full control of all commissaries on October 1, 1991. See http://www.commissaries.com/history.cfm.

position.[2] (Ex. 3, Blythe Decl. at ¶ 3; Ex. 1a at D-0256-57.) Both Blythe and Furtado believed that Plaintiff was the best candidate for the CAO position at the time. (Ex. 3, Blythe Decl. ¶ 3; Ex. 4 , Furtado Decl. ¶ 2.) Plaintiff was chosen for the position over Mary Bucolo, a white employee (Ex. 9; Bucolo Decl. ¶ 3) who also applied for the job (Ex.10, Bucolo Dep. 166:15-20). At the time Plaintiff was selected for the CAO position, Blythe was aware that Plaintiff had previously engaged in EEO activity, as he had been previously contacted by an EEO representative a few years prior. (See Ex. 11.) Plaintiff's promotion to CAO became effective September 9, 2003. (Ex. 1a at D-0303.) While Plaintiff was a CAO, Plaintiff was an active member of the collective bargaining unit. (Ex. 2, Pl. Dep. 43:6-7.)

**B. Annual Leave**

On July 11, 2003, Plaintiff submitted three applications for leave. (Ex. 1b at D-0189.) On the first application for leave, Plaintiff sought annual leave for August 7 and 8, 2003. (Ex. 1b at D-0189.) On the second application for leave, Plaintiff sought annual leave for August 28 and 29, 2003. (Ex. 1b at D-0189.) On the third application for leave, Plaintiff sought annual leave for August 31, 2003. (Ex. 1b at D-0189.) On July 13, 2003, Furtado advised Ms. Sellers that she needed to submit a leave planner which was required by the Master Labor Agreement. (Ex. 4, Furtado Decl. ¶ 6; see also Ex. 15 at 30-31.) Indeed, Plaintiff was well aware of the requirement that she submit an annual leave planner as evidenced by the fact that she submitted a leave planner every year in her fourteen-year career until 2003. (Ex. 2, Pl. Dep. 26:11-16.)

---

[2] Defendants' Exhibit 1b, an organizational chart for December 2003, shows the structure of the Newport Commissary. (Ex. 1b at D-0161.) The chart demonstrates Mary Gibson was Plaintiff's supervisor, Stephen Furtado was Plaintiff's second-line supervisor, and John Blythe was Plaintiff's third-line supervisor. (Ex. 1b at D-061.)

Pursuant to the Master Labor Agreement which governs collective bargaining unit employees, such as Plaintiff, submission of annual leave planners are required of all employees. (Ex. 15 at 30-31.) Specifically, Article 22, Section 2, of the Master Labor Agreement, entitled, "Annual Leave Planners," provides:

> Employees will submit their annual leave plan on DeCA Form 30-14 by 1 February of each year to identify employees' annual leave plans. The plan will be reviewed and a decision regarding the planner will be returned to the employee by 1 March. It is understood that the annual leave plan does not constitute final approval of annual leave, but supervisors will make reasonable efforts to accommodate employees' vacation decisions consistent with workload and staffing needs. Seniority based on SCD-Leave will be used when a conflict occurs. Annual leave planner provisions in effect will stay in effect unless changed through local negotiations. Once an employee has made the selection, he/she shall not be permitted to change the selection if such action infringes upon the choice of another employee.

(Ex. 15 at 30-31.)

On July 14, 2003, Blythe wrote a note to Plaintiff that stated:

> I am still waiting for your required leave planner. I will not approve any leave requests until the planner is submitted. All employees are required to do this.

(Ex. 1b at D-0185.) Accordingly, Blythe denied all three applications for annual leave because Plaintiff had not submitted a leave planner. (Ex. 1b at D-0189.) On July 15, 2003, Furtado directed Plaintiff to submit her annual leave planner by July 22, 2003. (Ex. 4 , Furtado Decl. ¶ 6-7; Ex. 4e.) In a written memorandum dated July 17, 2003, Blythe instructed Plaintiff and four other employees who also had not yet submitted a leave planner, to submit a leave planner by July 22, 2003. (Ex. 1b at D-0187.) The July 17, 2003, memorandum stated:

> At a meeting I held with all department managers in January, I discussed the requirement for all employees to submit an annual leave planner. If you are receiving this memorandum, I have either not received one or the leave you have annotated on the planner does not equal your use or lose balance. I cannot over emphasize the importance of you submitting the planner as instructed. Failure to comply could result in disapproval

of your request and forfeit of any unused balances at the end of the leave year. Please note no leave will be granted the week of Thanksgiving, Christmas and New Years.

Deadline for submission is July 22, 2003.

(Ex. 1b at D-0187.)

Subsequent to this instruction, the remaining four employees, with the exception of Plaintiff, submitted the required leave planners. (Ex. 13, Blythe Dep. 270:15-19.) On July 22, 2003, the date that the leave planners were due, Plaintiff indicated that, "Leave Planners was [sic] given out in June not January. Sense [sic] I am held strictly to what I put down. I don't want what happened last year to happen again." (Ex. 1b at D-0187.) Notably, Plaintiff, was the only employee at DeCA that did not submit a leave planner in 2003. (Ex. 13, Blythe Dep. 270:15-19.) Plaintiff stated in her declaration during the EEO administrative process that, "[h]e [John Blythe] was determined not to approve my leave because I did not submit a leave planner." (Ex. 14, Pl. Decl. at D-0109; see also Ex. 2, Pl. Dep. 210:1-15.)

Thereafter, in August 2003, Mary Gibson, became the Grocery Manager at the Newport Commissary (Ex. 18 at D-0144.)

After not having submitted a leave planner in accordance with the Master Labor Agreement and her supervisors' repeated instructions, Plaintiff submitted a request for annual leave on October 15, 2003, for twenty-four hours of annual leave. (Ex. 1i at D-0596.) The request sought annual leave from October 22, 2003, to October 24, 2003. (Ex. 1i at D-0596.) Plaintiff's leave request for twenty-four hours of leave was approved by Furtado on October 20, 2003, despite the fact that she had not included these dates on a leave planner. (Ex. 1i at D-0596).

On November 3, 2003, Plaintiff submitted two applications for leave. (Ex. 1b at D-0190.) The first application for leave sought annual leave for November 14-15, 2003. (Ex. 1b at D-0190.) The second application for leave sought annual leave for November 18-22, 2003. (Ex. 1b at D-0190.)

On November 4, 2003, Furtado denied Plaintiff's applications for leave for these two grouping of November dates. (Ex. 1b at D-0190.) Furtado denied the leave because there were already people on leave during these weeks.[3] (Ex. 1b at D-0190; Ex. 16, Furtado Dep. 117:22-118:4.)

On November 25, 2003, Plaintiff submitted an application for forty hours of sick leave for the dates of November 18-22, 2003. (Ex. 4a.) Furtado approved Plaintiff's request for leave that same day. (Ex. 4a.)

Although Plaintiff was denied leave for certain dates in 2003, there were many occasions on which she was approved both annual and sick leave for that year, even though she failed to include these dates on a leave planner. (Ex. 1c.) A leave audit of Plaintiff's leave in 2003 revealed that Plaintiff was approved and took 66 hours of annual leave and 129 hours of sick leave. (Ex. 1c.) Thus, Plaintiff was granted 195 hours of leave in the course of one year. (Ex. 1c.)

---

[3] William McCollum, the other CAO, was not scheduled to work on November 15, 2003, and November 22, 2003. (Ex. 1, DeSantis Decl. ¶ 5.) McCollum also had scheduled and eventually took annual leave on November 18, 2003. (Ex. 1, DeSantis Decl. ¶ 5.)

### C. Letter of Reprimand

On December 5, 2003, Gibson[4] instructed Plaintiff to go to the chill area to stock. (Ex. 1b at D-0194-95.) The chill area is the area in the store that holds boxes of cold products like cheese, butter, milk, and eggs. (Ex. 20, Gibson Decl. ¶ 5.)

At the time Plaintiff was instructed to go to the chill area to stock, Plaintiff was in the Health and Beauty Aids ("HBA") aisle placing products contained in boxes on the shelves (Ex. 2, Pl. Dep. at 47:21-22; Ex. 20, Gibson Decl. ¶ 3.) Plaintiff does not dispute that she refused to report to the chill area, admittedly. (Ex. 14 at D-0106.) Notably, Plaintiff did not like to work in the chill area. (Ex. 2, Pl. Dep. at 45:8-10.)

