UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROSEZOLA SELLERS, )
Plaintiff, )
)
v. ) C. A. No. 05-381S
)
UNITED STATES DEPARTMENT )
OF DEFENSE AND ROBERT M. GATES, )
SECRETARY OF THE DEPARTMENT )
OF DEFENSE, )
Defendants. )

**DEFENDANTS' CORRECTED STATEMENT OF FACTS AS**
**<u>TO WHICH THERE IS NO GENUINE DISPUTE</u>**

Defendants, United States Department of Defense and Robert M. Gates, Secretary of the Department of Defense, through undersigned counsel, and submit the following statement of undisputed facts:

1. Plaintiff, a black employee, was a Commissary Specialist Management ("CAO") trainee at DeCA. (Compl. ¶ 8-9.)

2. The Defense Commissary Agency is an independent Agency within the Department of Defense that operates a worldwide chain of commissary stores. (Ex. 1, DeSantis Decl. ¶ 3.)

3. The Defense Commissary Agency provides groceries to military personnel, retirees and their families through their stores. (Ex. 1, DeSantis Decl. ¶ 3.)

4. John Blythe, Mary Gibson, and Stephen Furtado were Plaintiff's supervisors at the Newport Commissary whom Plaintiff claims discriminated , harassed, and retaliated against her. (Ex. 2, Pl. Dep. 19:3-20:22.)



GOVERNMENT EXHIBIT

5. Plaintiff also claims that William McCollum and Mary Bucolo, who were her co-workers, harassed her. (Ex. 2, Pl. Dep. 19:3-20:22.)

6. Plaintiff began working as a Laborer for the Navy Branch Commissary Store in Newport, Rhode Island in 1988. (Ex. 1a at D-0370.)

7. Prior to 1990, each of the armed services ran its own Commissaries. See http://www.commissaries.com/history.cfm. The Defense Commissary Agency, under the Department of Defense, was established on May 15, 1990. See http://www.commissaries.com/history.cfm. After a transition period, DeCA then assumed full control of all commissaries on October 1, 1991. See http://www.commissaries.com/history.cfm.

8. Sometime thereafter, she went to work at the Commissary Store in New London, Connecticut. ( Ex. 2 , Pl. Dep. 8:13-18.)

9. In 1993, Plaintiff was reassigned to the Newport Commissary. (Ex. 1a at D-0275.)

10. In 1994, Blythe became the Store Director at the Newport Commissary. (Ex. 3, Blythe Decl. ¶ 2.)

11. In 1997, Plaintiff was promoted to Store Worker. (Ex. 1a at D-0325.) In 2000, Steve Furtado became the Store Administrator at the Newport Commissary. (Ex. 4, Furtado Decl. ¶ 1; Ex. 5 at D-0152.)

12. In 2003, Plaintiff applied for and was selected above two other applicants for the CAO position. (Ex. 3, Blythe Decl. at ¶ 3; Ex. 1a at D-0256-57.)

13. Both Blythe and Furtado believed that Plaintiff was the best candidate for the CAO position at the time. (Ex. 3, Blythe Decl. ¶ 3; Ex. 4 , Furtado Decl. ¶ 2.)

14. Plaintiff was chosen for the position over Mary Bucolo, a white employee (Ex. 9; Bucolo Decl. ¶ 3) who also applied for the job (Ex.10, Bucolo Dep. 166:15-20).

15. At the time Plaintiff was selected for the CAO position, Blythe was aware that Plaintiff had previously engaged in EEO activity, as he had been previously contacted by an EEO representative a few years prior. (See Ex. 11.)

16. Plaintiff's promotion to CAO became effective September 9, 2003. (Ex. 1a at D-0303.)

17. While Plaintiff was a CAO, Plaintiff was an active member of the collective bargaining unit. (Ex. 2, Pl. Dep. 43:6-7.)

