C
Benefit Management of Maine, Inc. v. Allstate Life Ins. Co.
C.A.1,1993.
This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter.Please use FIND to look at the applicable circuit court rule before citing this opinion. First Circuit Rule 36(b). (FIND CTA1 Rule 36.)

United States Court of Appeals,First Circuit.
BENEFIT MANAGEMENT OF MAINE, INC., Plaintiff, Appellant,
v.
ALLSTATE LIFE INSURANCE CO., ET AL., Defendants, Appellees.
**No. 91-1837.**

May 26, 1993

Appeal From The United States District Court for The District of Maine [Hon. W. Arthur Garrity, Jr., [FN*] *Senior U.S. District Judge*]

FN* Of the District of Massachusetts, sitting by designation.

*Robert W. Harrington* for appellant.
*William J. Kayatta, Jr.* with whom *Catherine R. Connors, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, John E. Hughes, III, Walter D. Willson, Wells, Wells, Marble & Hurst,* and *Ralph J. Elwart* were on brief for appellees.
D.ME.

AFFIRMED.

Before Selya, *Circuit Judge,*Coffin, *Senior Circuit Judge,* and Young, [FN**] *District Judge.*

FN** Of the District of Massachusetts, sitting by designation.

YOUNG, *District Judge.*
*1 From a welter of various claims, sounding in both contract and tort, Appellant Benefit Management of Maine, Inc. ("Benefit"), a retail purveyor of various insurance products, here raises the propriety of two pre-trial rulings as well as two aspects of the directed verdict which ultimately dashed its hopes. After a thorough review of the entire trial record, we affirm.

Since the four issues raised on appeal arise out of the contractual relations between the parties, we sketch those matters briefly at the outset to put the following discussion in context.[FN1]

On or about September 9, 1983, Benefit executed a Group Agency Agreement with Northbrook Life Insurance Company ("Northbrook"). Under the Group Agency Agreement, Benefit had an exclusive agency to sell certain Northbrook group health insurance products in Maine, New Hampshire, and Vermont. On or about April 13, 1984, Northbrook and its parent Allstate Life Insurance Co. ("Allstate ") contracted with Equitable Life Assurance Society of the United States ("Equitable") to have Equitable agents sell certain insurance products of Northbrook. Since this Northbrook-Equitable agreement arguably infringed Benefit's exclusive agency, Northbrook offered, and Benefit accepted, an Amended Group Agency Agreement which permitted the sales by the Equitable Agents in return for a reduction in Benefit's franchise fee as well as added contractual protections for Benefit.

On March 18, 1988, Northbrook, claiming severe business losses, sent Benefit a formal notice of withdrawal and suspension pursuant to the Amended General Agency Agreement.[FN2]At the same time, Northbrook offered Benefit a limited Service Agreement ("the Northbrook Service Agreement") which allowed Benefit certain renewal marketing and extended claims paying authority on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Northbrook policies then in force which were being serviced by Benefit.

Likewise, Allstate offered Benefit a service agreement ("the Allstate Service Agreement") which granted Benefit marketing and claims administration authority for certain future insurance business under the Allstate name.

Benefit was reluctant to enter into these two service agreements (collectively the "1988 Service Agreements") since the offer was extended for but a short time and then on a 'take it or leave it basis,' and since the termination provisions were less favorable to Benefit than those found in the Amended General Agency Agreement. The alternative, however, was no further business relationship at all with a most lucrative account.FN3 Since Allstate was dangling the prospect of a longer term relationship,FN4 Benefit signed.

Less than two months later Northbrook and Allstate gave notice that they were terminating the 1988 Service Agreements with Benefit.

This action ensued, Benefit charging, among other claims, breach of contract and fraud. Certain of its claims succumbed to summary judgment; the remainder collapsed when the District Court allowed a motion for directed verdict in favor of Northbrook and Allstate. Benefit's appeal raises four issues.

***2** 1. *Denial by the Magistrate Judge of Benefit's Motion*

*to Compel*

On April 23, 1991, in the course of preparing for trial, Benefit moved to compel discovery of fourteen documents which Allstate and Northbrook had withheld from production on the grounds that they were protected by the attorney-client privilege and the work-product doctrine. In support of its motion, Benefit argued that the documents were subject to the crime-fraud exception to the privilege.