After Gibson instructed Plaintiff to report to chill to stock, Plaintiff told Gibson that she was not dressed to work in chill. (Ex. 1b at D-0195.) Gibson informed Plaintiff that there were two jackets hanging on the wall for her to wear. (Ex. 1b at D-0195.) Plaintiff replied that she was not wearing other people's clothes. (Ex. 1b at D-0195.) Gibson then spoke to Blythe who told her to give Plaintiff another opportunity to follow her instructions. (Ex. 1b at D-0195; Ex. 21, Gibson Dep. 73:12-16.) Gibson then instructed Plaintiff to report to chill. (Ex. 1b at D-0195; Ex. 21 Gibson Dep. 73:12-16.) Plaintiff stated to Gibson that she had an injury. (Ex. 1b at D-0194-95; Ex. 2, Pl. Dep. 49:2-3; Ex. 21, Gibson Dep. 73:12-16.)

After Plaintiff told Gibson that she had an injury, Gibson told her that there was nothing in Plaintiff's personnel file indicating any current restrictions. (Ex. 18 at D-0145, Ex. 1b at D-0195.) Gibson also told Plaintiff that she would assist Plaintiff in loading the cart so that she

---

[4] Mary Gibson was Plaintiff's first level supervisor at the time the incident giving rise to the Letter of Reprimand arose. (Ex. 18 at D-0144, Ex. 1b at D-0161.)

would not have to lift heavy objects, but Plaintiff still refused. (Ex. 18 at D-0146, Ex. 1b at D-0195; Ex. 21, Gibson Dep. 74:23-75:27.) Plaintiff became loud and told Gibson that she would not report to chill area. (Ex. 18 at D-0145-46, Ex. 1b at D-0194-95.)

The medical documentation in Plaintiff's personnel file shows that the last time Plaintiff had any medical restriction was in October 2003 when she was instructed not to lift over 10 lbs. (Ex. 1b at D-0118-19.) Although in November 2003, Plaintiff's orthopedic doctor, Dr. Maher, recommended that she be out of work for one week, he did not provide any lifting restrictions upon her return to work. (Ex. 1b at D-0120.)

In addition, at the time Gibson instructed Plaintiff to work in the chill area, two jackets were available to all employees to be worn in the chill area. (Ex. 1b, at D-0195.) These jackets, that were available for use for all employees, had been worn by contractors (Ex. 2, Pl. Dep. 148:11-17), and by other DeCA employees while in the chill area (Ex. 3, Blythe Decl. ¶ 7; Ex. 20, Gibson Decl. at ¶ 6; Ex. 4, Furtado Decl. ¶ 8; Ex. 9, Bucolo Decl. ¶ 5). The employees that used these community jackets included white employees such as Blythe (Ex. 3, Blythe Decl. ¶ 7), Gibson (Ex. 20, Gibson Decl. at ¶ 6), Bucolo (Ex. 9, Bucolo Decl. ¶ 4), McCollum (Ex. 32, McCollum Decl. ¶ 3), and Nathan Fields (Ex. 4, Furtado Decl. ¶ 8).

After Plaintiff refused to report to the chill area to stock, Gibson then went to chill to stock, as it was priority. (Ex. 21, Gibson Dep. 75:19-76:3.) Gibson loaded boxes of product to a cart, cut the boxes open, and stocked the products one at a time on the shelf. (Ex. 20, Gibson Decl. ¶ 5.) The products stocked included items such as cheese, butter, milk, and eggs. (Ex. 20, Gibson Decl. ¶ 5.) When placing the product on the shelf, the heaviest item Gibson had to put on the shelf was one gallon of milk. (Ex. 20, Gibson Decl. ¶ 5.)

On February 25, 2004, Gibson issued Plaintiff received a Letter of Reprimand from Gibson based on her failure to follow instructions and disrespectful conduct. (Ex. 1b at D-0194). Gibson was not aware of Plaintiff's EEO activity at the time she issued the Letter of Reprimand on February 25, 2004. (Ex. 18 at D-0144; Ex. 20, Gibson Decl. ¶ 7.) The Letter of Reprimand stated that:

> Specifically, on December 5, 2003, I directed you to report for duty in the chill area to stock. I told you that jackets were available and that I would assist you by loading the cart with the items that you would stock. You became loud and told me that you would not report to that area. Although I repeatedly instructed you to report to the chill area, you still refused.

(Ex. 1b at D-0194.)

**D. Restoration Of Leave**

On March 4, 2004, Plaintiff submitted a request for restoration of annual leave request requesting that 99 hours of annual leave be restored from 2003 be restored. (Ex. 1b at D-0192.) The four criteria that Plaintiff was required to meet, under federal regulations, in order to have leave restored were:

(1) The restoration request covers leave in excess of 240 hours;

(2) The employee scheduled leave in writing before the beginning of pay period #24;

(3) The employee's leave was canceled for mission essential reasons; and

(4) Due to mission essential reasons, the employee's leave could not be rescheduled before the end of the leave year.

(Ex. 1b D-0192); see 5 U.S.C. § 6304(d)(1)-(2); 5 C.F.R. § 630.308(a).

For leave to be considered "schedule in writing," it be both requested and approved. See H.R. REP. No. 93-456 (1973) (attached as Ex.38) ("The committee intends that for purposes fo

complying with the 'scheduled in advance' requirement, some formal documentation will have to be furnished to show that the employee, a reasonable time before the end of the leave year, did, in fact request a certain amount of annual leave in advance, that such request was approved by the appropriate authority, and that such annual leave was lost due to the exigencies of the service or sickness of the employee."); S. REP. 93-491, at 4 (1973), reprinted in 1973 U.S.C.C.A.N. 2773, 2774 ("In the case of exigencies of public business or sickness, the leave would have to be previously scheduled and approved for the provisions of H.R. 1284 to become operative").

On Plaintiff's request for restoration of annual leave form, Furtado, checked off only two of the four criteria. (Ex. 1b at D-0192.) Furtado then recommended approval of Plaintiff's request for restoration of leave. (Ex. 1b at D-0192). However, Blythe did not sign off on the form because Plaintiff did not meet all four criteria to have her leave restored. (Ex. 13, Blythe Dep. 272:19-273:15.) Blythe found that there was no prior scheduled leave that had been canceled, that Plaintiff had time to schedule her leave, and that there was no prior scheduled leave canceled for mission essential reasons. (Ex. 13, Blythe Dep. 272:19-273:15.)

Although Furtado had originally recommended approval of Plaintiff's request for restoration of leave, he later became aware that Plaintiff did not meet the criteria to have her annual leave restored. (Ex. 17, Furtado Decl. at D-0154.) When examining Plaintiff's request for restoration of annual leave form in preparation for his deposition, Furtado realized that he had made a mistake when filling out the form:

Q. How is it that you found out that you made a mistake?

A. Looking at documents that I [sic] seen. There should have been four criteria to meet, and I [sic] didn't meet that.

(Ex. 16, Furtado Dep. 121:24-122-3.)

### E. Change in Schedule

Plaintiff's schedule prior to December 12, 2004, was from 6:00 a.m. to 2:30 p.m. (Ex. 21, Gibson Dep. 54:21-22.) In a memorandum dated December 6, 2004, Plaintiff was advised by Gibson that effective December 12, 2004, her work schedule would be Monday through Friday, 10:00 a.m. to 6:30 p.m. (Ex. 1b at D-0112.) Blythe told Plaintiff that her schedule was being changed because there were afternoon functions that had to be completed in CAO. (Ex. 24 at D-0140; see also Ex. 3, Blythe Decl. at ¶ 6; Ex. 13, Blythe Dep. 266:15-16.) In a an e-mail dated December 13, 2004, to DeCA Zone Manager Richard Cook, Blythe specifically noted that he needed to know whether or not Plaintiff could do the afternoon functions of her job before he could promote her. (Ex. 3a; Ex. 3, Blythe Decl. at ¶ 6.) Plaintiff's schedule was changed back to 6:00 a.m. to 2:30 p.m. on January 16, 2005. (Ex. 1b at D-0127.)

Plaintiff's position description provides that CAOs "[m]ay work uncommon tours of duty as required to meet demands of effective mission accomplishment." (Ex. 1b at D-0181.) Further, the Performance Plan, Element 2SA, for the CAO position indicates that, "[u]tilizing morning and afternoon checklist [sic] provide an accurate daily assessment of all components of the Computer Assisted Ordering System." (Ex. 25 at 240.) In addition, the Training Plan for Computer Assisted Ordering (CAO), states:

> Stores that have two CAOS assigned should provide overlap coverage using a work schedule for these general time frames (0600 hours through 1500 hours or 1000 hours through 1900 hours). At locations with two CAOS assigned, a later schedule when the store is not open for business, is the preferred arrangement, especially when CAO is first deployed to reduce/work down overwrites in the backroom.

(Ex. 1d at 32). In addition, the Training Plan provides "a 'model' task list that identified CAO

processing that will occur throughout the day and when the store operational tasks should be accomplished to use the system most effectively." (Ex. 1d at 33. ) These tasks included tasks between the hours of 10:00 a.m. to 6:30 p.m. (Ex. 1d at 33-38.)