18. On July 11, 2003, Plaintiff submitted three applications for leave. (Ex. 1b at D-0189.)

19. On the first application for leave, Plaintiff sought annual leave for August 7 and 8, 2003. (Ex. 1b at D-0189.)

20. On the second application for leave, Plaintiff sought annual leave for August 28 and 29, 2003. (Ex. 1b at D-0189.)

21. On the third application for leave, Plaintiff sought annual leave for August 31, 2003. (Ex. 1b at D-0189.)

22. On July 13, 2003, Furtado advised Ms. Sellers that she needed to submit a leave planner which was required by the Master Labor Agreement. (Ex. 4, Furtado Decl. ¶ 6; see also Ex. 15 at 30-31.)

23. Indeed, Plaintiff was well aware of the requirement that she submit an annual leave planner as evidenced by the fact that she submitted a leave planner every year in her fourteen-year career until 2003. (Ex. 2, Pl. Dep. 26:11-16.)

24. Pursuant to the Master Labor Agreement which governs collective bargaining unit

employees, such as Plaintiff, submission of annual leave planners are required of all employees. (Ex. 15 at 30-31.)

25. Specifically, Article 22, Section 2, of the Master Labor Agreement, entitled, "Annual Leave Planners," provides:

> Employees will submit their annual leave plan on DeCA Form 30-14 by 1 February of each year to identify employees' annual leave plans. The plan will be reviewed and a decision regarding the planner will be returned to the employee by 1 March. It is understood that the annual leave plan does not constitute final approval of annual leave, but supervisors will make reasonable efforts to accommodate employees' vacation decisions consistent with workload and staffing needs. Seniority based on SCD-Leave will be used when a conflict occurs. Annual leave planner provisions in effect will stay in effect unless changed through local negotiations. Once an employee has made the selection, he/she shall not be permitted to change the selection if such action infringes upon the choice of another employee.

(Ex. 15 at 30-31.)

26. On July 14, 2003, Blythe wrote a note to Plaintiff that stated:

> I am still waiting for your required leave planner. I will not approve any leave requests until the planner is submitted. All employees are required to do this.

(Ex. 1b at D-0185.)

27. Accordingly, Blythe denied all three applications for annual leave because Plaintiff had not submitted a leave planner. (Ex. 1b at D-0189.)

28. On July 15, 2003, Furtado directed Plaintiff to submit her annual leave planner by July 22, 2003. (Ex. 4 , Furtado Decl. ¶ 6-7; Ex. 4e.)

29. In a written memorandum dated July 17, 2003, Blythe instructed Plaintiff and four other employees who also had not yet submitted a leave planner, to submit a leave planner by July 22, 2003. (Ex. 1b at D-0187.)

30. The July 17, 2003, memorandum stated:

At a meeting I held with all department managers in January, I discussed the requirement for all employees to submit an annual leave planner. If you are receiving this memorandum, I have either not received one or the leave you have annotated on the planner does not equal your use or lose balance. I cannot over emphasize the importance of you submitting the planner as instructed. Failure to comply could result in disapproval of your request and forfeit of any unused balances at the end of the leave year. Please note no leave will be granted the week of Thanksgiving, Christmas and New Years.

Deadline for submission is July 22, 2003.

(Ex. 1b at D-0187.)

31. Subsequent to this instruction, the remaining four employees, with the exception of Plaintiff, submitted the required leave planners. (Ex. 13, Blythe Dep. 270:15-19.)

32. On July 22, 2003, the date that the leave planners were due, Plaintiff indicated that, "Leave Planners was [sic] given out in June not January. Sense [sic] I am held strictly to what I put down. I don't want what happened last year to happen again." (Ex. 1b at D-0187.)

33. Notably, Plaintiff, was the only employee at DeCA that did not submit a leave planner in 2003. (Ex. 13, Blythe Dep. 270:15-19.)

34. Plaintiff stated in her declaration during the EEO administrative process that, "[h]e [John Blythe] was determined not to approve my leave because I did not submit a leave planner." (Ex. 14, Pl. Decl. at D-0109; see also Ex. 2, Pl. Dep. 210:1-15.)