After a hearing and an *in camera* review of the documents, the Magistrate Judge denied the motion due to Benefit's failure to make the requisite *prima facie* showing of fraud. On June 10, 1991, Benefit filed a motion for reconsideration. No memorandum in support of the motion was filed, in violation of Local Rule 19 of the United States District Court for the District of Maine. Instead, Benefit submitted an amended Rule 19 Statement of Material Facts signed by counsel for Benefit for submission in opposition to the pending summary judgment motion by Allstate and Northbrook. After a hearing, the Magistrate Judge denied the motion to reconsider. No transcript of the hearing is available in the record.

On July 10, 1991, the first day of trial, Benefit filed a "Motion for Reconsideration By the Presiding Judge of a Decision of the Magistrate Judge Entered July 2, 1991."No supporting memorandum was filed. The District Judge informed Benefit that he would not rule immediately on the motion, that he would not reverse the Magistrate Judge on a " judgment call" on a discovery issue, but that "[i]f, on the other hand, there's a matter of law here involved, some legal issue that you can indicate was erroneously decided and you are clearly right, well then, I would maybe hear you at 4 o'clock next Friday afternoon or something.' Benefit has presented no evidence that it raised the issue again with the District Court or pressed for a ruling thereon. Accordingly, we rule that Benefit has waived this issue by its failure to develop the record in the District Court.

Pursuant to 28 U.S.C. § 636(b)(1)(A) (1991), "[a] judge may designate a magistrate to hear and determine any pretrial matter pending before the court [with exceptions not relevant here].... A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law."*See also Park Motor Mart, Inc.* v. *Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir. 1980). Consideration of discovery matters by a magistrate judge comes within the purview of the above subsection (A).*See Detection Systems, Inc.* v. *Pittway Corp.,* 96 F.R.D. 152, 154 (W.D.N.Y. 1982); *Citicorp* v. *Interbank Card Assn,* 87 F.R.D. 43, 46 (S.D.N.Y. 1980).FN5"Moreover, in resolving discovery disputes, the Magistrate is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

afforded broad discretion which will be overruled only if abused."*Detection Systems, Inc.,* 96 F.R.D. at 154. Interpreting this subsection, the First Circuit has stated that "[u]nder subsection (b)(1)(A) certain pretrial matters may be decided without further reference to the district judge, but the judge 'may reconsider ... where it has been shown that the magistrate's order is clearly erroneous or contrary to law.'"*Park Motor Mart,* 616 F.2d at 604 (omission in original).

***3** In the instant case, the District Judge was under no obligation to review the decision of the Magistrate Judge. The District Judge here offered Benefit an opportunity to present something concrete showing that the decision was clearly erroneous but the opportunity was never exercised by Benefit. Other than concerns as to subject matter jurisdiction, we are reluctant to consider on appeal a matter upon which the District Judge was given no opportunity to rule.*Park Motor Mart,* 616 F.2d at 605. This is a corollary of the well settled appellate rule that "issues adverted to [on appeal] in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."*United States* v. *Zannino,* 895 F.2d 1, 17 (1st Cir. 1990), *cert. denied,*494 U.S. 1082 (1990). Upon this record, we conclude Benefit waived its challenge to the ruling of the Magistrate Judge.

2. *Exclusion of the Group Agency Agreement Claims*

Benefit filed its complaint on June 19, 1990. On the day prior to the expiration of its right to amend, Benefit moved to amend its complaint and the District Court duly allowed this motion. When Northbrook and Allstate challenged the amended complaint by a motion for summary judgment, the briefing revealed a dispute concerning whether Benefit had claimed, in its amended complaint, a breach of the Amended General Agency Agreement. The District Court ruled that no such claim had been set forth in the Amended Complaint.