### F. Administrative EEO Complaints

#### 1. Plaintiff's Prior EEO Activity: Her First EEO Complaint Filed On or About Around May 7, 2001

On or about May 7, 2001, Plaintiff filed her first EEO complaint. (Ex. 6.) In this EEO complaint, Plaintiff alleged that she was discriminated on the basis of race (African American) and disability (Stomach Ulcers) "in that she was subjected to harassment when she was continuously switched from work assignment to work assignment; she was continuously assigned unfavorable assignments that required work in the freezer (without a coat) and heavy lifting (without a back brace); she was assigned to work nights, 3:00 pm to 11:30 pm or 6:00 pm to 2:00 am while others were not; and she was denied use of annual leave on April 24, 2001." (Ex. 7.) On May 21, 2003, Administrative Judge Berry issued a decision finding no discrimination. (Ex. 7.) This decision was sent to Plaintiff and Steven John Coaty, Esq., Plaintiff's counsel, who was representing her at that time. (Ex. 7 at P-0140.) This decision was not appealed, and the time period for appealing this decision has long passed. (Ex. 8, Andrade Decl. ¶ 4.)

#### 2. Plaintiff's Second EEO Complaint Which Is The Subject Of This Case

On December 18, 2003, Plaintiff contacted an EEO counselor with respect to her the denial of her annual leave applications by Blythe on July 14, 2003 and by Furtado on November 4, 2003. (Ex. 1b at D-0064, D-0071; Ex. 2, Pl. Dep. 35:22-36:5.) On February 26, 2004, Plaintiff contacted an EEO counselor concerning the Letter of Reprimand issued to her on

February 25, 2004. (Ex. 1b at D-0074, D–0064.) On or about April 14, 2004, Plaintiff filed her second EEO complaint which is the subject of this case. (Ex. 12.)

In a letter dated June 22, 2004, Plaintiff's claims were defined as follows:

a. Whether the complainant was discriminated against based on her race (Black) and reprisal (prior EEO activity) when, from July 14, 2003 to November 4, 2003, the Commissary Officer, Mr. John Blythe, Sr., denied her requests for annual leave on the following dates: August 7, 8, 28, 29, and 31, 2003 (40 hours) and November 14, and 18-22, 2003 (56 hours)?

b. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on February 25, 2004, her supervisor, Ms. Mary Gibson, issued her a Letter of Reprimand for failure to follow instructions and disrespectful behavior?

c. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on or about March 4, 2004, the Commissary Officer, Mr. John Blythe, Sr., disapproved her Request for Restoration of Annual Leave (96 hours)?

(Ex. 1b at D-0096.) Plaintiff was instructed that, "[i]f you believe the issues in your complaint is [sic] not correctly defined, please notify me, in writing, within 5 calendar days after you receive this letter, and specify why you believe the issues are not correctly defined. If you fail to contact me, I will conclude you agree that the issues are properly defined." (Ex. 1b at D-0096.)

At no time did Plaintiff disagree that these were the defined issues in the EEO complaint, nor did she seek to amend her EEO complaint to include claims relating to promotions and pay. The only time Plaintiff did seek to amend her EEO complaint, was to add a claim with respect to "[w]hether the complainant was discriminated against based on reprisal (prior EEO activity) when, on December 13, 2004 her duty hours and work assignments were abruptly changed with no explanation?" (Ex. 1b at D-0099.)

On June 10, 2005, DeCA issued a final agency decision was issued finding no

discrimination based on race or retaliation regarding the EEO complaint which is the subject of this case. (Ex. 1b at D-0236.)

### G. Plaintiff's District Court Case

On September 2, 2005, Plaintiff, Rosezola Sellers filed her Complaint with this Court. The Complaint alleged harassment and discrimination in that Plaintiff was treated differently than similarly-situated white employees with respect to promotions, pay, work hours, time off, and work assignments. (Compl. ¶ 11.) The Complaint also alleged retaliation in connection with discipline that Plaintiff received. (Compl. ¶ 12-13.) Subsequent to the Complaint being filed, on or about December 10, 2005, Plaintiff was removed from her employment with the Defense Commissary. Ex. 1j. On January 25, 2006, Plaintiff filed her First Amended Complaint. The First Amended Complaint did not allege any claims relating to her termination from employment, but rather removed previous counts that inappropriately alleged claims under the Civil Rights Act, 42 U.S.C. § 1981. (See Compl.; First Amended Compl.)

Discovery closed on August 15, 2007. On August 16, 2007, a day after the discovery deadline had passed and four months after Defendants had hand-delivered their responses to Plaintiff's discovery requests, Plaintiff's co-counsel, Louise Herman, called the undersigned to discuss Defendants' responses to Plaintiff's discovery. Plaintiff then did not move to compel discovery until August 24, 2007, after the discovery deadline had passed. Defendants filed a response to Plaintiff's motions to compel discovery on September 10, 2007.

In addition, on August 20, 2007, also after the discovery deadline had passed, Plaintiff filed a Motion to Amend Complaint. On August 21, 2007, Plaintiff filed an Amended Motion to

Amend Complaint.[5] On August 28, 2007, Plaintiff filed her Second Amended Motion to Amend Complaint.[6] Plaintiff sought to amend her First Amended Complaint to include claims relating to her December 2005 termination. On August 31, 2007, Defendants filed a response to Plaintiff's Second Amended Motion to Amend Complaint.

On November 2, 2007, United States Magistrate Judge David L. Martin, held a hearing on Plaintiff's motions to compel discovery and Plaintiff's motions to amend her Complaint. At the hearing, Judge Martin denied Plaintiff's Motion to Amend Complaint and Amended Motion to Amend Complaint as moot. (Mem. and Order dated Nov. 9, 2007.) On November 9, 2007, Judge Martin issued a Memorandum and Order Denying Plaintiff's Motions to Amend And to Compel. (Mem. and Order dated Nov. 9, 2007.) On November 27, 2007, Plaintiff filed Plaintiff's Objection to Report and Recommendation of Magistrate Judge Dated November 9, 2007.[7]

## III. Argument

### A. Summary Judgment Standard

Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[5] Plaintiff's original Motion to Amend Complaint had not been accompanied by the proposed amended pleading as required by District of Rhode Island Local Rule 15.

[6] Plaintiff's Second Amended Motion to Amend Complaint references and includes as an exhibit, the Final Agency Decision addressing Plaintiff's termination claim.

[7] The due date for filing a response to Plaintiff's Objection to Report and Recommendation of Magistrate Judge, is December 11, 2007.

matter of law." Fed. R. Civ. P. 56(c). Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party may not simply sit back and rest on the allegations in her complaint, but instead must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted).

**B. Title VII Burden Shifting Framework**

Plaintiff lacks direct evidence of discrimination. Accordingly, in evaluating her claims of discrimination, the Court applies the now long-familiar burden-shifting analysis framework articulated in McDonnell-Douglas-Burdine-Hicks. See Dominguez-Cruz v. Suttle Caribe Inc., 202 F.3d 424, 429 (1st Cir. 2000).

In a Title VII employment discrimination case, the plaintiff "carr[ies] the initial burden... of establishing a prima facie case of...discrimination." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If Plaintiff succeeds in making out her prima facie case, a presumption arises that Defendants unlawfully discriminated against her and the burden of production shifts to Defendants to produce evidence indicating that it took its employment action for legitimate, nondiscriminatory reasons. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Burdine, 450 U.S. at 254.

If Defendants carry this rather slight burden, the presumption created by Plaintiff's prima facie showing "drops out of the picture" entirely and the burden of production returns to Plaintiff to show that Defendants' tendered reason is pretextual, or a "coverup" for discrimination. Hicks, 509 U.S. at 510-11. It is at this third step in the burden-shifting analysis that the

McDonnell-Douglas framework "falls by the wayside." Mesnick v. General Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991). "The plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Feliciano dela Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5-6 (1st Cir. 2000) (quoting Burdine, 450 U.S. at 256). In so doing, Plaintiff must produce evidence that: (1) Defendants' articulated reason for the adverse employment action is a pretext; and (2) the true reason is discrimination. See Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999).

### C. All Claims Against Defendant United States Department of Defense Should Be Dismissed Because the United States Department of Defense Is Not a Proper Defendant

The law is clear that the only appropriate defendant in an employment discrimination action brought pursuant to Title VII against the federal government or any of its instrumentalities is the head of the agency in which the allegedly discriminatory acts occurred. 42 U.S.C. § 2000e-16(c); see also Soto v. U.S. Postal Service, 905 F.2d 537, 539 (1st Cir. 1990); Mahoney v. U.S. Postal Service, 884 F.2d 1194, 1196 (9th Cir. 1989). Thus, the only proper defendant in this case is Robert M. Gates, Secretary of the United States Department of Defense. Accordingly, Plaintiff's claims against the Defendant United States Department of Defense should be dismissed. See Morales v. Mineta, 220 F.Supp.2d 88, 91 (D.P.R. 2002) (dismissing Title VII claims against United States Department of Transportation and United States Coast Guard because the Secretary of United States Department of Transportation was the correct Defendant in Title VII action).