35. Thereafter, in August 2003, Mary Gibson, became the Grocery Manager at the Newport Commissary (Ex. 18 at D-0144.)

36. After not having submitted a leave planner in accordance with the Master Labor Agreement and her supervisors' repeated instructions, Plaintiff submitted a request for annual leave on October 15, 2003, for twenty-four hours of annual leave. (Ex. 1i at D-

0596.)

37. The request sought annual leave from October 22, 2003, to October 24, 2003. (Ex. 1i at D-0596.)

38. Plaintiff's leave request for twenty-four hours of leave was approved by Furtado on October 20, 2003, despite the fact that she had not included these dates on a leave planner. (Ex. 1i at D-0596.)

39. On November 3, 2003, Plaintiff submitted two applications for leave. (Ex. 1b at D-0190.)

40. The first application for leave sought annual leave for November 14-15, 2003. (Ex. 1b at D-0190.)

41. The second application for leave sought annual leave for November 18-22, 2003. (Ex. 1b at D-0190.)

42. On November 4, 2003, Furtado denied Plaintiff's applications for leave for these two grouping of November dates. (Ex. 1b at D-0190.)

43. Mr. Furtado denied the leave because there were already people on leave during these weeks. (Ex. 1b at D-0190; Ex. 16, Furtado Dep. 117:22-118:4.)

44. William McCollum, the other CAO, was not scheduled to work on November 15, 2003, and November 22, 2003. (Ex. 1, DeSantis Decl. ¶ 5.)

45. McCollum also had scheduled and eventually took annual leave on November 18, 2003. (Ex. 1, DeSantis Decl. ¶ 5.)

46. On November 25, 2003, Plaintiff submitted an application for forty hours of sick leave for the dates of November 18-22, 2003. (Ex. 4a.)

47. Furtado approved Plaintiff's request for leave that same day. (Ex. 4a.)

48. Although Plaintiff was denied leave for certain dates in 2003, there were many occasions on which she was approved both annual and sick leave for that year, even though she failed to include these dates on a leave planner. (Ex. 1c.)

49. A leave audit of Plaintiff's leave in 2003 revealed that Plaintiff was approved and took 66 hours of annual leave and 129 hours of sick leave. (Ex. 1c.)

50. Thus, Plaintiff was granted 195 hours of leave in the course of one year. (Ex. 1c.)

51. On December 5, 2003, Gibson instructed Plaintiff to go to the chill area to stock. (Ex. 1b at D-0194-95.)

52. Mary Gibson was Plaintiff's first level supervisor at the time the incident giving rise to the Letter of Reprimand arose. (Ex. 18 at D-0144, Ex. 1b at D-0161.)

53. The chill area is the area in the store that holds boxes of cold products like cheese, butter, milk, and eggs. (Ex. 20, Gibson Decl. ¶ 5.)

54. At the time Plaintiff was instructed to go to the chill area to stock, Plaintiff was in the Health and Beauty Aids ("HBA") aisle placing products contained in boxes on the shelves (Ex. 2, Pl. Dep. at 47:21-22; Ex. 20, Gibson Decl. ¶ 3.)

55. Plaintiff does not dispute that she refused to report to the chill area, admittedly. (Ex. 14 at D-0106.)

56. Notably, Plaintiff did not like to work in the chill area. (Ex. 20, Pl. Dep. at 45:8-10.)

57. After Gibson instructed Plaintiff to report to chill to stock, Plaintiff told Gibson that she was not dressed to work in chill. (Ex. 1b at D-0195.)

58. Gibson informed Plaintiff that there were two jackets hanging on the wall for her to wear. (Ex. 1b at D-0195.)

59. Plaintiff replied that she was not wearing other people's clothes. (Ex. 1b at D-0195.)

60. Gibson then spoke to Blythe who told her to give Plaintiff another opportunity to follow her instructions. (Ex. 1b at D-0195; Ex. 21, Gibson Dep. 73:12-16.)