Benefit argues that mention of "contracts" in Counts I and II of the Amended Complaint are references to the Amended General Agency Agreement as well as to the 1988 Service Agreements. Benefit also argues that references to " agreements" throughout the Amended Complaint are to the Amended General Agency Agreement and the 1988 Service Agreements. Lastly, Benefit urges that it pursued its claim for breach of the Amended General Agency Agreement in a number of significant pleadings and that Allstate and Northbrook were fully prepared and would not have been prejudiced by the trial of these claims.

These arguments are unpersuasive. A reading of the Amended Complaint as a whole supports the determination of the District Court that the Amended Complaint does not state a claim for breach of the Amended General Agency Agreement. In its recitation of the facts in the Amended Complaint, Benefit makes a perfunctory reference to Northbrook's exercise of the Withdrawal and Suspension clause of the Amended General Agency Agreement by alleging, " Northbrook exercised its termination power under the Agreement."This allegation does not challenge Northbrook's actions in any way. Moreover, a fair reading of the word "contracts" in Counts I and II is most reasonably a reference to the 1988 Service Agreements. In fact, as the District Court observed, Count I (alleging breach of contract against Allstate) could not refer to the Amended General Agency Agreement since Allstate was not a party to that agreement and had no contractual relationship with Benefit prior to the 1988 Allstate Service Agreement.

***4** Finally, Benefit's argument that it has pursued its claim for breach of the Amended General Agency Agreement throughout the pleadings and that Allstate and Northbrook should therefore have been on notice and prepared to respond to these claims at trial is without merit. This is tantamount to a claim that the District Court ought have allowed a further motion to amend the complaint-a motion Benefit never made.Rule 15(a) of the Federal Rules of Civil Procedure permits amendment to the pleadings "by leave of court or by written consent of the adverse party."Rule 15(b) provides that pleadings may be amended to conform to the evidence where issues not raised by the pleadings are tried by the express or implied consent of the parties. Here, Northbrook and Allstate oppose any such amendment and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

District Court was never asked to approve a further amendment. Even if the actions of the District Court could be interpreted as a denial of a motion by Benefit to further amend the Amended Complaint, such a denial was well within the discretion of the district judge.*See Riofrio Anda* v. *Ralston Purina Co.,* 959 F.2d 1149, 1154-55 (1st Cir. 1992) (affirming district court's denial of motion to amend after deadline for amendments has passed as consistent with purpose of Rule 15 [b] ). Here, the original Complaint was filed on June 19, 1990. The District Court ordered that all amendments to the pleadings be made by November 30, 1990. Since Benefit did not even raise the issue before the summary judgment hearing on or about June 24, 1991, there was no abuse of discretion in denying any further motion to amend.

3. *Fraud*

We next consider whether Northbrook's and Allstate's conduct was fraudulent. As to this aspect of the case, Benefit relies especially upon the testimony of Mark Stadler, former general manager of Northbrook. Stadler administered the 34 Northbrook General Agencies (NGA's) including Benefit, and he and others at Northbrook used language such as "partners" and "partnerships" as matter of course in referring to the NGA's. In February, 1988, when Northbrook was considering withdrawal from the Amended General Agency Agreements, however, Stadler, in an internal memo, opined that the NGA's "are sitting ducks!" Two days later, in another internal memo, he sketched this approach to further contract negotiations:

- Terminate Northbrook Contracts reinstate under

Allstate

- Remove Exclusivity Clause

- Run out Northbrook Certificates ... rollover to

Allstate Paper ...

- Immediately begin writing Allstate ...

- Limit term of agreement to one year

Benefit also presented evidence that in March, 1988, prior to the issuance of the notice of Withdrawal and Suspension, Allstate had been advised by McKinsey & Co., a business consulting company, that Allstate would need to invest at least $100,000,000 into its group life and health insurance business in order to be competitive.

Then, four days before Northbrook issued its formal withdrawal and suspension notice, Stadler wrote to his superior, noting that "all of the NGA's feel that we have Breached [sic] our agreement not to act in a matter detrimental to them" and suggesting:
***5** I believe we need to ask ourselves if the tables were turned would we sign the [proposed 1988 Service] agreements as they are currently worded. I doubt it. The NGA's have been good partners. We should not turn our backs on them now.