**D. Summary Judgement Is Appropriate On Plaintiff's Claims That She Failed to Administratively Exhaust Which is Prerequisite to Filing a Federal Action**

**1. Summary Judgment is Appropriate Because Plaintiff Failed to Exhaust Her Administrative Remedies as to Her Claim Regarding the Denial of Her Leave Request on July 14, 2003, in Which She Sought Leave for the Dates of August 7, 8, 29, and 31, 2003**

A federal employee alleging employment discrimination must exhaust administrative remedies before bringing a court action. Brown v. General Servs. Admin., 425 U.S. 820, 832 (1976); Velazquez-Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000); Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990); Roman-Martinez v. Runyon, 100 F.3d 213, 219 (1st Cir. 1996). In order to exhaust her administrative remedies, a plaintiff must contact an EEO counselor within 45 days of the allegedly discriminatory incident. 29 C.F.R. § 1614.105(a)(1); Danzig, 234 F.3d at 794. Failure to do so bars a plaintiff from bringing a court action based on that incident. Danzig, 234 F.3d at 794 (summary judgment appropriate where there is failure to exhaust administrative remedies); Jensen, 912 F.2d at 520 (affirming summary judgment where federal employee filing Title VII action failed to timely contact EEO counselor); Machado v. Frank, 767 F.Supp. 416, 419 (D.R.I. 1991) ("Failure to contact an EEO counselor within the allotted time period bars a civil action based on that event").

In order to claim relief for discrimination related to the denial of her leave request in which she requested leave for the dates of August 7, 8, 29, and 31, 2004, Plaintiff would have had to initiate contact with an EEO counselor within 45 days of July 14, 2003, the date on which her leave request for these August dates were denied. (See Ex. 1b at D-0189.) Thus, Plaintiff was required to contact an EEO counselor by August 28, 2003. In this case, Plaintiff did not contact an EEO counselor regarding her July 14, 2003, denial of leave until December 18, 2003.

(Ex. 1b at D-064.) Plaintiff admits that she did not contact an EEO counselor until the end of that year. (Ex. 2, Pl. Dep. 35:22-36:5.)

Because Plaintiff did not initiate EEO contact until December 18, 2003, claims relating to her denial of leave on July 14, 2003, are barred by her failure to exhaust administrative remedies.

**2. Summary Judgment is Appropriate Because Plaintiff Failed to Exhaust Her Administrative Remedies as to Her Claim Regarding Any Disparate Treatment with Respect to Promotions and Pay.**

In addition, Plaintiff also failed to exhaust her administrative remedies as to her disparate treatment claims with respect to promotions and pay. The EEO Counselor Intake Sheets, which Plaintiff signed and dated, shows that Plaintiff did not seek EEO counseling with respect to promotions and pay. (Ex. 1b at D-0071-76.) Rather, the February 4, 2004, Intake Sheet, shows Plaintiff sought EEO counseling with respect to the disapproval of leave. (Ex. 1b at D-0071.) The March 5, 2004, Intake Sheet, shows that Plaintiff sought EEO counseling with respect to a Letter of Reprimand issued on February 25, 2004. (Ex. 1b at D-0074.) Moreover, the EEO Counselor's Report shows that Plaintiff did not raise any claims with respect to promotions and pay. (Ex. 1b at D-0063-70.)

At Plaintiff's deposition, she could not even recall whether or not she contacted an EEO counselor with respect to these issues:

> Q. And when did you seek EEO counseling regarding the denial of the promotion?
>
> * * *
>
> A. I don't remember going because I was rejected. It was just a combination of that, plus being suspended. I think that's when all this was coming up. It was when I was suspended.
>
> Q. Did you file an EEO complaint regarding the denial of a promotion?

* * *

A. I don't recall if I did.

(Ex. 2, Pl. Dep. 21-22.)

Further, Plaintiff's claim that she was treated differently with respect to pay is duplicative of her claim that she was treated differently with respect to promotions. As demonstrated by Plaintiff's own testimony, Plaintiff's claims of promotions and pay essentially are one in the same as she stated that her denial of promotion resulted in loss of pay. (Ex. 2, Pl. Dep. 22:12-15.)

In addition, in her EEO Complaint, Plaintiff did not mention any claims with respect to promotions and pay. (Ex. 12 at D-0045.) Further, she never amended her EEO complaint to include these issues even though she had the opportunity to do so. (Ex. 1b at D-0096; Ex. 1b at D-0099.) In fact, in a letter dated June 22, 2004, Plaintiff's explanation of her claims was defined as follows:

> a. Whether the complainant was discriminated against based on her race (Black) and reprisal (prior EEO activity) when, from July 14, 2003 to November 4, 2003, the Commissary Officer, Mr. John Blythe, Sr., denied her requests for annual leave on the following dates: August 7, 8, 28, 29, and 31, 2003 (40 hours) and November 14, and 18-22, 2003 (56 hours)?
>
> b. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on February 25, 2004, her supervisor, Ms. Mary Gibson, issued her a Letter of Reprimand for failure to follow instructions and disrespectful behavior?
>
> c. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on or about March 4, 2004, the Commissary Officer, Mr. John Blythe, Sr., disapproved her Request for Restoration of Annual Leave (96 hours)?

(Ex. 1b at D-0096). Plaintiff was instructed that, "[i]f you believe the issues in your complaint is

not correctly defined, please notify me, in writing, within 5 calendar days after you receive this letter, and specify why you believe the issues are not correctly defined. If you fail to contact me, I will conclude you agree that the issues are properly defined." (Ex. 1b at D-0096.)

At no time did Plaintiff disagree that these were the defined issues in the EEO complaint, nor did she seek to amend her EEO complaint to include claims relating to promotions and pay. The only time Plaintiff did seek to amend her EEO complaint, was to add a claim with respect to "[w]hether the complainant was discriminated against based on reprisal (prior EEO activity) when, on December 13, 2004 her duty hours and work assignments were abruptly changed with no explanation?" (Ex. 1b at D-0099.) Thus, Plaintiff not only failed to seek EEO counseling with respect to promotions and pay, she also failed to include any such claims in her EEO complaint even after having an opportunity to amend her EEO complaint. See also Liggett v. Rumsfeld, No. Civ. A. 04-1363, 2005 WL 2099782, at * 8 (E.D. Va. Aug. 29, 2005) (holding that plaintiff's claim "that he was denied promotions is beyond the scope of this action because he failed to exhaust administrative remedies since he did not raise denial of promotions in his 2002 EEOC complaints") (attached as Ex. 26); O'Dwyer v. Snow, No. 00CIV8918, 2004 WL 444534, at *5 (S.D.N.Y. March 10, 2004) (finding claims relating to appraisal, failure to promote, and workload review time-barred because plaintiff failed to contact an EEO counselor within 45 days) (attached as Ex. 27).

Accordingly, Plaintiff failed to exhaust her administrative remedies with respect to any claims relating to promotions and pay and summary judgment on these issues should be granted.

**3. Summary Judgment is Appropriate Because Plaintiff Failed to Exhaust Her Administrative Remedies Through the Grievance Procedure With Respect to Her Fourteen-Day Suspension Decision Letter Issued on April 11, 2005**

"Federal law and EEOC regulations set forth special rules for discrimination claims brought by federal employees covered by collective bargaining agreements." Frasure v. Principi, 367 F.Supp.2d 245, 252 (D. Conn. 2005). The Federal Labor-Management Relations Act, 5 U.S.C.

§§ 7101-35, provides that "[a]n aggrieved employee affected by a prohibited personnel practice [including discrimination] which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both." 5 U.S.C. § 7121(d). The EEOC regulations further provide that:

> When a person is employed by an agency subject to 5 U.S.C. § 7121(d) and is covered by a collective bargaining agreement that permits allegations of discrimination to be raised in the negotiated grievance procedure, a person wishing to file a complaint or a grievance on a matter of alleged employment discrimination must elect to raise the matter under either part 1614 [Federal Sector Equal Employment regulations], or the negotiated grievance procedure, but not both.

29 C.F.R. § 1614.301(a).

This election is deemed to have been made when the employee initiates an action under the applicable statutory procedure or files a written grievance, whichever is first. 5 U.S.C. § 7121(d). Whichever procedure the employee chooses first, the election is "irrevocable." Vinieratos v. United States, Dep't of Air Force, 939 F.2d 762, 768 (9th Cir. 1991).

In this case, Plaintiff was an employee covered by a collective bargaining agreement. (Ex. 2, Pl. Dep. 43:6-14.) The negotiated grievance procedure outlined in the Master Labor Agreement allows employees to grieve "any matter related to the employment of the employee."