61. Gibson then instructed Plaintiff to report to chill. (Ex. 1b at D-0195; Ex. 21 Gibson Dep. 73:12-16.)

62. Plaintiff stated to Gibson that she had an injury. (Ex. 1b at D-0194-95; Ex. 2, Pl. Dep. 49:2-3; Ex. 21 Gibson Dep. 73:12-16.)

63. After Plaintiff told Gibson that she had an injury, Gibson told her that there was nothing in Plaintiff's personnel file indicating any current restrictions. (Ex. 18 at D-0145, Ex. 1b at D-0195.)

64. Gibson also told Plaintiff that she would assist Plaintiff in loading the cart so that she would not have to lift heavy objects, but Plaintiff still refused. (Ex. 18 at D-0146, Ex. 1b at D-0195; Ex. 21, Gibson Dep. 74:23-75:27.)

65. Plaintiff became loud and told Gibson that she would not report to chill area. (Ex. 18 at D-0145-46; Ex. 1b at D-0194-95.)

66. The medical documentation in Plaintiff's personnel file shows that the last time Plaintiff had any medical restriction was in October 2003 when she was instructed not to lift over 10 lbs. (Ex. 1b at D-0118-19.)

67. Although in November 2003, Plaintiff's orthopedic doctor, Dr. Maher, recommended that she be out of work for one week, he did not provide any lifting restrictions upon her return to work. (Ex. 1b at D-0120.)

68. In addition, at the time Gibson instructed Plaintiff to work in the chill area, two jackets

were available to all employees to be worn in the chill area. (Ex. 1b, at D-0195.)

69. These jackets, that were available for use for all employees, had been worn by contractors (Ex. 2, Pl. Dep. 148:11-17), and by other DeCA employees while in the chill area (Ex. 3, Blythe Decl. ¶ 7; Ex. 20, Gibson Decl. at ¶ 6; Ex. 4, Furtado Decl. ¶ 8; Ex. 9, Bucolo Decl. ¶ 5).

70. The employees that used these community jackets included white employees such as Mr. Blythe (Ex. 3, Blythe Decl. ¶ 7), Ms. Gibson (Ex. 20, Gibson Decl. at ¶ 6), Ms. Bucolo (Ex. 9, Bucolo Decl. ¶ 4), Mr. Bucolo (Ex. 32, McCollum Decl. ¶ 3) and Nathan Fields (Ex. 4, Furtado Decl. ¶ 8).

71. After Plaintiff refused to report to the chill area to stock, Gibson then went to chill to stock, as it was priority. (Ex. 21, Gibson Dep. 75:19-76:3.)

72. Gibson loaded boxes of product to a cart, cut the boxes open, and stocked the products one at a time on the shelf. (Ex. 20, Gibson Decl. ¶ 5.)

73. The products stocked included items such as cheese, butter, milk, and eggs. (Ex. 20, Gibson Decl. ¶ 5.)

74. When placing the product on the shelf, the heaviest item Gibson had to put on the shelf was one gallon of milk. (Ex. 20, Gibson Decl. ¶ 5.)

75. On February 25, 2004, Gibson issued Plaintiff received a Letter of Reprimand from Gibson based on her failure to follow instructions and disrespectful conduct. (Ex. 1b at D-0194.)

76. Ms. Gibson was not aware of Plaintiff's EEO activity at the time she issued the Letter of Reprimand on February 25, 2004. (Ex. 18 at D-0144; Ex. 20, Gibson Decl. ¶ 7.)

77. The Letter of Reprimand stated that:

> Specifically, on December 5, 2003, I directed you to report for duty in the chill area to stock. I told you that jackets were available and that I would assist you by loading the cart with the items that you would stock. You became loud and told me that you would not report to that area. Although I repeatedly instructed you to report to the chill area, you still refused.

(Ex. 1b at D-0194.)