During the same period, as the negotiations leading to the execution of the 1988 Service Agreements spun out, Allstate and Northbrook agents continued to claim that Allstate "will be a player in the health insurance business," despite the fact that other Allstate representatives were, even then, meeting with Goldman Sachs investment bankers to discuss the sale of Allstate's group life and health business.

From this evidence and other corroborating circumstances, Benefit argues strenuously that it can reasonably be inferred that Northbrook and Allstate-in league together-concocted the notice of withdrawal and suspension of the Amended General Agency Agreement primarily to get out from under its terms. Then, well knowing that they were ultimately going to dump Benefit just as soon as it suited them, they offered in its place the 1988 Service Agreements.

There is no dispute as to the fraud claim but that the law of Maine applies. In Maine,

[a] defendant is liable for fraud or deceit if he (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

justifiably relies upon the representation as true and acts upon it to his damage.*Jourdain* v. *Dineen,* 527 A.2d 1304, 1307 (Me. 1987) (quoting *Letellier* v. *Small,* 400 A.2d 371, 376 [Me. 1979] ). Moreover, to sustain its burden on the claim of fraud, Benefit " must prove every element of [its] claim by clear and convincing evidence; in other words, evidence that establishes every factual element to be highly probable."*Wildes* v. *Ocean National Bank of Kennebunk,* 498 A.2d 601, 602 (Me. 1985).

Benefit asserts that in order to properly exercise its rights under the Withdrawal and Suspension clause of the Amended General Agency Agreement, FN6 Northbrook had not only to cease marketing group life and health insurance through the NGA distribution system, but also through all distribution systems in Benefit's territory as well, including Equinet, the Equitable distribution system. Benefit argues that the Notice of Withdrawal and Suspension and accompanying letter dated March 18, 1988 represented that "Northbrook was ceasing and suspending marketing group life and health insurance policies in Benefit's territory," which notice, Benefit says, was false because Northbrook maintained an ongoing contract with Equitable to sell the same products in Benefit's territory.FN7 In support of its argument, Benefit has provided us with numerous citations to documents and testimony by Allstate and Northbrook officers to show that the Withdrawal and Suspension was not intended to affect the Equinet distribution system.

***6** Where, as here, the District Court has ruled that the evidence is insufficient to sustain a particular proposition, our standard of review is well settled:

> [W]e must find that, viewing the evidence in the light most favorable to the non-moving party, reasonable jurors could come to but one conclusion. We must give [Benefit] every benefit of every legitimate inference. However, such inferences may not rest on conjecture or speculation, but rather the evidence offered must make 'the existence of the fact to be inferred more probable than its nonexistence.'

*DiPalma* v. *Westinghouse Electric Corp.,* 938 F.2d 1463, 1464 (1st Cir. 1991) (quoting *Goldstein* v. *Kelleher,* 728 F.2d 32, 39 [1st Cir. 1984], *cert. denied,*469 U.S. 852 [1984] ) (other citations omitted). Where a plaintiff must establish each of the elements of its claim by clear and convincing evidence, a trial judge necessarily must be guided by this heightened evidentiary standard in determining, for purposes of a motion for directed verdict, whether a jury could reasonably conclude that the plaintiff has met its burden.*Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1985).

There was no error in the District Court's analysis of Benefit's fraud claim. While it is true, as Benefit claims, that the Notice of Withdrawal and Suspension states not only that Northbrook is planning to discontinue its NGA distribution system, of which Benefit was a part, but goes on to represent that Northbrook is withdrawing from "the small-to-medium size employer group life and health insurance market in certain market territories, " App. I at 227, this representation was not false. After an exhaustive trek through the entire record, we find no indication that Benefit presented any evidence from which it could be inferred that Northbrook or Allstate continued to sell group policy insurance in Benefit's area after March, 1988, when Northbrook represented that it would stop. Much of the evidence presented by Benefit implies that Northbrook intended to continue selling products through Equitable after that date, but Benefit has not shown that Northbrook ever made any such sales. Since no jury could reasonably find that this representation was false, an essential element of the fraud claim is absent. The District Court thus appropriately granted a directed verdict. FN8

4. *Breach of Contract*FN9

Benefit argues that the District Court, misinterpreting and misapplying Illinois law, improperly directed a verdict for Allstate and Northbrook on its claims for breach of the two 1988 Service Agreements and breach of the duty of good faith and fair dealing.