(Ex. 15 at 63.) Claims relating to discrimination are not excluded under this procedure. (Ex. 15 at 63.)

In fact, Plaintiff filed a grievance on April 26, 2005, concerning her fourteen-day suspension issued on April 11, 2005. (Ex. 1e-g.) Plaintiff was represented by the Union in this grievance. (Ex. 1g at D-404.) In Step 1 of the grievance procedure, her grievance was denied by Store Director John Blythe. (Ex. 1g. at D-0402.) Subsequently, the Union requested mediation but the matter was not resolved. (Ex. 1g at D-0394.) The Union then filed a Step 2 grievance which was denied by Zone Manager Richard W. Cook. (Ex. 1g at D-0394.) Thereafter, the grievance was not pursued by going to the next step which was arbitration. (Ex 1g at D-0393; Ex. 15 at 67.) Thus, despite having elected to pursue her claims connected to her suspension in the negotiated grievance procedure, Plaintiff failed to exhaust her administrative remedies as to any race or retaliation claim concerning this suspension. See Frasure, 367 F.Supp.2d at 253-54 (plaintiff failed to exhaust administrative remedies available to her under collective bargaining agreement); Stuart v. General Motors Corp., 217 F.3d 621, 631 (8th Cir. 2000) ("Because her claim of retaliation with respect to the disciplinary actions is not administratively exhausted, the Court will not address the merits of Stuart's claim of retaliation by discipline").

Additionally, Plaintiff never argued on her grievance form that the discipline imposed was due to race or retaliation. (Ex. 1g at D-404.) Accordingly, Plaintiff failed to exhaust her administrative remedies as to any race or retaliation claim concerning this suspension. See Redmon v. Mineta, No. 06-5272, 2007 WL 1837134, at *4-5 (6th Cir. June 25, 2007) (plaintiff failed to exhaust administrative remedies where plaintiff did not raise her Title VII claims in the union grievance procedure) (attached as Ex. 28).

**D. Summary Judgment Should Be Granted Because Plaintiff Cannot Establish Race Discrimination In Count I**

Plaintiff may establish a prima facie case of race discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was performing satisfactorily so as to meet the employer's legitimate job-performance expectations; (3) she suffered some adverse action at the hands of her employer; and (4) she was treated less favorably than someone outside her protected class. See Ashley v. Paramount Hotel Group, Inc., 451 F.Supp.2d 319, 330 (D.R.I. 2006).

"Adverse action" is a term of art under federal employment statutes. In the discrimination context, an employee is subjected to an adverse action when she suffers some personal loss or harm with respect to "a term, condition, or privilege of employment." Randlett v. Shalala, 118 F.3d 857, 861-62 (1st Cir. 1997); see Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996); Connell v. Bank of Boston, 924 F.2d 1169, 1179 (1st Cir. 1991); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). An adverse employment action need not rise to the level of a discharge to be actionable. Connell, 924 F.2d at 1179. It must, however, at a minimum, impair or potentially impair the plaintiff's employment in some cognizable manner. Nelson v. Upsala College, 51 F.3d 383, 387 (3d Cir. 1995).

The Plaintiffs must demonstrate a cognizable injury of some kind. "While it is true that [an] 'adverse employment action' need not always be discharge, demotion, or failure to promote'. . . not every unpleasant matter. . . creates a cause of action." Alba v. Upjohn Co., Inc., 1997 WL 136334, at *5 (D. Mass. Feb. 21, 1997); Montandon v. Farmland Industries, Inc., 116 F.3d 355, 359 (8th Cir. 1997) ( "Not everything that makes an employee unhappy is an actionable adverse action."). As the First Circuit held in Blackie:

> Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

Blackie, 75 F.3d at 725.

Determining whether a particular action is materially adverse requires a case-by-case inquiry. Simas v. First Citizens' Federal Credit Union, 170 F.3d 37, 49 (1st Cir. 1999). The question of whether the employer took a materially adverse employment action must be judged on an objective basis. Suarez v. Pueblo Intern., Inc., 229 F.3d 49, 55-56 (1st Cir. 2000); Blackie, 75 F.3d at 726; Doe v. DeKalb County School Dist., 145 F.3d 1441, 1448-49 (11th Cir. 1998). As the First Circuit stated in Blackie:

> Workplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act does not elevate that act or omission to the level of a materially adverse employment action.

Blackie, 75 F.3d at 725.

**1. Plaintiff Cannot Show That She Was Treated Less Favorably Than Similarly-Situated Non-Black Employees As To Prove Her Prima Facie Case.**

In order to make her prima facie of race discrimination, Plaintiff must show that she was treated less favorably than similarly situated non-black employees. To be similarly situated, the employee must be out of her protected class with whom Plaintiff compares herself must be similarly situated in all material aspects. See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996). Plaintiff offers only her speculation that her denial of annual leave, her denial of restoration of leave, the Letter of Reprimand issued in February 2003, and her change in

work schedule in December 2004, were somehow racially-driven.

**a. Annual Leave**

Plaintiff cannot show that she was treated less favorably than those outside of her protected class when, in fact, all employees were required to submit leave planners. (Ex. 15 at 30.) Plaintiff admits that she was told by Blythe that "we had to submit our dates by a certain time." (Ex 31 at 33.) However, plaintiff was the only employee that failed to submit a leave planner as required. (Ex. 13, Blythe Dep. 270:15-19.)

Moreover, Plaintiff cannot show that she was treated less favorably in terms of being denied annual leave than those outside of her protected class of being black. William McCollum, a white employee, had previously been denied leave because another employee was already scheduled for leave for the dates that he requested. Notably, his leave request was denied because of Plaintiff's scheduled leave which was on her annual leave planner. (Ex. 30, McCollum Dep. II 56:5-9; see also Ex. 29, McCollum Dep.I: 27:4-28:17.)

**b. Restoration of Leave**

While Plaintiff alleges that Furtado discriminated against her with respect to her request for restoration of leave (Ex. 2, Pl. Dep. 68:16-18), Plaintiff freely admits that he is the one who actually recommended that her leave be restored:

> Q. Did Steve first approach you regarding this restoration of annual leave, or did you approach him first?
>
> A. I knew nothing about it. He paged me to his office.
>
> Q. So, he's the one who informed you that you could get your leave back?
>
> A. Yes.

(Ex. 2, Pl. Dep. 208:4-11).

In addition, Plaintiff cannot point to competent evidence of similarly-situated employees outside of her protected class that were treated more favorably with respect to restoration of leave. Furtado has never recommended, nor denied approval of a request for annual leave other than for the Plaintiff. (Ex 16, Furtado Dep. 123:20-22.)

**c. Letter of Reprimand Issued February 25, 2004**

Plaintiff also cannot establish that she was treated less favorably than others outside of her race in connection with the Letter of Reprimand issued to her on February 25, 2004. Plaintiff cannot point to any non-black employees supervised by Gibson who flatly refused after repeated instructions to work in the chill area.

**d. Change in Schedule on December 12, 2004**

Plaintiff cannot establish that she was treated differently than those outside of her protected class with regard to her schedule change on December 12, 2004. On the contrary, both McCollum and Bucolo had their work schedules changed numerous times in the CAO position. (Ex. 9, Bucolo Decl. ¶ 4; Ex. 32, McCollum Decl. ¶ 2.) When Bucolo began as a CAO, she worked afternoon hours. (Ex. 29, McCollum Dep. I 187:17-188:1; Ex. 9, Bucolo Decl. ¶ 4.)

**2. Plaintiff Cannot Establish That She Suffered An Adverse Action To Prove Her Prima Facie Case of Race Discrimination With Regard To Her Denial of Leave and Denial of the Request for the Restoration of That Leave**

Given Plaintiff's failure to schedule her leave earlier and in the context of her leave record[8] showing numerous times where she had been in fact granted annual leave, Plaintiff's

---

[8] In a prior EEO complaint, Plaintiff also alleged that she was wrongfully denied annual leave in 2001. As noted by the Administrative Judge in that decision, "[T]he record shows that

denial of leave in this case does not constitute an adverse action. Box v. Principi, 442 F.3d 692, 697 (8th Cir. 2006) (holding that plaintiff's claim regarding her denial of annual leave "fall[s] short of showing an adverse employment action"); Allen v. Potter, 115 Fed. Appx. 854, 861 (7th Cir. 2004) ("When the several denials of leave are considered in the context of Ms. Allen's entire leave record, the four denials in 1991 and the one denial in each of the other years . . . cannot be said to be anything more than 'a mere inconvenience'"); Pitchford v. Potter, No. 3:03CV00374, 2007 WL 1020467, at *10 (E.D. Ark. March 30, 2007) (finding that "[a] reasonable person in the plaintiff's position would have scheduled his leave earlier and avoided any harm. But for the plaintiff's inaction, there would have been no denial of leave") (attached as Ex. 33); Mihalko v. Potter, Civil Action No. 00-2076, 2003 WL 23319594, at *6 (W.D. Pa. 2003) (plaintiff's allegations that he was denied leave "construed in the favorable light to the Plaintiff- simply do not constitute adverse employment actions") (attached as Ex. 34).