78. On March 4, 2004, Plaintiff submitted a request for restoration of annual leave request requesting that 99 hours of annual leave be restored from 2003 be restored. (Ex. 1b at D-0192.)

79. The four criteria that Plaintiff was required to meet, under federal regulations, in order to have leave restored were:

(1) The restoration request covers leave in excess of 240 hours;

(2) The employee scheduled leave in writing before the beginning of pay period #24;

(3) The employee's leave was cancelled for mission essential reasons; and

(4) Due to mission essential reasons, the employee's leave could not be rescheduled before the end of the leave year.

(Ex. 1b D-0192); see 5 U.S.C. § 6304(d)(1)-(2); 5 C.F.R. § 630.308(a).

80. For leave to be considered "schedule in writing," it be both requested and approved. See H.R. REP. No. 93-456 (1973).

81. On Plaintiff's request for restoration of annual leave form, Furtado, checked off only two of the four criteria. (Ex. 1b at D-0192.)

82. Furtado then recommended approval of Plaintiff's request for restoration of leave. (Ex. 1b at D-0192.)

83. However, Blythe did not sign off on the form because Plaintiff did not meet all four criteria to have her leave restored. (Ex. 13, Blythe Dep. 272:19-273:15.)

84. Blythe found that there was no prior scheduled leave that had been canceled, that Plaintiff had time to schedule her leave, and that there was no prior scheduled leave canceled for mission essential reasons. (Ex. 13, Blythe Dep. 272:19-273:15.)

85. Although Furtado had originally recommended approval of Plaintiff's request for restoration of leave, he later became aware that Plaintiff did not meet the criteria to have her annual leave restored. (Ex. 17, Furtado Decl. at D-0154.)

86. When examining Plaintiff's request for restoration of annual leave form in preparation for his deposition, Furtado realized that he had made a mistake when filling out the form. (Ex. 16, Furtado Dep. 121:24-122-3.)

87. Plaintiff's schedule prior to December 12, 2004, was from 6:00 a.m. to 2:30 p.m. (Ex. 21, Gibson Dep. 54:21-22.)

88. In a memorandum dated December 6, 2004, Plaintiff was advised by Gibson that effective December 12, 2004, her work schedule would be Monday through Friday, 10:00 a.m. to 6:30 p.m. (Ex. 1b at D-0112.)

89. Mr. Blythe told Plaintiff that her schedule was being changed because there were afternoon functions that had to be completed in CAO. (Ex. 24 at D-0140; see also Ex. 3, Blythe Decl. ¶ 6; Ex. 13, Blythe Dep. 266:15-16.)

90. In a an e-mail dated December 13, 2004, to DeCA Zone Manager Richard Cook, Mr. Blythe specifically noted that he needed to know whether or not Plaintiff could do the afternoon functions of her job before he could promote her. (Ex. 3; Ex. 3a, Blythe Decl.

¶ 6.)

91. Plaintiff's schedule was changed back to 6:00 a.m. to 2:30 p.m. on January 16, 2005. (Ex. 1b at D-0127.)

92. Plaintiff's position description provides that CAOs "[m]ay work uncommon tours of duty as required to meet demands of effective mission accomplishment." (Ex. 1b at D-0181.)

93. Further, the Performance Plan, Element 2SA, for the CAO position indicates that, "[u]tilizing morning and afternoon checklist [sic] provide an accurate daily assessment of all components of the Computer Assisted Ordering System." (Ex. 25 at 240.)

94. In addition, the Training Plan for Computer Assisted Ordering (CAO), states:

> Stores that have two CAOS assigned should provide overlap coverage using a work schedule for these general time frames (0600 hours through 1500 hours or 1000 hours through 1900 hours). At locations with two CAOS assigned, a later schedule when the store is not open for business, is the preferred arrangement, especially when CAO is first deployed to reduce/work down overwrites in the backroom.

(Ex. 1d at 32.)