Since we here review a diversity case brought in the United States District Court for the District of Maine, we must determine the applicable law as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would a court of the state of Maine.*Klaxon* v. *Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Each of the 1988 Service Agreements contained choice of law provisions stating that Illinois law would govern each contract. Since a Maine court, under established principles, would honor contractual choice of law and apply the law of the state of Illinois in this case, we shall do the same, as did the trial court.*Lincoln Pulp & Paper Co., Inc.* v. *Dravo Corp.*, 436 F. Supp. 262, 268 (D. Me. 1977).

***7** Benefit's Amended Complaint asserted separate claims for breach of contract (Counts I and II) and breach of the duty of good faith and fair dealing (Counts V and VI). The District Court consolidated the breach of fair dealing counts with the breach of contract counts, ruling that Illinois did not recognize an independent cause of action for breach of the duty of good faith.

The District Court then directed a verdict for Northbrook and Allstate on the contract claims. The court reasoned (1) that where independent business people knowingly enter into a contract, they must bear responsibility for its terms, (2) that the Northbrook Service Agreement provided for termination upon 90 days notice and the Allstate Service Agreement likewise provided for termination, albeit on 180 days notice, (3) that the requisite notices had been given, and (4) that, even in the context of a franchise agreement, the covenant of good faith and fair dealing does not supervene express contractual terms. Benefit here challenges the decision of the District Court to fold the issue of good faith and fair dealing into the two contract counts (thus dismissing those counts that asserted that issue as an independent cause of action) and its ultimate legal conclusion that, notwithstanding the implied covenant of good faith, the express terms of the 1988 Service Agreements governed and were fulfilled.

Benefit relies on *P & W Supply Co., Inc.* v. *E.I. DuPont de Nemours & Co., Inc.*, 747 F. Supp. 1262, 1268 (N.D. Ill. 1990) for the proposition that Illinois recognizes a separate cause of action for bad faith termination of a franchisee in violation of state law.*P & W Supply Co.*, however, held only that an independent cause of action exists pursuant to the Illinois Franchise Disclosure Act ("Franchise Act"), Ill. Rev. Stat. ch. 815, ¶ 705/1 *et seq.* (1993) (formerly ch. 1211/2, ¶ 1701 *et seq.*). *See* 747 F. Supp. at 1267-68. The instant action was not brought under the Franchise Act, but under common law. Indeed, Benefit could not have brought this action under the Franchise Act because that statute applies only to Illinois dealerships.*Highway Equipment Co.* v. *Caterpillar Inc.*, 908 F.2d 60, 64 (6th Cir. 1990) (Franchise Act enacted to benefit Illinois residents only).[FN10]

We agree with the District Court that the Franchise Act is inapplicable and, further, that no independent cause of action exists under the common law of Illinois."Under Illinois law, a covenant of good faith and fair dealing is implied in every contract." *Capital Options Investments* v. *Goldberg Bros.*, 958 F.2d 186, 189 (7th Cir. 1992); *P & W Supply Co.*, 747 F. Supp. at 1267. Breach of the implied covenant, however, does not create an independent cause of action.*Beraha* v. *Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992); *Williams* v. *Jader Fuel Company, Inc.*, 944 F.2d 1388, 1394 (7th Cir. 1991). Claims for breach of the implied covenant of good faith and fair dealing are, therefore, considered as part of a claim for breach of contract.*See e.g.*, *LaScola* v. *U.S. Sprint Communications*, 946 F.2d 559, 565 (7th Cir. 1991) (no independent action sounding in contract for breach of an implied covenant of good faith and fair dealing in the employment-at-will setting); *Harrison* v. *Sears, Roebuck & Co.*, 546 N.E.2d 248, 256 (Ill. App. Ct. 1989) (same); *Gordon* v. *Matthew Bender & Co., Inc.*, 562 F. Supp. 1286, 1290 (N.D. Ill. 1983) (same); *Foster Enters., Inc.* v. *Germania Fed. Sav. and Loan Ass'n*, 421 N.E.2d 1375, 1380-81 (Ill. App. Ct. 1981) (discretion authorized under a contract but exercised in bad faith results in an actionable breach of contract).*But see BA Mortgage and Int'l Realty Co.* v. *American Nat'l Bank and Trust Co. of Chicago*, 706 F. Supp. 1364, 1373 (N.D. Ill. 1989) (limiting the holding of *Gordon* v. *Matthew Bender* to employment at will situations).