**3. Plaintiff Cannot Demonstrate Pretext With Respect to Her Claim of Race Discrimination**

Assuming arguendo that Plaintiff can state a prima facie case of race discrimination, the undisputed facts show that Defendants had legitimate, non-discriminatory reasons for denying Plaintiff's request for annual leave, denying Plaintiff's request for a restoration of her leave, issuing a Letter of Reprimand in February 2004, and changing her work schedule in December 2004. While Plaintiff disagrees with these decisions, her failure to produce competent, sufficient evidence that Defendants' stated reasons are false (i.e., a pretext) is fatal to her claim. Plaintiff's uncorroborated belief that Defendants' targeted her because of her race is, without more,

---

the Complainant was granted and used more annual leave in the previous year than only one other worker." (Ex. 7 at P-0138).

insufficient to rebut Defendants' articulated legitimate, non-discriminatory reasons. See Aramburu v. Boeing Co., 112 F.3d 1398, 1409 (10th Cir. 1997) (employee's subjective belief that he was discriminated based on his national origin insufficient to show that employer actually discriminated against him).

"Especially relevant" to a showing of pretext would be evidence of disparate treatment of black employees. Ashley v. Paramount Hotel Group, Inc., 451 F.Supp.2d 319, 333 (D.R.I. 2006) (citing McDonnell Douglas Corp, 411 U.S. at 804). "A claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects. Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996). Thus, in offering any comparative evidence, Plaintiff bears the burden of showing that the individuals with whom she seeks to be compared "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999)(quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). Plaintiff cannot point to any similarly-situated non-black employees who were treated more favorably than she was treated.

Moreover, Plaintiff's subjective belief that she was being discriminated against by management officials is undermined by the fact that Blythe and Furtado determined that Plaintiff was the best candidate for the CAO position at that time of her selection. (Ex. 3, Blythe Decl. ¶ 3; Ex. 4, Furtado Decl. ¶ 2.) Indeed, Blythe selected Plaintiff over a white applicant, Mary Bucolo. (Ex. 10, Bucolo Dep. 166:15-20.)

In addition, it was Furtado who recommended, in the first place, that Plaintiff's leave be

restored. (Ex.1b at D-0192; Ex. 2, Pl. Dep. 208: 4-11.)

### 1. Denial of Annual Leave

With respect to Plaintiff's claim concerning her denial of leave, she asserts that the reason for her denial of leave was because she did not submit an annual leave planner. (Ex. 2, Pl. Dep. 210:1-15; Ex. 14, Pl. Decl. at D-0109.) Thus, Plaintiff concedes Defendants had a legitimate, non-discriminatory reason for denying her leave.

Plaintiff's denial of leave in November because other employees were on leave, fails to support a finding of race discrimination or retaliation. The record shows that McCollum was either off or had approved annual leave scheduled on at least one of the days in each of the two grouping of dates that Plaintiff was requesting for annual leave. (Ex. 1, DeSantis Decl. ¶ 5.) See also Allen, 115 Fed. Appx. at 861 (holding that Postal Service's reasons for denying leave were not pretext as they were "supported by testimony regarding the projected high mail volume and anticipated staffing levels each day")

Plaintiff also asserts that all of her leave for the remainder of 2003 was denied:

Q. So, all your leave for the remainder of the year was denied?

A. All of it was denied.

(Ex. 2, Pl. Dep. 209:2-3.)

Contrary to Plaintiff's assertion, following the July 14, 2003, denial of leave, Plaintiff submitted a request on October 15, 2003, for twenty-four hours of annual leave. (Ex. 1i at D-0596.) The request sought annual leave from October 22, 2003, to October 24, 2003. (Ex. 1i at D-0596.) Plaintiff's leave request for twenty-four hours of leave was approved by Stephen Furtado on October 20, 2003. (Ex. 1i at D-0596.) Apparently, Plaintiff was not deterred from

requesting annual leave. Furtado's approval of twenty-four hours of annual leave in October 2003, undercuts any argument of discriminatory animus. Plaintiff also fails to mention that in the year 2003 alone, Plaintiff was approved 66 hours of annual leave and 129 hours of sick leave, with a combined total of 195 hours of leave.[9] (Ex. 1c.)

### 2. Restoration of Leave

Plaintiff cannot establish that Defendants' legitimate non-discriminatory reason for denying her request for restoration of leave was pretext. In this case, Defendants' denied Plaintiff's request for restoration of leave because she did not meet all four criteria to have leave restored. (Ex. 13, Blythe Dep. 272-73.)

The four criteria that Plaintiff was required to meet in order to have leave restored were:

(1) The restoration request covers leave in excess of 240 hours;

(2) The employee scheduled leave in writing before the beginning of pay period #24;

(3) The employee's leave was cancelled for mission essential reasons; and

(4) Due to mission essential reasons, the employee's leave could not be rescheduled before the end of the leave year.

(Ex. 1b at D-0192); see also 5 U.S.C. § 6304(d)(1)-(2); 5 C.F.R. § 630.308(a).

Defendants do not dispute that Plaintiff met the first criterion. However, Plaintiff did not meet the second, third, and fourth criteria which are all interrelated. In order for leave to be considered "scheduled in writing," the leave must be both requested and approved. See H.R. REP. No. 93-456 (1973) (attached as Ex.38) ("The committee intends that for purposes fo

---

[9] In a prior EEO complaint, Plaintiff also alleged that she was wrongfully denied annual leave in 2001. As noted by the Administrative Judge in that decision, "[T]he record shows that the Complainant was granted and used more annual leave in the previous year than only one other worker." (Ex. 7 at P-0138).

complying with the 'scheduled in advance' requirement, some formal documentation will have to be furnished to show that the employee, a reasonable time before the end of the leave year, did, in fact request a certain amount of annual leave in advance, that such request was approved by the appropriate authority, and that such annual leave was lost due to the exigencies of the service or sickness of the employee."); S. REP. 93-491, at 4 (1973), reprinted in 1973 U.S.C.C.A.N. 2773, 2774 ("In the case of exigencies of public business or sickness, the leave would have to be previously scheduled and approved for the provisions of H.R. 1284 to become operative").

Plaintiff cannot produce any documents showing that any leave was requested and approved. Thus, the inquiry on whether she met the remaining two criteria would end here. This is because the third criterion can only be met by satisfying the second criterion. Leave cannot be canceled unless it was previously approved. Moreover, in order to get to the fourth criterion, "mission essential reasons" exists must be established.

Even assuming she had requested and had been approved annual leave, and that the leave was canceled sue to mission essential reasons, she cannot show that her leave could not be rescheduled before the end of the leave year as required by the fourth criterion. (Ex 2, Pl. Dep. 36:19-37:6.)

Moreover, Plaintiff, admits that she cannot meet all of the criteria to have her annual leave restored. (Ex. 2, Pl. Dep. 208:12-15.)

### 3. Letter of Reprimand Issued on February 25, 2004

"[T]he pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs." Hankins v. AirTran Airways, Inc., 237 Fed. Appx. 513, 522 (11th Cir. 2007). In this case, Gibson believed that Plaintiff was able to stock

items in chill due to the fact that there was no medical documentation that showed Plaintiff had any restrictions for the day in question. (Ex. 1b at D-0195, D-0118-19; Ex. 20, Gibson Decl. ¶ 8.) Gibson's honest belief is supported by the fact that at the time she asked Plaintiff to stock, Plaintiff was already stocking in the HBA aisle. (Ex. 20, Gibson Decl. ¶ 3.) In addition, Plaintiff never provided Gibson any documentation showing that she did, in fact, have any medical restrictions on December 5, 2003. (Ex. 20, Gibson Decl. ¶ 8.) Plaintiff's reaction to receiving the letter of reprimand reflects the same defiant behavior when she was instructed to go to chill. As Plaintiff bluntly stated, "It states in the letter what kind of <u>corrective</u> <u>action</u> I'm going to take, NONE!" (Ex. 23 at D-0046; Ex. 2, Pl. Dep. 195:3-196:3.) (emphasis in original).