95. In addition, the Training Plan provides "a 'model' task list that identified CAO processing that will occur throughout the day and when the store operational tasks should be accomplished to use the system most effectively." (Ex.1d at 33.)

96. These tasks included tasks between the hours of 10:00 a.m. to 6:30 p.m. (Ex.1d at 33-38.)

97. On or about May 7, 2001, Plaintiff filed her first EEO complaint. (Ex. 6.)

98. In this EEO complaint, Plaintiff alleged that she was discriminated on the basis of race (African American) and disability (Stomach Ulcers) "in that she was subjected to harassment when she was continuously switched from work assignment to work

assignment; she was continuously assigned unfavorable assignments that required work in the freezer (without a coat) and heavy lifting (without a back brace); she was assigned to work nights, 3:00 pm to 11:30 pm or 6:00 pm to 2:00 am while others were not; and she was denied use of annual leave on April 24, 2001." (Ex. 7.)

99. On May 21, 2003, Administrative Judge Berry issued a decision finding no discrimination. (Ex.7.)

100. This decision was sent to Plaintiff and Steven John Coaty, Esq., Plaintiff's counsel, who was representing her at that time. (Ex. 7 at P-0140.)

101. This decision was not appealed, and the time period for appealing this decision has long passed. (Ex. 8, Andrade Decl. ¶ 4.)

102. On December 18, 2003, Plaintiff contacted an EEO counselor with respect to her the denial of her annual leave applications by Blythe on July 14, 2003 and by Furtado on November 4, 2003. (Ex. 1b at D-0064, D-0071; Ex. 2, Pl. Dep. 35:22-36:5.)

103. On February 26, 2004, Plaintiff contacted an EEO counselor concerning the Letter of Reprimand issued to her on February 25, 2004. (Ex. 1b at D-0074, D–0064.) On or about April 14, 2004, Plaintiff filed her second EEO complaint which is the subject of this case. (Ex. 12.)

104. In a letter dated June 22, 2004, Plaintiff's claims were defined as follows:

a. Whether the complainant was discriminated against based on her race (Black) and reprisal (prior EEO activity) when, from July 14, 2003 to November 4, 2003, the Commissary Officer, Mr. John Blythe, Sr., denied her requests for annual leave on the following dates: August 7, 8, 28, 29, and 31, 2003 (40 hours) and November 14, and 18-22, 2003 (56 hours)?

b. Whether the complainant was discriminated against based on race (Black) and

reprisal (prior EEO activity) when, on February 25, 2004, her supervisor, Ms. Mary Gibson, issued her a Letter of Reprimand for failure to follow instructions and disrespectful behavior?

c. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on or about March 4, 2004, the Commissary Officer, Mr. John Blythe, Sr., disapproved her Request for Restoration of Annual Leave (96 hours)?

(Ex. 1b at D-0096.)

105. Plaintiff was instructed that, "[i]f you believe the issues in your complaint is [sic] not correctly defined, please notify me, in writing, within 5 calendar days after you receive this letter, and specify why you believe the issues are not correctly defined. If you fail to contact me, I will conclude you agree that the issues are properly defined." (Ex. 1b at D-0096.)

106. At no time did Plaintiff disagree that these were the defined issues in the EEO complaint, nor did she seek to amend her EEO complaint to include claims relating to promotions and pay. (Ex. 1b at D-0099.)

107. The only time Plaintiff did seek to amend her EEO complaint, was to add a claim with respect to "[w]hether the complainant was discriminated against based on reprisal (prior EEO activity) when, on December 13, 2004 her duty hours and work assignments were abruptly changed with no explanation?" (Ex. 1b at D-0099.)

108. On June 10, 2005, DeCA issued a final agency decision was issued finding no discrimination based on race or retaliation regarding the EEO complaint which is the subject of this case. (Ex. 1b at D-0236.)

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Ly T. Nguyen
LY T. NGUYEN
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
401-709-5000
401-709-5017 (fax)
Email: ly.nguyen@usdoj.gov