***8** Unlike the result which obtains under the Franchise Act,[FN11] we conclude that, absent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

special circumstances, the duty of good faith implied at common law in Illinois may not supplant the express terms of a contract. In Illinois, the term "good faith" refers to "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties."*Kham & Nate's Shoes No. 2, Inc.* v. *First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir. 1990); *see also Capital Options Investments,* 988 F.2d at 189. Thus, while principles of good faith-such as a requirement of good cause for termination-may be imposed to fill the gap where a contract is silent, *see e.g., Dayan* v. *McDonald's Corp.,* 466 N.E.2d 958, 973 (Ill. App. Ct. 1984) (stating in dicta that where a franchise contract is wholly silent on the issue of termination, "the implied covenant of good faith restricts franchisor discretion in terminating a franchise agreement to those cases where good cause exists"), "no obligation can be implied which would be inconsistent with the explicit terms of the contract." *Williams,* 944 F.2d at 1394."Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of ' good faith.' "*Kham & Nate's Shoes,* 908 F.2d at 1357;*Highway Equipment Co.,* 908 F.2d at 64, n.3 (at common law "no case in ... Illinois ... has applied a good cause obligation" to contravene an express termination at will provision); *Hentze* v. *Unverfehrt,* 604 N.E.2d 536, 539 (Ill. App. Ct. 1992). Thus, compliance with the explicit terms of a termination agreement is, absent actual "bad faith" or "opportunistic advantage-taking," *Hentze,* 604 N.E.2d at 539 (citing *Kham & Nate's Shoes,* 908 F.2d at 1357), good faith conduct notwithstanding the economic consequences imposed upon the terminated party.

The present case, though factually distinguishable from both express and silent termination clause cases, falls comfortably within the ambit of the former.FN12 Here, each of the 1988 Service Agreements contains an express termination-upon-notice provision which may be exercised "without regard to the terms above"-terms which detailed the grounds for termination for cause. FN13We agree with the District Court and rule that the contract language adopted by the parties here authorized termination at will upon notice and that this language may not, under the common law of Illinois, be vitiated absent bad faith.

Under Illinois law, "bad faith" has been described as "opportunistic advantage-taking or lack of cooperation depriving the other contracting party of his reasonable expectations,"*Hentze,* 604 N.E.2d at 539 (citing *Kham & Nates Shoes,* 908 F.2d at 1357), or as conduct "violat[ing] community standards of decency, fairness or reasonableness,"*Zick* v. *Verson Allsteel Press Co.,* 623 F. Supp. 927, 929 (N.D. Ill. 1985), or "generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive."*Valley Liquors,* 822 F.2d at 670 (quoting *Black's Law Dictionary* 127 [5th Ed. 1979] ).

***9** Here, Benefit itself adduced the evidence that in 1988 Allstate needed an infusion of $100,000,000 in order to remain competitive in this market. This evidence, coupled with the fact that Northbrook and Allstate treated all the NGA's as shabbily as they had Benefit conclusively demonstrates the absence of malice toward Benefit. True, Allstate and Northbrook did not cover themselves with glory in their retreat from the market that sustained Benefit. The "good hands" people are here revealed as much less than the cooperative partners they held themselves out to be. Instead, this record makes abundantly clear that both Allstate and Northbrook single-mindedly pursued their economic advantage with little regard for the consequences to Benefit and the other NGA's and maneuvered in such a way as to squeeze the last bit of service out of their soon to be dumped "partners."