In addition, two jackets were available for Plaintiff to use. (Ex. 1b, D-0195.) Plaintiff's subjective complaint that the jackets were "dirty" falls short of showing pretext when other DeCA employees and contract employees used these jackets when going into the chill area. (Ex. 2, Pl. Dep. 148:11-17; Ex. 3, Blythe Decl.¶ 7; Ex. 20, Gibson Decl. at ¶ 6; Ex. 4, Furtado Decl. ¶ 8; Ex. 10, Bucolo Decl. ¶ 5. The employees that used these community jackets included white employees such as Blythe (Ex. 3, Blythe Decl.¶ 7), Gibson (Ex. 20, Gibson Decl. at ¶ 6),. Bucolo (Ex. 10, Bucolo Decl. ¶ 4), McCollum (Ex. 32, McCollum Decl. ¶ 3), and Nathan Fields (Ex. 4, Furtado Decl. ¶ 8). Thus, among the users of these community jackets, were the same individuals, Blythe and Gibson, that Plaintiff is now claiming discriminated and retaliated against her. (Ex. 3, Blythe Decl.¶ 7; Ex. 6 , Gibson Decl. at ¶ 6.)

Even assuming that Plaintiff was injured, Gibson offered to assist her. (Ex. 18 at D-0146, Ex. 1b at D-0195; Ex. 21, Gibson Dep. 74:23-75:27.) Gibson told Plaintiff that she would assist Plaintiff in loading the cart so that she would not have to lift heavy objects, but Plaintiff still

refused. (Ex. 18 at D-0146, Ex. 1b at D-0195; Ex. 21, Gibson Dep. 74:23-75:27.) The fact that Gibson then had to the job that Plaintiff refused to do (Ex. 20, Gibson Decl. ¶ 4), demonstrates the importance of the task being done that day. Though Plaintiff could have easily assisted Gibson by taking individual items from the case to the shelf, Plaintiff did not.[10]

Accordingly, Plaintiff fails to offer sufficient evidence to defeat summary judgment. See King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997) ("Although King produced depositions and affidavits of witnesses to challenge the appropriateness of the disciplinary action, this evidence contesting the factual underpinnings of the reasons for discipline, without more, is insufficient to present a jury question regarding the retaliation claim").

**4. Change in Schedule on December 12, 2004**

Plaintiff cannot establish that Defendants's reasons for the change in schedule to accomplish afternoon CAO duties was pretext. Plaintiff stated during her deposition that she did not have a problem working that shift. (Ex. 2, Pl. Dep. I, 38:24-25.) In an e-mail dated December 13, 2004, Blythe specifically noted that he needed to know whether or not Plaintiff could do the afternoon functions of her job to promote her. (Ex. 3, Blythe Decl. ¶ 6, Ex. 13, Blythe Dep. 266:15-16.) Plaintiff's schedule change is also consistent with her position description which states that CAOs "[m]ay work uncommon tours of duty as required to meet demands of effective mission accomplishment." (Ex. 1b at D-0181.)

Moreover, the Training Plan for Computer Assisted Ordering ("Training Plan",

---

[10] The Worker's Compensation Hearing transcript shows that Plaintiff's claim of prior injury was to her left wrist and that Plaintiff was right-handed. (Ex. 22 at D-0681, 6:24-3.) Thus, Plaintiff's outright refusal to stock even the lighter items in chill with her dominant, uninjured right hand does not give credence to Plaintiff's allegations.

specifically supports changing Plaintiff's schedule to cover afternoon functions, particularly when a store has two CAOs. (Ex. 1d at 32.) In addition, the Training Plan provides a 'model' task list that identifies CAO processing that will occur throughout the day, including afternoon hours. ( Ex. 1d at 33-38.)

Plaintiff's hours were changed so that could understand the afternoon functions of the CAO system. (Ex. 16, Furtado Dep. 225:12-21; Ex. 21, Gibson Dep. 52:19-54:3.) In the afternoon, the 856 posts, which is a number reflecting the goods coming in the back door. (Ex. 21, Gibson Dep. 52:19-54:3.) Because this affects the balance on hand ("BOH") of that same good in the store, the CAO must adjust the order so that the order can reflect both what is on the shelf and what came through the back door. (Ex. 21, Gibson Dep. 52:19-54:3.) For example, if there is a full shelf full of goods and there is an additional order of four cases of that same good that came in, there would not be a need to reorder more of that same good. (Ex. 21, Gibson Dep. 52:19-54:3.)

Plaintiff now attempts to second-guess the decision to change her work schedule for this short period of time. However, as the First Circuit has previously explained, "[c]ourts may not sit as super personnel departments, assessing the merits-or even the rationality of employers' non-discriminatory business decisions." Mesnick, 950 F.2d at 825; see also Petitti v. New England Tel. and Telegraph Co., 909 F.2d 28, 31 (1st Cir. 1990) ("It is not a court's role 'to second-guess the business decisions of an employer'").

In this case, Plaintiff has failed to show the existence of genuine material facts which would permit a jury to include that Defendants' explanation for its actions were pretextual and that intentional race discrimination was the true reason for its actions.

**E. Summary Judgment Should Be Granted Because Plaintiff Cannot Establish a Prima Facie Case of Retaliation as Alleged in Count III.**

Title VII prohibits an employer from discriminating against an employee because she has opposed any unlawful employment practice. 42 U.S.C. § 2000e-3(a). In order to make out a claim of retaliation under Title VII, Plaintiff must show the following: (1) that she engaged in protected conduct; (2) that she experienced an adverse employment action; and (3) a causal connection between the protected conduct and the adverse employment action. See Gu v. Boston Police Dep't., 312 F.3d 6, 14 (1st Cir. 2002). "An employee has engaged in protected activity protected by Title VII if she has either opposed any practice made unlawful by Title VII, 'or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 44 (1st Cir. 2007), (quoting 42 U.S.C. § 2000e-3(a)).

In Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006), the Supreme Court refined the analysis for evaluating claims of adverse employment actions in the context of retaliation claims. In Burlington Northern, the Court held that in the context of a retaliation claim, an "adverse action" is one that would be materially adverse to a reasonable employee or job applicant Id. at 2415. The Court noted that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces injury or harm," and ruled that an employer's actions are "materially adverse" only if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 2414-15. Whether or not a particular employer action is materially adverse "will often depend upon the particular circumstances," but the Court noted that "petty slights, minor annoyances, and simple lack of manners" will not generally deter employees from

complaining about discrimination. Id. at 2415. "Title VII does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that take place at work and that all employees experience." Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 619 (8th Cir. 2007).

**1. Plaintiff Cannot Establish a Prima Facie Case of Retaliation Because She Cannot Establish a Causal Connection Between the Protected Conduct and the Adverse Employment Action**

Plaintiff has failed to point to any competent evidence suggesting a causal link between her complaint of discrimination and the alleged adverse employment actions. The importance of demonstrating a causal link cannot be understated. As the court noted in Holloway v. Thompson Island Outward Bound Educ. Ctr., Inc., 492 F.Supp.2d 20 (D. Mass. 2007):

> There are sound reasons for the requirement that an employee claiming retaliation produce evidence of a causal link between his complaint of discrimination and an adverse employment action. If filing a complaint about discriminatory behavior were to give an employee complete protection from workplace discipline, then any employee who had engaged in misconduct "could effectively inhibit well-deserved [discipline] by merely filing, or threatening to file a discrimination complaint."

Id. at 26; see also Mesnick v. General Elec. Co., 950 F.2d 816, 828-29 (1st Cir. 1991) (statutes that protect an employee from retaliation do not "clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers").

**a. Plaintiff's Filing of Her Prior EEO Complaint Is Too Far Removed From the Alleged Adverse Actions to Establish a Causal Connection**

Plaintiff's filing of her prior EEO complaint is too far removed from the alleged adverse action to constitute a causal connection. The Supreme Court has stated that, "[t]he cases that

accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

Plaintiff filed her first EEO complaint on or about May 7, 2001. (Ex. 6.) The first alleged retaliatory action which is the subject of her second EEO complaint was her denial of leave in July 2003. (Ex.1b at D-0064, D-0071; Ex. 2, Pl. Dep. at 35:22-36:5.) Accordingly, Plaintiff's alleged claims of retaliation are too remote in time to the filing of her first EEO complaint to establish a causal connection. See Moron-Barradas v. Dep't of Educ. of Com. Of Puerto Rico, 488 F.3d 472, 481 (1st Cir. 2007) (finding no evidence of causal connection where EEO charge was filed on April 11, 2000, and adverse action occurred on August 7, 2001); Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 85 (1st Cir. 2005) (termination occurring two months after filing discrimination complaint does not standing alone meet the causal connection requirement); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) ("Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

**b. Plaintiff Cannot Show a Causal Connection Between Her EEO Activity and Plaintiff's Letter Of Reprimand Issued by Ms. Gibson Because Ms. Gibson Was Not Aware of Any Alleged EEO Activity**

Summary judgment is also appropriate because Plaintiff cannot establish a prima facie case of retaliation with respect to the Letter of Reprimand because there is no evidence that Gibson was aware of Plaintiff's EEO activity at the time she issued the Letter of Reprimand. In fact, Mary Gibson stated that she had no knowledge of Plaintiff's EEO activity at the time she

issued the Letter of Reprimand. (Ex. 20, Gibson Decl. ¶ 7.) See Sanchez v. Denver Pub. Schs., 164 F.3d 527, 533-34 (10th Cir. 1998) (holding that plaintiff failed to establish prima facie case of retaliation because there was no evidence that the decision maker knew of plaintiff's protected conduct); Kosereis v. Rhode Island, 331 F.3d 207, 217 (1st Cir. 2003) (finding no causal connection in retaliation claim and noting that it is insufficient to merely state that claimant engaged in a protected activity and then was disciplined); Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) ("[T]he adverse action must have been taken for the purpose of retaliating. And to defeat summary judgment, a plaintiff must point to some evidence of retaliation by a pertinent decision maker").