Their conduct, however, driven as it was by economic necessity, does not rise to the level of bad faith under the law of Illinois. Although this Court is aware of no Illinois law directly on point, it has generally been held that when a product line is withdrawn from the market, good cause exists for terminating the contract.*See Medina & Medina* v. *Country Pride Foods, Ltd.,* 858 F.2d 817, 824 (1st

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir. 1988) (following answer of the Supreme Court of Puerto Rico to certified question from the First Circuit, good faith withdrawal from the market does not violate Puerto Rico franchise act); *Lee Beverage Co.* v. *I.S.C. Wines of California,* 623 F. Supp. 867, 868 (E.D. Wis. 1985) (good cause for termination where dealer withdrew product line from market) (Wisconsin state law); *St. Joseph Equipment* v. *Massey-Ferguson, Inc.,* 546 F. Supp. 1245 (W.D. Wisc. 1982) (same) (Wisconsin state law).FN14*Compare Hentze,* 604 F.2d at 539-540 (termination of dealership contract amounted to " bad faith" because of tactics aimed at running terminated dealership out of business).

Since here there was good cause to withdraw this insurance product line from the market, the District Court was correct in ruling that Benefit presented insufficient evidence for a jury to find that Allstate or Northbrook terminated the 1988 Service Agreements in bad faith.

*CONCLUSION*

The District Court having dealt properly with the discovery matter addressed by the Magistrate Judge, having appropriately declined to permit further amendment of the complaint, and having justifiably directed a verdict as to both the contract and fraud counts, its decision is, in all respects,

*Affirmed.*

FN1. As Benefit's case began to sink on summary judgment and ultimately foundered upon a directed verdict, we draw all reasonable inferences in Benefit's favor throughout.*Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 431 (1st Cir. 1992) (inferences drawn against party prevailing on summary judgment); *DiPalma v. Westinghouse Electric Corp.,* 938 F.2d 1463, 1464 (1st Cir. 1991) (inferences drawn against party prevailing on directed verdict).

FN2. This notice stated, in pertinent part:

Current business conditions have caused Northbrook to revaluate its Group Agency operations, resulting in our withdrawal from the small-to-medium sized employer group life and health insurance market in certain market territories.

FN3. During 1988, Benefit derived more than 65% of its revenues from its Northbrook business-a sum of over $2,000,000 from which Benefit received commissions of approximately $665,000.

FN4. Allstate's agents communicated with Benefit as follows:
The term of the new Allstate contract is one year. We anticipate that during this year major changes will evolve in our strategy of healthcare delivery.... This provision has not been included with the idea of terminating without a continuation option. It has been placed in the contract to prompt renegotiation more favorable to all parties when the cycle is complete and our local market strategy is solidified.

FN5. Subsection (b)(1)(B) of 28 U.S.C. § 636 permits a district judge to designate a magistrate judge to conduct hearings and to submit proposed findings of fact and recommendations regarding dispositive motions and other matters specifically excepted from subsection (b)(1)(A). A district judge *shall* make a de novo review of these findings *if* a party objects within the required time period. It is undisputed, however, that subsection (b)(1)(A) applies to the instant discovery matter.

FN6. The Withdrawal and Suspension clause of the Amended General Agency Agreement states:
The Company [Northbrook] may withdraw all or any part of the authority granted to the Group Agency [Benefit] in Sections 1 and 2 hereof, with respect to any line or lines of insurance which the Company has decided to cease or suspend writing in any or all of the location(s) in which the Group

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Agency has been authorized hereunder. The Company will give not less than one hundred eighty (180) days advance notice to the Group Agency prior to such cessation or suspension.
App. I at 105.

FN7. Prior to trial in the District Court, Benefit's counsel at various times had pointed to other oral statements as being allegedly false. These other promissory estoppel and fraud theories were dismissed on summary judgment. Supp. App. at pp. 11-13.Benefit has not appealed the granting of summary judgment on any fraud claims. In its Brief on Appeal, Benefit relies only on the single alleged theory of fraud discussed above. Appellant's Brief at pp. 18-19 ("The false statement was the notice of withdrawal and suspension....").