**2. Plaintiff Cannot Establish a Prima Facie Case of Retaliation Because She Cannot Establish an Adverse Employment Action with Respect to the Denial of Annual Leave, Restoration of Leave, and Change in Work Schedule**

Plaintiff's denial of annual leave, denial of restoration of leave, and change in work schedule do not constitute adverse employment actions because Plaintiff did not suffer significant harm. As stated above, these decisions, are at most, a mere inconvenience to Plaintiff.

Further, Blythe told Plaintiff that her schedule was being changed because there were afternoon function that have to be completed in CAO. (Ex. 3, Blythe Decl. at ¶ 6.) In a an e-mail dated December 13, 2004, to Cook, Blythe specifically noted that he needed to know whether or not Plaintiff could do the afternoon functions of her job in order to promote her. (Ex. 3, Blythe Decl. ¶ 6.) Accordingly, Plaintiff has failed to demonstrate that change in schedule for a short period of time was an adverse action when, in fact, it was to assist her in getting promoted. See Clegg v. Arkansas Dept. of Correction, 496 F.3d 922, 929 (8th Cir. 2007) (holding plaintiff failed to demonstrate that she suffered adverse action where remedial training was done in order

to help her improve on her next performance evaluation and was only temporary assignment.)

### 3. Summary Judgment Should Be Granted Because Plaintiff Cannot Establish Pretext With Respect to Her Retaliation Claim

Assuming arguendo that Plaintiff can state a prima facie case of retaliation, as discussed above, the undisputed facts show that Defendants had legitimate, non-discriminatory reasons for denying Plaintiff's request for annual leave, denying Plaintiff's request for a restoration of her leave, issuing a Letter of Reprimand in February 2004, and changing her work schedule in December 2004.

Plaintiff has failed to point to any similarly-situated employee who did not engage in EEO activity who was treated more favorably. Further, Plaintiff admitted that she was denied leave because she did not submit a leave planner. (Ex. 2, Pl. Dep. 210:1-15; Ex. 14, Pl. Decl. at D-0109) Even after refusing to submit a leave planner, Plaintiff was granted annual leave in October by Furtado. (Ex. 1i at D-0596). In the year 2003 alone, Plaintiff was approved 66 hours of annual leave and 129 hours of sick leave, with a combined total of 195 hours of leave. (Ex. 1c.)

Moreover, Plaintiff cannot establish that Defendants' legitimate non-discriminatory reason for denying her request for restoration of leave was pretext. As elaborated in detail above, Plaintiff did not meet the criteria to have her leave restored. (Ex. 1b at D-0192); see also 5 U.S.C. § 6304(d)(1)-(2); 5 C.F.R. § 630.308(a). Pursuant to federal regulations, these are criteria that all employees must meet to have their leave restored. 5 U.S.C. § 6304(d)(1)-(2); 5 C.F.R. § 630.308(a).

In addition, Plaintiff cannot show that Gibson singled her out because of her EEO Activity, when in fact there was no evidence that Gibson, who was a new supervisor starting at

the Commissary in August 2003, was even aware of any EEO activity at the time she instructed Plaintiff to go to chill December 2003 or at the time she issued the Letter of Reprimand. (Ex. 20, Gibson Decl. ¶ 7.) Plaintiff's outright refusal to go to the chill area to help stock items such as cheese, milk, and eggs, without providing any medical documentation to Defendants of her current restrictions, clearly broke any causal connection, assuming one even existed, between the Letter or Reprimand and Plaintiff's prior activity. See Hankins v. AirTran Airways, Inc., 237 Fed. Appx. 513, 520 (11th Cir. 2007) (holding that plaintiff's misconduct broke the causal connection between the protected activity and employment decision).

Further, Plaintiff's change in schedule December 2004 to accomplish afternoon CAO tasks has no connection to her EEO complaint filed in May 2001. Plaintiff was well aware by her job description and training plan provided to her that she may be working afternoon hours. (Ex. 1b at D-0181; Ex. 1d at 33-38.) Indeed, a reasonable person would barely consider hours changed to 10:00 a.m. to 6:30 p.m. for one month retaliatory.

### F. Summary Judgment Should Be Granted Because Plaintiff Cannot Establish a Prima Facie Case of Hostile Work Environment As Alleged in Count III.

For a prima facie case of hostile work environment, Plaintiff must show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. Torres-Negron, 488 F.3d at 39. Thus, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule,

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment, Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Defendants are entitled to summary judgment because Plaintiff cannot establish all the elements of her prima facie case of hostile work environment. In determining whether an environment is hostile or abusive, courts look at all the circumstances including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Clark County School Dist. v. Breeden, 532 U.S. 268, 270 (2001) (quoting Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998)).

First, Plaintiff cannot cite to any offensive acts or utterances by Gibson, Furtado, Blythe, or Bucolo that would demonstrate that the work place was permeated with discriminatory or retaliatory animus as to alter the conditions of her employment and create an abusive work environment. The alleged harassment, she points to appear to be written statements made by her managers and co-workers that support her of her fourteen-day suspension that Plaintiff failed to administratively exhaust. (Ex. 2, Pl. Dep. 19:3-20:22.) Plaintiff asserts that McCollum, Gibson, Furtado, and Bucolo wrote statements alleging that she made a face at someone's mother, that she called them bad names, that she coughed on someone's neck, that she hit a person in the stomach with her cart. (Ex. 2, Pl. Dep. 19:3-20:22.)

In the Notice of Proposed Suspension dated February 7, 2005, Plaintiff was charged with disruptive behavior, disrespectful conduct involving a supervisor, and failure to comply with supervisory instructions. (Ex. 1f at P176). The evidence used to support these charges included

written statements by McCollum, Bucolo, and Johnnie Spencer describing how Plaintiff was harassing them. (Ex. 1h.) The evidence supporting the fourteen-day suspension also included written statements by Gibson and Furtado relating to Plaintiff's misconduct. (Ex. 1h.) Even assuming her fourteen-day susupension claim was administratively exhausted, this does not constitute an actionable hostile work environment claim.

As the Fourth Circuit duly noted in Hawkins v. Pepsico, Inc.:

> Personality conflicts and questioning of job performance are unavoidable aspects of employment. They are an inevitable byproduct of the rough edges and foibles that individuals bring to the table of their interactions. Law does not blindly ascribe to race all personality conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Indeed, legally sufficient evidence is required to turn an ordinary conflict such as that between [the plaintiff] and [the supervisor] into an actionable claim of discrimination.

Hawkins v. Pepsico, Inc., 203 F.3d 274, 282 (4th Cir. 2000). Indeed, in the present case, Plaintiff's conflicts with her co-workers and her disagreement with management decisions are enough are not sufficient to sustain her hostile work environment claim.

Second, Plaintiff has failed to establish that such alleged harassment was subjectively offensive. In fact, with regard to Bucolo, Plaintiff stated that, "I never had a problem with Mary Bucolo." (Ex. 2, Pl. Dep. 107:13.) Although Plaintiff asserts that McCollum called her a "bitch" and "crazy" (Ex. 2, Pl. Dep. 161:17-18), she stated that she did not know when he did this "because it didn't bother me. I didn't care what he thought. That was his choice." (Ex. 2, Pl. Dep. 161:1-4.)

Third, Plaintiff cannot establish that any alleged harassment was based on her race. Plaintiff stated that she had no idea why McCollum called her "crazy" or a "bitch":

Q. Why do you think that he called you crazy or a bitch?

A. I have no idea. I never bothered to ask. Billy liked getting brownie points, and he just felt the more I show them I hate Rose Sellers, the more brownie points I can get. That's how Billy works. So, I felt, more power to him.

Q. Did you believe that he called you crazy or a bitch because of your race?

A. I have no idea why Billy did what Billy did. I can't speak for Billy.

(Ex. 2, Pl. Dep. 162:15-25.)

Accordingly, the complained harassment is not severe and pervasive as a matter of law, but rather reflect other employees' and Defendants' concerns with Plaintiff's behavior in the workplace.

## IV. Conclusion

For the reasons stated above, Defendants respectfully request that summary judgment be entered in their favor.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Ly T. Nguyen
LY T. NGUYEN
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
401-709-5000
401-709-5017 (fax)
Email: ly.nguyen@usdoj.gov