FN8. In his opinion, the District Judge stated that Allstate and Northbrook could not have marketed group life and health insurance in Maine after January 1, 1988, because they had sold this portion of the business to Metropolitan. Even if there were evidence to the contrary, as Benefit says, i.e., that the Equitable business was exempted from the transfer to Metropolitan, Benefit still has shown no actual sales by Equitable, only the potential for sales. Any error by the trial judge regarding this matter is therefore harmless.

FN9. Benefit also argues on this point that the District Court improperly characterized the testimony of Benefit's damages expert as contrary to the evidence. We need not reach this issue since it was not a ground on which the District Court based its directed verdict, viz., "[The weakness of the expert testimony] is not an independent ground of the Court's granting the motion for directed verdict, nevertheless it's a factor. It's sort of a background consideration which the Court has not felt it should ignore...."

FN10. Allstate and Northbrook also assert that their relationships with Benefit did not satisfy the requirements for a franchise agreement under the Franchise Act. The Franchise Act defines a franchise as a contract or agreement by which-
(a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and (b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or its other commercial symbol designating the franchisor its affiliate; and (c) the person granted the right to engage in such business is required to pay, directly or indirectly, a franchise fee of $500 or more.
Ill.Rev.Stat. ch. 815, ¶ 705/3 (1993) (formerly ch. 121 1/2, ¶ 1703(1)).

***10** We need not decide whether the District Court correctly determined that a reasonable jury could have found that the 1988 Service Agreements between Benefit and Allstate and Northbrook respectively were franchise agreements. Even if these agreements were franchise agreements under the Franchise Act, as they pertain to businesses outside Illinois they are entitled to no more protection than other agreements.*Highway Equipment Co,* 908 F.2d at 64 (extraterritorial franchise agreements are not protected by the Franchise Act).

FN11. Under the Franchise Act the implied covenant of good faith may override the express terms of a contract.*P & W Supply Co,* 747 F. Supp. at 1268 (franchisor may not terminate absent good cause even though contract provided for termination on 30 days notice with or without cause).

FN12. It must be candidly recognized,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

however, that in each of the cases cited by Allstate and Northbrook for the proposition that where a contract expressly provides for termination without cause there is no room for implying a requirement of good cause, the termination clause was somewhat more explicit than that in the present case.*See Highway Equipment Co.,* 908 F.2d at 64 (right to terminate "without cause"); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 669 (7th Cir. 1987), *cert. denied,*484 U.S. 977 (1987) (right to terminate "at any time and for any reason" ); *see also Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 132 (5th Cir. 1979), *cert. denied,*444 U.S. 938 (1979) (right to terminate "at any time for any reason").

FN13. The termination provisions provided that: "Termination of the Agreement at the option of either party without regard to the terms set out above may be effected by such party providing the other with one hundred and eighty days (180) written notice" [ninety days in the case of the Northbrook Service Agreement]. The terms "set out above" in the 1988 Service Agreements provided a number of reasons why Allstate and Northbrook could terminate for cause (e.g. bankruptcy of the Administrator's [Benefit's] business, gross negligence, fraud or embezzlement by the Administrator, etc.). Indeed, Benefit refers to the termination provision in the 1988 Service Agreements as "much more favorable to Allstate" than were the cognate provisions of the Amended General Agency Agreement.

FN14. In *Wright-Moore Corp. v. Ricoh Corp.,* 908 F.2d 128, 138 n.4 (7th Cir. 1990), the Seventh Circuit reserved the market withdrawal issue for another case but stated in dicta that other courts have considered market withdrawals to constitute good cause since they carry little chance of unfair dealing. The Seventh Circuit rejected, however, the broad holding in *American Mart Corp. v. Joseph E. Seagram & Sons, Inc.,* 824 F.2d 733, 734 (9th Cir. 1987), relied on by Allstate, that business considerations of a franchisor could constitute good cause for termination. *Id.* at 138.

C.A.1,1993.
Benefit Management of Maine, Inc. v. Allstate Life Ins. Co.
993 F.2d 1530, 1993 WL 177120 (C.A.1 (Me.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.