UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROSEZOLA SELLERS,

Plaintiff,

v. : C. A. No. 05-381S

UNITED STATES DEPARTMENT OF DEFENSE and ROBERT M. GATES, SECRETARY OF THE DEPARTMENT OF DEFENSE,

Defendants.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANTS' CORRECTED MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT[1]

## BRIEF INTRODUCTION AND FACTS

Plaintiff, Rosezola Sellers (hereinafter "Sellers"), is African American. On September 2, 2005, Sellers filed this lawsuit against the United States Department of Defense and Donald Rumsfeld, the Secretary of Defense (hereinafter collectively referred to as "Defendants"). In her Complaint, Sellers alleges that, during her employment, she was subjected to racial harassment and discrimination as well as retaliation in violation of Title VII.

In 1988, Sellers began working for the Defense Commissary Agency in Newport, Rhode Island (hereinafter the "Newport Commissary").[2] In about 1988, Al Felton, who

[1] Sellers is not providing the deposition transcripts in support of her Memorandum although she has cited to them. To the extent the Court deems it necessary to have the transcripts, they are currently segregated and available for delivery to the Court.

was then in charge of the Newport Commissary (hereinafter "Felton"), recruited Sellers to work at the Newport Commissary. From the time she arrived until about 1995 – when Felton left -- Sellers had no problems.

That changed in 1995 when John Blythe (hereinafter "Blythe") replaced Felton and became the Store Administrator. For much of the next seventeen years with Blythe at the helm, Sellers was continuously subjected to racial harassment and discrimination as well as retaliation.[3] Acting without an attorney on each occasion, Sellers was forced to file charges of discrimination, harassment and retaliation on: November, 1997,[4] March and then November, 2001 (the "First Charge"), April 16, 2004 (the "Second Charge"), May 4, 2005 (the "Third Charge") and finally on March 29, 2006 (the Fourth Charge").[5] The First and Fourth Charges are the subject of this lawsuit only to the extent that they provide background information. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

In the First Charge, Sellers' initial contact with a local EEO Counselor was on March 15 after which she filed a formal EEO charge on May 8, 2001. This charge was investigated from November 7, 2001 to January 23, 2002. The formal charge alleged that

---

[2] Prior to this, Sellers worked in security at the Navy Exchange. While there, she was not subjected to discriminatory or retaliatory conduct.

[3] In about 1990 and 1991, Sellers was temporarily transferred to a Branch Commissary Store in New London; while there, she did not have any problems and was not subjected to discriminatory or retaliatory conduct. To the contrary, her job performance evaluations reflect that she excelled while there. (See evaluations)

[4] There are no documents relating to the 1997 charges. The only evidence that a 1997 charge was filed is an Affidavit signed by Blythe, which is part of the 2001 charges, in which he states: "Until EEO (sic) contacted me in 1997, complainant had never complained about not being issued a coat to work in the freezer." (Page 367) Also, on page 369, also part of the 2001 charges, Blythe states "First off, I have met with the local EEO representatives numerous times over the years, each and every time Ms. Sellers has had some type of personal problem in relation to the operation of the Newport Commissary. I have tried to reason with her, and Ernest Signorino can attest to that. She makes claims of a prejudicial and discriminatory nature, but never provides any documentation to substantiate them." See Plaintiff's Exhibit 1.

[5] Sellers was not represented by an attorney when she filed the charges.

Blythe had harassed and discriminated against Sellers based on her race and handicap by directly and/or indirectly doing things like switching her assignments and schedule, treating her differently than whites, assigning her unfavorable duties, claiming that she was unable to get along with people, denying her leave, and not selecting her for the position of Store Worker. In November, 2001, Sellers amended the formal charge to include a claim that Blythe's subordinate, Donald Leger (hereinafter "Leger") had retaliated against her for filing the First Charge by issuing her a letter of caution for inappropriate behavior and a procedural reminder for tardiness. See Plaintiff's Exhibit 1.

In the second charge, which is the subject of this lawsuit, Sellers first contacted a local EEO counselor on December 18, 2003 and subsequently filed a formal charge on April 19, 2004. The formal charge was investigated from December 1, 2004 to February 15, 2005. The formal charge, at least as initially drafted by the EEO, listed the issues as (1) whether Blythe racially discriminated and retaliated against her when he denied her requests for annual leave on the following dates in 2003: August 7-8, 28-29, 31 and November 14-15 and 18-22; (2) whether Blythe's subordinate, Mary Gibson, the Grocery Manager (hereinafter "Gibson") discriminated against her by issuing Sellers a letter of reprimand for failure to follow instructions and disrespectful behavior; and (3) whether Blythe discriminated and/or retaliated against her when, on March 4, 2004, he disapproved Sellers' request to have her leave restored. Sellers amended her charge to include an allegation that she was retaliated against when her duty hours and work assignments were abruptly changed without an explanation on December 13, 2004.

In the last charge which dealt with her firing, Sellers contacted an EEO Counselor on December 2, 2005; she filed a formal complaint on March 29, 2006. The investigation took place from January 23 to May 17, 2007.

## ARGUMENT

### I. DEFENDANTS' ARGUMENTS THAT SELLERS FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES ARE WITHOUT MERIT.

Defendants contend that some of Sellers' claims are barred because she failed to exhaust her administrative remedies in a number of different ways. For the reasons set forth below, defendants arguments are without merit.

#### A. The Denial of Annual Leave in July, 2003.[6]

On July 14, 2003, Sellers applied to take annual leave on the following four dates: August 7, 8, 29 and 31, 2003. Sellers did not contact an EEO counselor until December 18, 2003. Defendants argue that this is fatal to Sellers' claim because she was required to make such contact within forty-five days of July 13, 2003.[7] *See Defendants' Memorandum at p. 19-20.* Defendants argument is without merit because it fails to take into account the doctrine of accrual.

Admittedly, federal employees who seek to bring Title VII actions in federal court must first exhaust their administrative remedies. Unlike private sector employees, federal employees must first contact an EEOC counselor and this must be done within forty-five days of the discriminatory act. *See, e.g., Heins v. Potter*, 271 F. Supp. 2d 545 (S.D.N.Y.

[6] Plaintiff fully discusses the facts relating to her annual leave issues in the pretext portion of her brief. Only those facts regarding the exhaustion issue are discussed here.

[7] It should be noted that she filed a formal complaint May 8, 2001 and investigation took place November 7, 2001 to January 23, 2002.

2003) (*citing* 29 C.F.R. § 1614.105(a)(1)). If the EEOC counselor does not resolve the claim, a federal employee is then allowed to submit a formal administrative complaint (sometimes referred to as the "Charge of Discrimination"). *Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001).

Significantly, this forty-five day counseling requirement is subject to waiver, equitable tolling, and equitable estoppel. *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir. 1996). *See also* 29 C.F.R. § 1614.105(a)(2) (forty-five days may be extended if employee was prevented by circumstances beyond his or her control or for other reasons considered sufficient by agency or Commission).

The doctrine of accrual also applies to the forty-five day requirement. *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999) (the EEOC regulations – which state that the forty-five day period does not commence until the plaintiff knew or reasonably should have known that the discriminatory act occurred – appear to codify the federal common law of accrual). As courts have consistently explained: "Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date – often the same, but sometimes later – on which the plaintiff discovers that he has been injured." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Harris v. Department of New York*, 186 F.3d 243, 247 (2d Cir. 1999). In *Nieves-Marques v. Puerto Rico*, 353 F.3d 108, 119-20 (1st Cir. 2003), the First Circuit explained that "the time of accrual of a civil rights action is when the aggrieved party knows or has reason to know of the injury which is the basis for his action or when facts supportive of a civil rights action are or should be apparent to a reasonably prudent person similarly situated." Moreover, to trigger the statute of

limitations, the plaintiff needs to have been placed on notice, not only of the decision, but also that the decision is final and that it will be followed by no further process. *See, e.g., O'Brien v. Department of Springfield*, 319 F. Supp.2d 90, 101-02 (D. Mass. 2003).

Applying the law of accrual here, it is clear that summary judgment is improper. Defendants only denied Sellers the right to take leave on the four dates she had selected in August. As Blythe explained in his deposition, Sellers was still able to re-apply for leave on other dates. Blythe Deposition at 272-3. Turning to Sellers, she was concerned, not so much with the fact that she could not take the days selected in August, but whether she was ultimately going to lose her leave by the end of the year. See Plaintiff's Exhibit 14; see also Sellers Deposition 35-7, 240.

B. Sellers' Promotion From GS-5 To GS-7.

Defendants argue that summary judgment is proper because Sellers failed to exhaust her promotion and pay claim.[8] *See Defendants' Memorandum at p. 20-22.* For the reasons set forth below, defendants' argument is without merit.

A. Scope of the Charge.

A cursory review of the law makes this point abundantly clear. The issue raised herein concerns the extent to which the scope of the EEOC charge limits the scope of the Title VII lawsuit. The seminal case, *Sanchez* v. *Standard Brands, Inc.* discussed when the allegations of the EEOC charge might limit the scope of a subsequent Title VII suit. The court held that the scope of the judicial complaint is not limited to the scope of the charge, but rather to the EEOC investigation that reasonably can be expected to grow out of it. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). This holding has become known as the "scope of the investigation" rule and has been consistently

[8] We admit that this is one and the same.

applied in the First Circuit. *See, Johnson v. General Electric*, 840 F.2d 132, 139 (1st Cir. 1988); *Powers v. Grinnell Corp.*, 915 F.2d 34 (1st Cir. 1990); *Davis v. Lucent Tech., Inc.*, 251 F.3d 227, 233 (1st Cir. 2001); *Swallow v. Fetzer Vineyards, et al.*, 46 Fed. Appx. 636 (1st Cir. 2002). The rule "does not require the filing of an actual amendment to the administrative charge. *Davis, supra* at 233. To the contrary, "[w]here a claim was not explicitly included in an agency charge, the claim may survive if it was within the 'scope of the investigation,' i.e. was based on acts of discrimination that the [agency] investigation 'could reasonably be expected to uncover.'" *Swallow, supra* at 644-645, *citing Davis, supra* at 233. In fact, even where a claim was not investigated, if it should have been, it can still be deemed within the scope. *Davis, supra* at 233.

Applying the facts here, it is clear that Sellers' retaliation, and separate racial discrimination, claims were administratively exhausted. In the course of the EEOC investigation, Plaintiff explicitly and repeatedly complained about her failure to be promoted to a GS-7. In fact, the EEOC investigative record is replete with references to plaintiff's failure to be promoted. See Plaintiff's Exhibit 2.

For example, on February 15, 2005, Plaintiff filed a sworn statement with the EEOC wherein she complains that she has not been promoted to a GS-7, despite the fact that her position has "promotion potential to that grade level. See Plaintiff's Exhibit 2. Plaintiff explicitly states, "the date is Feb. 15, 2005. I still have not received my GS-7." See, Id. Plaintiff also indicates that, unlike herself, other similarly-situated CAO employees received promotions on time and did not require a schedule change. *See, Id.* Thereafter, in the course of the EEOC investigation, by sworn declaration dated February 16, 2005, John Blythe responds to Plaintiff's claims by alleging, among other things, that

Defendants have been attempting to promote plaintiff, but that plaintiff was unwilling to cooperate in obtaining the necessary training required to promote her. See, Plaintiff Exhibit 2. Further, by sworn declaration dated February 18, 2005, Mary Gibson responded to Plaintiff's allegations by stating that Defendants were trying to train Plaintiff for the promotion but that Plaintiff was not interested in helping herself to the next level. Ms. Gibson further stated that a checklist needed to be done in order for Plaintiff to be promoted to the GS-7. Gibson also responds to Plaintiff's failure to promote claim by stating that she is trying to move plaintiff to the next level. See, Plaintiff's Exhibit 2. By notice dated February 21, 2005, the EEO investigator forwarded managements' statements to her and informed her of her right to file a rebuttal. See, Plaintiff's Exhibit 2. By written rebuttal dated February 24, 2005, Plaintiff complained that John Blythe " will do anything to keep me from receiving my GS-7." See Plaintiff's Exhibit 2. In light of the numerous instances where plaintiff's failure to be promoted to a GS-7 was raised both by plaintiff and by management in the course of the EEOC investigation, clearly, the EEOC's investigation should have uncovered this claim.[9]

B. The *Clockedile* Decision.

Even assuming that plaintiff's failure to be promoted claim did not satisfy the scope of the investigation rule – which it did -- the First Circuit has held that a judicial complaint can encompass discrete acts of retaliation "reasonably related and growing our to the discrimination complaint of to the agency…" *Clockedile v. N.H. Dept. of Corr.*,

[9]Contrary to defendants position, it is the EEO which dropped the ball. The EEO wrote Sellers a letter stating: "If you add issues that are not part of the existing claim or are not like or related to the pending claim, those issues will be returned to you for further counseling." Significantly, the EEO never alerted Sellers that any claims raised by her would not be investigated or considered part of her complaint. See Plaintiff's Exhibit 2.

245 F.3d 1,6 (1st Cir. 2001). "[A]n administrative charge is not a blueprint for the litigation to follow." Rather, "[t]he charge merely provides the EEOC with 'a jurisdictional springboard to investigate whether the employer is engaged in any discriminatory practices.'" *Grinnell*, *supra* at 38. Given this, an employee is not required to file a separate EEOC charge alleging retaliation when the retaliation occurs in response to the filing of the original EEOC charge. *Gawley v. Indiana University*, 276 F.3d 301, 314 n.8 (7th Cir. 2001).

C. Failure to Exhaust Fourteen-Day Suspension.

Defendants claim that summary judgment is proper on this claim as well. In short, defendants argue that a federal employee, who believes she has been discriminated against and whose collective bargaining agreement provides for a negotiated grievance procedure, may file *either* a grievance or an EEO complaint, but not both. Moreover, if an employee files a timely written grievance before filing a written EEO complaint, she has irrevocably chosen the negotiated grievance procedure, and is precluded from filing an EEO complaint on the same matter. Defendants argue that, once the grievance-arbitration procedure is elected, judicial review is available only if she has fully exhausted her administrative remedies in dealing with her grievance. *See Defendants' Memorandum at pages 23-25.*

Applying these principles here, defendants argue that summary judgment is proper because, after first filing a grievance on April 26, 2005 concerning her fourteen-day suspension, Sellers went through the first two steps of the grievance-arbitration procedure but then abandoned her grievance at the next step of arbitration. Defendants

argue that this means she has failed to exhaust her administrative remedies as to her race or retaliation claims in this case.[10]

Defendants ignore a line of United States Supreme Court decisions which apply here. In *Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (1974), the Supreme Court held that arbitration, pursuant to a collective bargaining agreement, will not necessarily bar a subsequent Title VII suit even if the claimant lost the arbitration. The Court rejected the defendant's arguments that future litigation would be barred by the doctrines of election of remedies, waiver, collateral estoppel, and res judicata. *Id.* at 49-51 & n.10. Significantly, *Alexander-Gardner* has been extended to federal employees. *Chandler v. Roudebush,* 425 U.S. 840 (1976) (federal plaintiffs enjoy absolute right to trial de novo just like private-sector employees and employees of state government and political subdivisions under Title VII). Admittedly, that decision was called into question by the Supreme Court's later decision in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (1991). In *Gilmer*, the Court ruled that a statutory discrimination claim under the Age Discrimination in Employment Act could be compelled to arbitration by virtue of a provision in an individual employee's securities arbitration by virtue of a provision in an individual employee's securities industry registration application. In *Wright v. Universal Mar. Serv. Corp.,* 525 U.S. 70, 80 (1998), the Supreme Court acknowledged, but refused to resolve, the tension between these two lines of cases. Instead, it held that, even assuming a collective bargaining agreement can waive an employee's right to a federal

---

[10] Even assuming defendants' argument had merit – which they do not – it is clear that Sellers exhausted her administrative remedies through the grievance-arbitration provision. It was the union – and not Sellers – who decided not to pursue her grievance to the final step of arbitration. Given this, Sellers has exhausted her administrative remedies. *See Rosell v. Wood,* 357 F. Supp. 2d 123, 132 & n.13 (D.C. 2004) ("The final agency decision is then either the Union's refusal to refer the matter to arbitration or the final result of the arbitration process....")

forum, any such waiver must at a minimum be "clear and unmistakable." *Id.* at 79-81 (Court found no such waiver because the collective bargaining agreement's language was that clear and court found no clear and unmistakable waiver of federal forum in language in contract purporting to cover "all matters affecting wages, hours and other terms and conditions of employment").

Since *Wright,* courts have had occasion to address the issue whether there has been a "clear and unmistakable" waiver. *See, e.g., O'Brien v. Town of Agawam,* 350 F.3d 279 (1st Cir. 2003) (no waiver in light of language that arbitration provision applies only to "grievances" which were defined as allegations that Town violated collective bargaining agreement and where there was no reference to arbitration of statutory claims); *Quint v. A.E. Staley MFg. Co.*, 172 F.3d 1, 8-9 (1st Cir. 1999) (collective bargaining agreement lacked any express reference to federal anti-discrimination statutes and this meant there was no "clear and unmistakable waiver" of employee's right to bring statutory discrimination claim in federal court).

Applying the law here, it is clear that summary judgment is improper. The collective bargaining agreement does not contain a clear and unmistakable waiver of Sellers' right to pursue a Title VII action in this Court. *See Government Ex. 15, Articles 47 (Negotiated Grievance Procedure), Article 48 (Grievance Mediation), and Article 49 (Arbitration).* There is not a single reference to arbitration of statutory claims let alone a clear and unmistakable waiver.[11]

## II. DEFENDANTS' ARGUMENTS THAT PLAINTIFF CANNOT SATISFY A PRIMA FACIE CASE ARE WITHOUT MERIT AS A MATTER OF LAW.

### A. Similarly-Situated Prong of Prima Facie Case.

[11] Even assuming, *Cocodile* applies.

Relying on *Ashley v. Paramount Hotel Group, Inc.*, 451 F. Supp.2d 319, 330 (D.R.I. 2006), defendants argue that Sellers cannot establish a prima facie case of discrimination on her claims of (1) denial of leave in November, 2003, (2) the refusal to restore her leave in March, 2004, (3) the letter of reprimand of February 25, 2004, and (4) the change in her schedule on December 12, 2004 because she cannot prove an essential element: that she was treated less favorably than similarly situated non-black employees.

In fact, contrary to Defendant's assertion, the First Circuit has explicitly rejected the notion that Plaintiff is required to proffer comparator evidence in order to establish her *prima facie* case. *Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572, 584 (1st. Cir. 1999). A *prima facie* case of race discrimination only requires a showing that: 1) the plaintiff is within a protected class; (2) she was qualified for, and performing her job at a level that met the employer's legitimate expectations; (3) she was nevertheless dismissed; and (4) after her departure, the employer sought someone of roughly equivalent qualifications to perform substantially the same work. *Feliciano De La Cruz v. El Conquistador Resort and Country Club,* 218 F. 3d 1,5 (1st Cir. 2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 506 (1993).

Moreover, the plaintiff's burden in establishing a *prima facie* case is a modest one. *Cardona Jimenez v. Bancomerico de Puerto Rico*, 174 F.3d 36, 41 (1st Cir. 1999); *Equal Employment Opportunity* Comm'n v. Amego, Inc., 110 F.3d 135, 141 n.2 (1st Cir. 1997). "All that is needed is the production of admissible evidence which, if uncontradicted, would justify a legal conclusion of discrimination." *Sanchez v. Puerto Rico Oil Co.*, 37

F.3d 712, 719 (1st Cir. 1994). In fact, "the contours of a prima facie case are flexible and situation-specific." Id.[12]

B. Adverse Action Prong.

Defendants argue that Sellers cannot establish another prong of her prima facie case: that she suffered an adverse job action with respect to her leave.[13] *See Defendants Memorandum at p. 28.* In support, defendants make the implausible argument that such a conclusion is warranted because Sellers failed to schedule her leave earlier and, in 2001, received more leave than any other employee. Defendants also rely on four cases holding that denial of leave is not an adverse job action: *Box v. Principi*, 442 F.3d 692, 697 (8th Cir.), *Allen v. Potter*, 115 Fed. Appx. 854, 861 (7th Cir. 2004), *Pitchford v. Potter*, No. 3:03CV00374, 2007 WL 1020467 at 10 (E.D. Ark. March 30, 2007) and *Mihalko v. Potter.*

For the following reasons, defendants argument is without merit. First, there is even more support for the proposition that denial of leave amounts to an adverse action. *See, e.g., Allah v. City of New York*, 47 Fed. Appx. 45 (2nd Cir. 2002) (loss of vacation and pay are adverse actions); *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241 (8th Cir. 1998) (denial of vacation days was sufficient adverse employment action to sustain claim because it was material change in existing employment benefits); *Martin v. Stericycle, Inc.*, 389 F. Supp. 2d 131 (D.C. Mass. 2005) (holding vacation request was not adverse but only because it had not been earned yet); *Mendoza v. Sysco Food Services of Arizona,*

[12]Plaintiff addresses the issue relating to similarly-situated employees in the pretext section below. As is amply demonstrated in that part, non-black employees comparison Plaintiff disputes Defendant's contention that similarly-situated non-black employees were treated more favorably than plaintiff. Plaintiff's has set forth her substantive argument in this regard below in addressing the issue of pretext.

[13] It is difficult to determine whether defendants contend that the denials in July and November plus the refusal to restore in March are not adverse job actions. For purposes of this section, Sellers will assume defendants are treating all three the same.

337 F. Supp. 2d 1172 (D.C. Az. 2004) (it can be inferred that denying employee's vacation preference is adverse employment action) (citation omitted)); *Dimitrov v. Seattle Times Co.,* 2000 U.S. App. LEXIS 22402 (9th Cir. 2000) (denial of vacation time amounts to adverse employment action); *Donaldson v. Governors State University*, 2001 U.S. Dist. LEXIS 20697 (D.C. Ill. 2001) (loss of vacation is adverse job action).

In fact, the cases that defendants cite can be easily distinguished. For example, in *Box*, the plaintiff did not lose any vacation time because, on the day selected, he took sick leave. In *Allen*, the court held there was no adverse employment action but only because the plaintiff's complaint was that he had not been able to take the precise leave dates he selected and had not lost any allotted leave time. Similarly, in *Mihalko*, it does not appear that the plaintiff suffered a loss as a result of the denial.[14]

## III. DEFENDANTS' ARGUMENT THAT SUMMARY JUDGMENT IS PROPER BECAUSE PLAINTIFF CANNOT ESTABLISH PRETEXT IS UNAVAILING.

In short, defendants contend that Sellers cannot prove pretext on her claims relating to: the denial of her annual leave, the denial of her restoration application, the issuance of a letter of reprimand in February, 2004, and the change in her work schedule in December, 2004. In support, defendants contend that there is no evidence showing falsity of their legitimate, non-discriminatory reasons and further that there is no evidence that she was treated differently than similarly-situated white employees. See Defendants' Memorandum at p. 30-1. In fact, as the following establishes, there are many more ways of proving pretext which are applicable here.

### A. The Law Relating To Pretext.

#### 1. Falsity.

[14] Indeed, even if this Court were to find that Sellers' leave claims are not adverse job actions, they are still part of her hostile work environment claim.

An employee can establish pretext by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Proof that an employer's explanation is "unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 2106 (2000). In *Reeves*, the Court held that it is appropriate for a jury to infer "from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.,* at 2109. Further, an employer may not escape liability for its discriminatory conduct simply by showing that there were other sufficient causes for the adverse action taken. The employee need only establish that the protected characteristic, in this case race, was a "motivating factor" in the adverse action taken against the plaintiff, even if there were other factors. *Desert Palace, Inc. v. Costa*, 2003 U.S. LEXIS 4422 (June 9, 2003).

2. Similarly-Situated Comparisons.

Alternatively, a plaintiff can show pretext by demonstrating that her employer treated her differently than other similarly situated employees outside the protect class. *Booker v. Massachusetts Department of Public Health, et al.*, 2007 U.S. Dist. LEXIS 93714 (D. Mass. December 21, 2007). *See, Santiago-Ramos, v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 64 (1st Cir. 1999). When attempting to show similarly situated, a plaintiff can establish pretext by proffering evidence that similarly-situated employees outside the protected group were treated more favorably than plaintiff. In determining who constitutes a

"similarly-situated" employee for the purposes of comparator evidence, the First Circuit has employed a "reasonably comparable" standard. *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1sr Cir. 1989). The test that has been utilized is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Significantly, the Court recognizes that an "[e]xact correlation is neither likely nor necessary" as long as the cases are fair congeners." *Id.* at 19. More specifically, this Court has held that a plaintiff does not have to limit her comparison only to other employees disciplined by the same supervisor. Further, the conduct engaged in by other employees to whom plaintiff compares herself need not be the same conduct engaged in by the plaintiff, particularly where similarly situated employees outside plaintiff's group who engaged in more serious misconduct received more lenient treatment. *Briddell v. Saint-Gobain Abrasives, Inc.*, 2007 U.S. Dist. LEXIS 26829 (D. Mass. March 30, 2007); *Petsch-Schmid v. Boston Edison company, et al.*, 914 F. Supp. 697, 704 (D. Mass 1996). In *Petsch*-Schmid, a case involving a claim of sex discrimination, the plaintiff alleged that her employer did not place male employees with similar performance problems on remedial plans or did so only after prolonged probationary periods. Plaintiff further alleged that she was discharged for an infraction far less severe than incidents for which male employees only received mild discipline. The Court held that, despite the fact that plaintiff was disciplined by a different supervisor than the male counterparts and despite the fact that the conduct for which she was disciplined was different than that of her male counterparts, plaintiff had proffered evidence of pretext sufficient to survive summary

judgment. *See, Id.* In addition, evidence of past treatment toward others similarly situated can be used to demonstrate pretext. *Dartmouth Review, supra* at 18.

3. <u>Weaknesses, Implausibilities, Inconsistencies.</u>

A plaintiff can prove pretext by identifying weaknesses, implausibilities, inconsistencies, incoherencies or contradictions with respect to the legitimate, non-discriminatory reason. *See Santiago-Ramos*, 217 F.3d at 56.

3. <u>Procedural Irregularities.</u>

A plaintiff can also establish pretext by establishing evidence of procedural irregularities and the use of subjective criteria. *Merritt v. Tellabs Operations, Inc.*, 2007 U.S. App. LEXIS 3609 (10th Cir February 15, 2007). Deviation from company policy can be circumstantial evidence of discrimination. *Ash, Githon v. Bullock, et al.*, 129 Fed. Appx. 529 (11th Cir. 2005).

4. <u>Discriminatory Atmosphere.</u>

Evidence of a discriminatory atmosphere may be relevant in proving pretext since such evidence does tend to add color to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff. *Creely v. Genesis Health Ventures, Inc.*, 184 Fed. Appx. 197 (3rd Cir. 2006).

B. <u>The Following Discussion Makes Clear That Sellers – And Other Non-Whites Were Treated Differently Than Similarly Situated Whites.</u>

Even assuming Sellers committed the acts for which she was disciplined and fired – which she vehemently denies – similarly-situated whites engaged in much more egregious conduct for which they did not even receive a verbal counseling let alone a letter of reprimand, suspension or firing. In the Notice of Proposed Suspension dated February 7, 2005 (the "Suspension Notice"), Sellers was charged with engaging in

disruptive behavior. See Government Exhibit 1f. Examples of the purported conduct include calling McCollum names such as “a damn crybaby”, directing sucking noises at him and allegedly saying “ill yuck, you make me sick.” Ms. Sellers was also accused of making “disparaging comments” to another employee, Johnnie Spencer, and conveying “false information” to his supervisor. She was also allegedly charged with making an untruthful statement to a customer about Mary Bucolo – a white employee -- not being at work. Other examples of Ms. Seller’s alleged disruptive conduct included the allegation that Sellers yelled and banged her hand on her chest and rolled her eyes. Sellers was additionally charge with failing to comply with her supervisor’s instructions – one of which was issued some four months after the incident.

In the Notice of Proposed Removal, she was charged with failure to follow instructions, disruptive behavior and disrespectful conduct. See Plaintiff’s Exhibit 3. The behavior allegedly included blocking the passage of a co-worker and folding her arms and staring at her supervisor, making remarks about Gibson such as “Mary is just little Ms. Innocent, you’re so innocent” and coughing on McCollum and saying to him “you’re gay.”[15]

In the Letter of Reprimand of February, 2004, Sellers was charged with failing to follow Gibson’s directions and disrespectful conduct that allegedly occurred on December 5, 2003. See Plaintiff’s Exhibit 4.

---

[15] Significantly, in her deposition, Gibson was asked to describe the misconduct in which Sellers engaged. She said: “On different occasions, she was disrespectful….If I would call her to my office she would fold her arms and just stand there and stare at me, would not answer me when I spoke to her. If I had asked her to do something she would talk back. There were numerous times. Gibson Deposition 69. She was asked if she could recall any other misconduct by Sellers and she said no. Id. She eventually admitted that Sellers was only disrespectful on three or four occasions. Id. With respect to the folding of the arms, she could only recall Sellers doing that once or twice. Id.

As the following demonstrates, other whites engaged in the same conduct but at a level which was much worse. Just considering this evidence, summary judgment is improper.[16]

1. <u>William McCollum.</u>

As previously noted, McCollum is white and the person who performed the same job as Sellers at least as of September 2003 when Sellers became CAO. As the following makes clear, McCollum was insubordinate, rude, disrespectful and disruptive. Yet, he was never disciplined.

First, McCollum had arguments with Blythe. For example, Furtado recalled an incident in which McColloum aggressively confronted Blythe because he believed that Blythe was not carrying his weight in the store. Furtado testified that, during this encounter, McCollum was obviously mad and raised his voice. He also criticized Blythe and said something like: "You're lucky to have Furtado running the store; it would look like crap if he [Furtado] was not out there!" Significantly, Furtado described McCollum's conduct as disrespectful. Unlike Sellers, McCollum was never disciplined. Furtado Deposition at 84-89;[17] McCollum Deposition at 22, 26.[18]

---

[16] It should be noted that, as civilian employees, all of the following employees were subject to the same policies including those relating to discipline. See Plaintiff's Exhibit 5.

[17] Although Furtado easily recalled this incident, Blythe – as he did with many others – did not. However, he admitted that, if McCollum did what Furtado described, he would have taken disciplinary action against him. Blythe Deposition at 179-80.

[18] Significantly, when Sellers expressed her opinions, she was viewed as being disrespectful. When a white employee did the same, he was viewed as just expressing an opinion. Furtado Deposition at 87-88.

The second incident also involves McCollum and Blythe. During this incident, McCollum was again disrespectful. McCollum Deposition 21-2. Again, he did not receive any discipline. McCollum Deposition 26.[19]

Gibson also testified that McCollum refused to do things she asked. Gibson Deposition 213. In fact, she said this happened with employees on almost a daily basis. Gibson 213.

Gibson also testified that she and McCollum had problems including that he was rude on at least four occasions and was sarcastic, loud and otherwise had an "attitude." Gibson Deposition 215, 219; For example, he would speak to Gibson in a way she found inappropriate. Rather than discipline him – like she did with Sellers -- she tried to reason with him. Gibson Deposition 219. She testified that if she asked him something, he would often say something very rude back including "Well I don't know" and "Find out yourself!" When he made such comments, again, rather than discipline him, she would ask him what the problem was. Gibson Deposition 219. As she described, "Billy's way was that either you talk to him or he just didn't talk to you at all unless he had to." Gibson 219. In fact, there was a point when he stopped talking to Gibson at all. Gibson Deposition 219-20. During this same exchange, Gibson testified that also refused to do things she asked him to do. Gibson Deposition 221-2. As if to downplay this, she said he did it no more than other employees. Gibson Deposition 222-3.[20]

[19] Sean Jackson, an employee, was present during this encounter and provided a statement. See Plaintiff's Exhibit 6. As the statement reflects, McCollum almost bragged about the fact that he "told Blythe off." The document also reflects that McCollum anticipated receiving some form of discipline. Yet, he did not.

[20] Ironically, Gibson testified that she believed that McCollum lied during his deposition. Gibson Deposition at 227.

Turning to McCollum's fellow employees, they fared no better with McCollum. The following is a good example.[21] During this incident, an employee whose first name is Tina asked McCollum what he was doing. When McCollum did not respond, Tina said something like "You got a problem with me; you are nothing but a f**cking punk." According to McCollum, Tina said this in front of customers. At that point, McCollum walked into Furtado's office. Unlike what happened with Rose – in which she did not get to give her version or even find out that there was a problem – Furtado brought the two together in his office. During this meeting, Tina yelled and "flipped" out at Furtado. At that point, Tina just left. A few days later, Gibson – McCollum's supervisor -- told McCollum that they were going to have a meeting with the Store Director. McCollum – who did not believe that Gibson should be present – walked away from Gibson without saying a word. McCollum went directly to the Store Director's office and told him that he was not going to attend any meeting with Gibson. Significanly, McCollum testified that neither he nor Tina were disciplined.

Although management knew, McCollum was allowed to come in late two hours. Gibson testified that she heard this from a number of employees including one who was supposed to leave at 4:00 a.m. but could never do that because McCollum was late. Gibson Deposition 174-6. Gibson considered this to be serious and even considered this to be a form of government fraud. Gibson 177, 179. She claims she spoke to Furtado. Gibson Deposition 177. Unlike Sellers, Gibson and Furtado "went straight to McCollum" and changed his shift to a later time.[22] Significantly, McCollum was never disciplined or even written up. When questioned why, Gibson admitted that this was

[21] Indeed, the conduct of "Tina" – who is white – is further evidence of the more harsh treatment of Sellers.
[22] Although McCollum said that he was spoken to about being late on one occasion, he did not say his schedule was changed in response to these discussions. McCollum Deposition at 36-38.

grounds for discipline but she could not answer why she did not take any. Gibson Deposition 178-9. Unlike the case with Sellers, Gibson never sought to get any written statements from employees who claimed that he was coming in late. Gibson Deposition 178.[23] Throughout her testimony, Gibson tried to justify her failure to take action against him by saying that she did not know whether any of these rumors were true. Gibson Deposition 180. She ultimately admitted that discipline was taken against Sellers based on allegations that also may not have been true. Gibson Deposition at 180. Gibson testified that, even after his schedule changed, McCollum was late. Gibson Deposition at 239, 242-3. She did not write him up because there was no way to prove it. Id.[24]

2. Brenda Venable.

Brenda Venable is another good example. Venable admitted that she "cussed like a sailor" at work and that "her number one word is "f**ck". Venable Deposition 36. She did this in the front office and even in the presence of Furtado and Blythe. Furtado Deposition at 104-6. In fact, Furtado testified that he could not even keep count of how often she swore because it happened so frequently. Furtado Deposition at 104.

Venable admits that she has yelled at Furtado. Venable Deposition at 23. This even happened in front of other employees. Venable Deposition at 24. She could not even give a count of how often this occurred. Venable Deposition 23. Significantly, this was during times that he was her acting supervisor. When this happened, Furtado's response was to talk about it in his office. Furtado Deposition at 24. She was never disciplined for this. Venable Deposition 26.

[23] Gibson admitted in her deposition that, when she took disciplinary action against Sellers, she never told her beforehand. Gibson Deposition at 179.

[24] Signficantly, Gibson testified that Sellers is someone who told her this. She did not ask her for a statement and does not know why. Gibson Deposition 243.

Brenda Venable also argued with Blythe and did this in the presence of other employees. Venable Deposition at 24; Furtado Deposition 91.

There was a big incident between Blythe and Venable in which she yelled and swore at him and accused him of nepotism. Furtado was present and described Venable's conduct as being "absolutely disruptive and disrespectful." Furtado Deposition 104, 109-110. Yet, he never told anyone that she should be disciplined. Furtado Deposition at 110. Significantly, Blythe never disciplined Venable. Blythe Deposition 116-17.[25]

Venable also refused to follow her supervisor's instructions. Furtado Deposition at 106. As Furtado testified, there were times when he asked her to do things and she refused. Furtado Deposition 106. Rather than write her up or report her to Blythe, he did the task himself. Furtado Deposition 107.

Venable also did not follow Blythe's instructions. When she used the "f**ck" word at work, he would ask her "Can't you use a different word?" Venable Deposition at 37. Yet, Venable never stopped. Venable Deposition 37-9.

Venable admits she called Blythe a "fucking liar."[26] Venable Deposition 112. Significantly, this was in front of employees in the break room. Venable Deposition at 113. Although he remarkably could not recall this incident, Blythe admitted that this was a "pretty serious" offense. Blythe Deposition at 133.

[25] An employee who witnessed this incident, Richard Klein, gave a statement. He wrote, among other things: "There has been so much swearing and unprofesionalism allowed to occur at the Commissary, and it appears to be consistently rewarded while good workers and people have to suffer through it; it needs to stop." See Plaintiff's Exhibit 8.

[26] Blythe admitted that an employee swearing at a supervisor or another employee could be disrespectful conduct. Blythe Deposition 127-8. Yelling at a supervisor would also be disrespectful conduct. Depending on the circumstances, it could be disruptive conduct. Blythe Deposition 128-9. If any of this happened, he would discipline an employee if she reported to him. Blythe Deposition at 129. If an employee called a boss a "fucking liar" at work, that would be disrespectful conduct. Blythe Deposition 129. In fact, it would be very disrespectful conduct. Blythe Deposition 129. Depending on where it took place, it could also be disruptive. Blythe Deposition 129. Blythe could not think of any circumstance in which a subordinate calling a boss a fucking liar at work would not warrant discipline. Blythe Deposition at 129-30. Blythe admitted that calling your boss a fucking liar is pretty serious. Blythe Deposition 133.

Despite all of this, Blythe testified that he never even counseled Venable. Blythe Deposition 16. Moreover, he never even expressed any dissatisfaction with her conduct at work. Blythe Deposition at 16.

Finally, Brenda Venable stocked vendor product on government time. Although management was aware, she continued to practice and was never disciplined. Gibson Deposition at 105, 107; Furtado Deposition at 112.

Venable criticized Furtado. Venable Deposition at 116.

There was another incident with Venable in which she was insubordinate, disrespectful and rude to Blythe. Venable Deposition at 119-128. Venable testified that she used to have a credit card in her name. However, at some point, she became concerned that there were not enough controls in terms of reconciling what was being ordered and what was actually making it into the Commissary. Given this, she went to Blythe and explained that she did not want the credit card in her name and did not want to have responsibility for this task any more. Blythe disagreed and told her that she did not have a choice because it was her responsibility. Instead of complying Venable dropped the card on his desk and walked out. Venable Deposition 123. Significantly, Venable was not disciplined for this. Even better, the responsibility was eventually given to someone else. Venable Deposition at 119-128.[27]

Finally, there are documents which reflect even more serious problems between Blythe and Venable. See Plaintiff Exhibit 7. See also Blythe Deposition 58-70. Among other things, these documents reflect that things got so bad between Blythe and Venable that she felt compelled to file an EEO complaint in which she accused him of retaliation.

[27]There is a document which establishes further problems between Venable and Blythe. there were other problems between Blythe and Venable. See e-mail exchange. See Blythe Deposition 58-70.

The e-mail also reflects that Blythe felt that she spent much of her time in the break room instead of working.

3. Mike Texeira.

Mike Texeira – who is white -- is another example of a white, similarly-situated person who was treated much better than Sellers even though he engaged in much more egregious conduct. One incident involves an employee, Luke Magnuson. During this incident, Texeira assaulted Magnuson in the warehouse punching him in the face. Blythe Deposition 51; Furtado Deposition 60-64. This encounter was so serious that the base police were called. Significantly, Gibson – to whom Texeira reported – testified that he only received a suspension for a week. Gibson Deposition 111-12.[28]

Gibson had other problems with Texeira. For example, Furtado testified that Texeira argued and disagreed with Gibson. Furtado Deposition 90, 94. Furtado testified that, at times, Texeira raised his voice at her. Furtado Deposition 94. Furtado confirmed that the two have had "some words." Furtado Deposition 100. Significantly, unlike she did with Sellers, Gibson never complained to Furtado about Texeira. Furtado Deposition 100.

Significantly, Texeira refused to follow Gibson's orders. Placing this in context, Gibson testified: "I know me and him there for a while didn't get along" for about three or four months. Gibson Deposition 116-7. The reason for the rift was because Texeira refused to follow any of her instructions. Gibson Deposition 117. Gibson testified that, rather than write him up or counsel him, she went to Furtado. Gibson Deposition 117. This happened twice a week for about four months. Gibson Deposition 118. After about

[28] Gibson lost credibility during the deposition when she refused to admit that Texeira's conduct was more egreigious. Rather than say so, she merely skirted the question by saying she could not answer the question. Gibson Deposition 116.

four months, she went to F. 118. Although she could see that he was not following her directions, she never confronted Texeira or even raised her voice to him. Gibson Deposition 119-20. Moreover, unlike Sellers, she never reduced any of these infractions to writing. Significantly, she never disciplined him. When questioned why she disciplined Sellers for the same kind of conduct for which she did not discipline Texeira, Gibson tried to say that it was because Sellers' conduct happened three-hundred sixty-five days a year and Texeira's transgressions only lasted three or four months. When pressed that this was not what she had previously said, Gibson retracted her statement and admitted that Sellers' conduct only took place three or four times. Gibson Deposition 122. In fact, Gibson admitted that Texeira failed to follow her directives more than Sellers. Gibson Deposition 124. Yet, she wrote Sellers up and not Texeira. Gibson Deposition 124.[29]

4. Ryan Diego.

For a number of reasons, Ryan Diego, a white employee who reported to Gibson, is also instructive on the issue of pretext. This involves an incident which took place in Gibson's office. At the time, Sellers was there along with Gibson and Diego. At some point, Gibson had to leave and Sellers and Diego remained in her office. While she was gone, Diego put a computerized drawing of a penis on Gibson's computer screen and left. When Gibson arrived, she discovered the penis. She immediately paged Diego. While waiting for Diego, Gibson asked Sellers to write a statement.[30] Sellers told her that she

[29]At one point, Gibson attempts to justify not taking action against Texeira because Texeira involved Furtado who gave him permission not to do what Gibson said. However, Furtado denies this. Furtado Deposition 100-01.

[30] She is asked why she needed her statement and said she just wanted to know if she saw anything. Gibson Deposition 127.

had nothing to say.[31] In the meantime, Diego returned and immediately confessed. Later that day, Sellers wrote a statement confirming that she had seen nothing. Gibson Deposition 129. Despite this, Sellers was fired, in part, for not writing the statement. Gibson Deposition 133.[32] When pressed why she was disciplined for this, Gibson challenged the validity of her written statement and said that it was nothing more than a statement by Sellers that she did not want to be involved. When question what was wrong with that, Gibson testified "nothing." Gibson Deposition 133-4. When further pressed as to why she was reprimand and fired, in part, Gibson stated "That is what HR advised me to do." Gibson Deposition at 134. Even more ironically, Gibson admitted that she did not even need the statement because Diego immediately confessed. Gibson Deposition at 136.[33]

As of this were not bad enough, other employees have routinely refused to write statements and were not disciplined. For example, Gibson testified that she asked McCollum for a statement, and he refused. Gibson Deposition 134. Unlike Sellers, she did not discipline him. When pressed as to why she disciplined Sellers and not McCollum for the same conduct, Gibson answered: "I can't answer that; I don't have an answer." Gibson Deposition 135. Also, even Sellers replacement – Mary Bucolo – refused to follow Gibson's instructions. Bucolo Deposition 147-149. During this

[31] When questioned about what Sellers meant by this, Gibson admitted that it was possible that Sellers had seen nothing. Gibson Deposition 128.

[32] Ironically, Diego only received a letter of reprimand. Gibson Deposition 126.

[33] Presumably realizing the import of her answer, Gibson changed her answer and claimed that she needed the statement because she anticipated that Human Resources would want statements from any witnesses. Gibson Deposition at 137. In addition to undermining her credibility, this further establishes pretext. This is because, as is discussed elsewhere, when McCollum wrote statements about Sellers, he identified persons as being present. Yet, before taking discipline against Sellers, no one ever sought to interview these individuals let alone Sellers.

incident, Bucolo saw Gibson and another employee arguing.[34] Knowing this, Gibson instructed Bucolo to write a statement about the incident. Bucolo refused and said she did not want to get involved. Unlike what happened with Sellers – but consistent with what happened with Walsh and other white employees – Gibson said that was fine and merely walked away. Notably, Bucolo was not disciplined.

5. Richard Walsh.

Richard Walsh, another white employee who reported to Gibson, is a further example of pretext. Gibson testified, he did not follow her instructions. Gibson Deposition at 207. The following is just one such example. On October 24, 2004 – when the papertrail on Sellers was reaching a high point – Gibson instructed Richard Walsh to write a statement about an alleged incident between Gibson and Sellers in which Sellers had allegedly engaged in misconduct. Significantly, Walsh refused Gibson's instruction saying that he did not want to get involved. Gibson reported this to Blythe who likewise instructed Walsh to write a statement. Nonetheless, Walsh continued to refuse. Significantly, Walsh was not disciplined for this. Yet, Sellers was fired, in part, for the same conduct. In fact, in Sellers' case, the statement was not even needed and she eventually provided a statement as requested. Furtado Deposition 180. Richard Walsh wrote a statement confirming the fact that he had refused the directives by management to write a statement.[35] Significantly, Walsh stated that, following his refusal, Blythe stated to him that "He [Blythe] didn't know why I [Walsh] wouldn't write a statement but that he was going to get rid of that woman (Ms. Sellers) one way or another." When questioned about this incident, Blythe recalled that Walsh had refused to comply with his

---

[34] Significantly, the employee was not Sellers.
[35] This statement is part of a file which Sellers subpoenaed from the union. See Exhibit ____.

and Gibson's requests for a statement. Blythe Deposition 154-156. He further admitted that Sellers was fired, in part, for not providing a statement and further acknowledged that Walsh was not disciplined to his knowledge. Blythe Deposition 184-5.

6. Diane Walsh.

Diane Walsh – who is white -- is another example. She routinely swore and complained about management. Bucolo Deposition at 142.

6. Conduct By All Employees.

Furtado has heard other employees say negative things about their managers. Furtado Deposition 83. He admitted that, over the years, he has heard this quite a bit from Brian Berube and William McCollum. Id. 83. Also, Gibson testified that, on a daily basis, employees refused to follow her instructions. Gibson Deposition 213-14. Also, Gibson testified that all employees, at one time or another, were argumentative with her. Gibson Deposition at 151.

7. Other Non-Whites: Charles Cloud and Thelma Edens.

Charles Cloud (hereinafter "Cloud") had numerous problems on the job. See Plaintiff's Exhibit 9. Many of his problems were similar to those experienced by Sellers. As is made clear in his Affidavit, he was treated less favorably than whites.

The next example involves Thelma Edens, Fillipino "of color."[36] Blythe Deposition 224. This incident began when Diane Walsh told Blythe that Edens had some of Walsh' documents in her folder. Blythe immediately accepted her word, and confronted Edens. Rather than ask her if she had the documents, Blythe directed her to

[36] Edens was one-hundred fifteen pounds and only five feet tall.

open her folder. When she did, he did not find Walsh's documents.[37] Blythe admits that Edens did nothing to warrant discipline. Blythe Deposition 228. Yet, he called the base police on her.[38] Blythe Deposition 226.[39] Edens complained about this incident in a letter to Zone Manager Cook. Significantly, her version differs greatly from Blythe's. See Plaintiff's Exhibit 10. Among other things, she said that she felt Blythe was "actively trying to intimidate her due to my EEO claims." Moreover, the letter makes clear that Walsh had been harassing Edens and Blythe failed to take prompt, remedial action. This is evidence that when a black complains, management's response is vastly different.[40]

C. <u>If Either Party Should Get Summary Judgment On The Promotion Claim, It Should Be Sellers.</u>

Defendants claim that, after Sellers became a GS-5 CAO Trainee, she was not promoted to a GS-7 because, through her own fault, she did not receive the requisite training. *See Blythe Affidavit of February 16, 2005.*[41] There is simply no support for this in the record.

Before discussing the reasons why this is a pretext, it is important to provide some background information which establishes that, contrary to defendants' assertions, Blythe and Furtado wanted Bucolo – and not Sellers – to be the second CAO person.

---

[37] Blythe alleges that he did find other documents which did not belong to Edens in her folder. Significantly, he testified that she did nothing which warranted discipline. Blythe Deposition 228.

[38] Although Furtado could not recall the exact date of another incident involving Edens, it took place within the last four years while he was Store Administrator. Furtado Deposition 32-3. He could not recall what happened, but knows this incident involved coupons.

[39] Significantly, even though Diane Walsh's accusation was untrue, she was not disciplined. Singificantly, he did not take any action against Diane Walsh for making the false accusation. Blythe Deposiltion at 229.

[40] Sellers further explains the issues relating to her disparate treatment in her answers to interrogatories. (Exhibit 19)

[41] He wrote that "she has not received her promotion from GS-5 to GS-7 because she has not yet received the requisite training, that efforts at training have been futile, that Sellers does not accept guidance from McCollum, her supervisors or any one else, that she fails to do her job properly, that when she is asked to do something she just plain will not do it, that she spends her day doing "absolutely nothing."

McCollum – who had only been working at the Commissary since March, 2000 -- received the first CAO job.[42] After this, Sellers began hearing rumors that Newport was going to get a second CAO position. See Plaintiff's Exhibit 14 (Sellers Affidavit) Between the time that McCollum got the first CAO job and the time that Sellers received the second one in September, 2003, Mary Bucolo[43] – a white Store Worker who had only been at the Commissary a short time -- started receiving CAO training from McCollum. McCollum Deposition at 135. Blythe and Furtado directed McCollum to train Bucolo; they never asked him to train Sellers. McCollum Deposition at 135-6. In fact, during that time period, Blythe and Gibson were asking Bucolo to do CAO tasks. Bucolo Deposition at 32. Significantly, while Bucolo was receiving on-the-job training, Sellers was not. McCollum Deposition at 135.

Given this, Sellers began asking for on-the-job training as well. See Plaintiff's Exhibit 14. Unlike Bucolo, Furtado and Blythe made excuses and Sellers did not receive any such training. Id. Continuing to see Bucolo receive CAO training, Sellers complained to Blythe's boss, Mr. Cooke, the Zone Manager. Id. Sellers told him she wanted to train for the CAO job but that Blythe and Furtado were not allowing this to happen. Sellers explained that Bucolo – who was <u>only</u> a part-time worker and had only been at the Commissary for a short time – was receiving training but she was not. Cook told her he would talk to Blythe. Id. Thereafter, Blythe tried to discourage Sellers by reminding her that she would have to come in at six o'clock in the morning. As Sellers describes in her Affidavit, Blythe appeared upset and angry when he said this.

[42] Sellers contends that she <u>never</u> saw a posting for the CAO job that McCollum got. Bucolo confirms that, although she saw one for the job Sellers applied for, she never saw one before that. *Bucolo Deposition at 166-7.* In his Affidavit, Cloud confirms this. See Plaintiff's Exhibit 9.
[43] Bucolo replaced Sellers after she was fired. *Bucolo Deposition at 25.*

Nevertheless, Sellers told him she wanted to train because she was interested in the position. Id.

Sellers' training was short-lived because Furtado told her that there was something wrong with the computer. Id. Given this, Sellers was sent back to the Produce Department. Id. After being sent to Produce, Sellers continued to see Bucolo being trained by McCollum. Id. At that point, Sellers questioned Furtado. After getting the run-around several times, Sellers informed Furtado that if she did not receive the CAO job, she would file another EEO complaint. Id.

Eventually, the job was posted and Sellers applied. Sellers Deposition 21. In September, 2003, Furtado told her that she had gotten the CAO job although she had never had an interview. See Plaintiff's Exhibit 9. Unbeknownst to Sellers, Blythe had already sent Bucolo to the CAO school in Virginia. Gibson Deposition 26-30. Even after she became CAO, Blythe and Gibson continued to ask Bucolo to do CAO tasks. McCollum Deposition at 137; B*ucolo Deposition at 32.*[44]

After a year of working in the CAO position, Sellers began asking when she was going to receive her promotion from GS-5 to GS-7. See Plaintiff's Exhibit 14. Again, she began getting the runaround. Id. Eventually, she was told that she would get her promotion once she went to CAO school in Virginia. Id. On October 13-15, 2004, Sellers went to, and successfully completed the training program at, the school in Virginia. See Plaintiff's Exhibit 15.

[44]McCollum trained Bucolo so much before the second CAO job opened up that he felt that she should have gotten the job and was even "screwed". McCollum Deposition at 135. In his deposition he was asked why he believed this and he said: "Well, you're doing training for the job for over a year and then when it comes out, you don't get it. That's kind of being screwed. McCollum Deposition at 135.

After she returned from school, Sellers again began asking why she was not getting her promotion. See Plaintiff's Exhibit 14. At first, Sellers got no answer. Id. Eventually, either Gibson or Furtado began telling Sellers something she had never heard before: that they had to sign off on a training sheet before she could be promoted. Id. Significantly, when she showed the training list to McCollum – who was exclusively in charge of her training – he laughed. Id. Significantly, Sellers had been successfully performing all of the duties on the training list. Id. By the time she was fired, Sellers still had not received her GS-7 promotion.

The following discussion makes clear that Sellers, not only can make out a prima facie case, but pretext as well.[45]

For the following reasons, it is a pretext. First, McCollum testified that he was the exclusive trainer on all functions relating to CAO. McCollum Deposition at 21-22. He further testified that Sellers had completed <u>all</u> of her training. McCollum Deposition at 111. Contrary to Blythe's Affidavit submitted to the EEO, McCollum testified that Sellers was always receptive to being trained. McCollum Deposition at 112. Second, McCollum testified that, after he got the CAO job himself, he <u>never</u> received any training except for attending the same CAO school that Sellers went to. McCollum Deposition at 71-2, 80.[46] Similarly, Bucolo testified that she did not undergo any such training after she replaced Sellers in May, 2006. Bucolo Deposition at 35. In fact, she testified that she had completed all training long before she even got the CAO in May, 2006. Bucolo

[45] To make out a prima facie case, Sellers must prove: (1) that she belongs to a protected class, (2) she performed her job satisfactory, (3) her employer took an adverse employment decision, and (4) someone with similar qualifications, and not within the protected class, did not receive the same adverse treatment. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). It is abundantly clear that Sellers can meet this burden.

[46] McCollum testified: "I trained myself until I went to school . . . in Virgnia." He received no other training. McCollum 71-2, 80-1.

Deposition at 35-6. Unlike Sellers, Bucolo testified that management never told her that she had to undergo any formal training except for attending the school in Virginia. Bucolo Deposition at 37. Finally, she knew nothing about any training lists that had to be filled out by management. Gibson Deposition at 37.

Sellers' job performance belies defendants' position that she needed additional training. First, Mr. Cloud – with whom she worked in dairy and who knew the CAO job – said Sellers knew all the CAO functions. Second, Furtado testified that, on a scale o f one to five with one being the best and five the worst, he ranks Sellers as a two. Furtado Deposition at 126. In fact, on February 1, 2004, Sellers received a mid-year evaluation in which Furtado wrote that her overall performance was satisfactory. See Plaintiff's Exhibit 16. Although it is unsigned, Sellers also received an evaluation for the period July 1, 2003 to June 30, 2004 in which she was rated "fully successful" – which is one ranking below "excellent." Id. Gibson also confirms that Sellers was more than proficient in her CAO job. Gibson Deposition 50-2. When asked who did a better job – Sellers or McCollum – she could not answer. Gibson Deposition 51-2. Similarly, when asked who was more efficient – McCollum or Sellers – she likewise could not answer the question. Id.

D. Leave Requests.

Defendants contend that Sellers cannot prove pretext on her leave denials because they had a legitimate, non-discriminatory reason for denying it: her refusal to submit a leave planner as allegedly required.

Defendants are simply wrong. Furtado's deposition testimony amply demonstrates this fact. He testified that the failure to provide a leave planner was only a

"guide" to ensure that employees working the same job and in the same department would not be taking leave at the same time. Furtado Deposition 112-17. Significantly, Furtado confirmed that an employee can still take leave even if she has not submitted a leave planner. Furtado Deposition at 116.

Second, defendants argue that Sellers cannot show pretext because McCollum – a similarly situated white person -- was denied leave because he sought to take days off previously selected by Sellers. Defendants' argument is unavailing. First, unlike Sellers, McCollum was not denied leave. Rather, he only not allowed to take leave on the dates he selected. Second, Sellers agrees that she should not have been able to take leave in either August or November, 2003 if William McCollum – who was in her department and did her job – had previously selected her dates. Yet, at least before defendants filed their motion for summary judgment, there was no evidence that that is what happened. To the contrary, the Affidavits submitted by Blythe and Furtado do not even come close to mentioning that McCollum is the person who had selected leave. Rather, the Affidavits reflect that her leave was denied because "I had already approved <u>other employees</u> to take leave during that period." See, e.g., Defendants' Exhibit 17. Moreover, defendants submitted to the EEO a document reflecting the leave taken by employees during 2003. This document does <u>not</u> reflect that McCollum was on leave the days selected by Sellers.[47]

E. <u>Leave Restoration.</u>

[47] Indeed, during his deposition, Furtado attempted to say that she was denied leave, not because of McCollum, but because of employees from produce who had selected the time. Once he was reminded that Sellers was a CAO person at the time she was denied, he admitted that she should have been compared to McCollum. Furtado Deposition 116-118. He confirmed that, as long as McCollum was not out, she would be able to take leave.

Defendants contend that Sellers's application for leave restoration was properly denied because she did not meet the criteria on the application. For the following reasons, defendants contention is without merit.

Furtado's deposition makes clear that this alleged reason for denial is a pretext. Furtado testified that he approved the restoration and gave the form to Blythe. As far as he knew, the restoration was subsequently approved by Blythe. Furtado Deposition 118-120. In fact, Furtado testified that he only found out that Blythe denied the restoration the day before his deposition on July 31, 2007 – during a meeting with his lawyer. Furtado Deposition 123. Yet, directly contradicting this, Furtado submitted an Affidavit to the EEO in which he claimed that Sellers was denied the restoration because she did not meet the criteria. Defendants' Exhibit 5. Casting even more doubt is the fact that, after Furtado approved the leave on March 4, 2004, no one spoke about this with Sellers. Furtado Deposition at 125.

F. The Letter of Reprimand.

Defendants again contend that summary judgment is proper because Sellers cannot point to any non-black supervised by Gibson who engaged in the exact conduct. Defendants' argument is without merit. First, Gibson contends that this incident involved Cloud. Gibson Deposition at 71-3. Yet, in his Affidavit, Cloud directly contradicts this. See Plaintiff's Exhibit 9. Second, as discussed above, a number of white employees engaged in much worse conduct that Sellers. Finally, as Sellers demonstrated above, the law does not require such exact comparisons.

G. The December 12, 2004 Change in Hours.

Defendants argue that summary judgment is proper because Sellers cannot establish that she was treated differently with respect to the change in December 12 because both McCollum and Bucolo had their work schedules changed numerous times in the CAO position and that Sellers cannot dispute that the reason for the change – the need for training in the afternoon – was a pretext. See Defendants' Memorandum at pp. 35-36.

Again, defendants argument is without merit. First, as noted above, Sellers had completed her training. Second, defendants changed her hours back within a short time. See Plaintiff's Exhibit 18. Although defendants claim this was because Sellers lacked any interest in learning, as noted above, McCollum testified that Sellers was always receptive to training. Third, also as noted above, McCollum testified that Sellers' training was completed. Fourth, the letter indicating the change does not reflect that her hours are being changed for training purposes. In fact, unlike McCollum who was always told why his hours were changing (McCollum Deposition 175), Sellers was never told why her hours were changing. Fifth, Bucolo testified that she never had to work afternoon hours when performing CAO and that there were no afternoon CAO tasks. Gibson Deposition at 41-43; 186. Sixth, McCollum said, during the time that Sellres worked at the Commissary, CAO tasks could be performed at any time. McCollum 75. Seventh, Sellers testified that she never worked on any such duties while her hours were changed. Sellers Deposition 39-40. In fact, she found herself mainly stocking the shelves. Id.

## IV. DEFENDANTS' ARGUMENT THAT SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S RETALIATION CLAIM IS WITHOUT MERIT.

Defendants move for summary judgment on Sellers' retaliation claim as well. Because the law is essentially the same – including the fact that pretext evidence can be used to show causation -- Sellers incorporates her arguments on disparate treatment set forth above as well as her hostile work environment.

## V. DEFENDANT'S ARGUMENT THAT SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM IS WITHOUT MERIT.[48]

Defendants contend that Sellers' hostile work environment claim is ripe for summary judgment. Defendants' argument is without merit insofar as they mischaracterize and overlook the facts in this case.

The following discussion makes clear that Sellers was subjected to pervasive harassment based on her race. For example, Sellers was repeatedly treated with disrespect, yelled at, required to complete menial tasks by her supervisors that were not associated with her job, Gibson – and others -- told lies about Sellers, and she was treated differently and more harshly than similarly situated whites. Sellers was also subjected to the following:

(1) Unlike similarly-situated non-blacks, she was required to work schedules which made it difficult for her to do her job;

(2) At one point, Furtado issued her a letter in which he instructed her – hour by hour – how she had to spend her day (Plaintiff's Exhibit 18);

(3) At a time when Furtado claims that Sellers' job performance was deficient – which Sellers disputes – he significantly increased her duties and responsibilities (Furtado Deposition at 233-6);

---

[48] Sellers incorporates by reference the facts in support of her disparate treatment claims.

(4) Her supervisors allude to the fact that she acted like a gorilla when they describe her as banging on her chest during meetings (Furtado Deposition at 167);

(5) Her supervisors refused to take down a dummy with a noose around its neck;

(6) She was excluded from meetings that even Bucolo was allowed to attend (Furtado Deposition 227);

(7) Gibson issued to her an unjustifiably low evaluation;

(8) Sellers was never questioned to get her side of the story; and

(9) She was unjustifiably disciplined and suspended for two weeks.

## CONCLUSION

Defendants have failed to establish that summary judgment is proper. Therefore, their motion should be denied.

Plaintiffs,
By her attorneys,

/s/ Patricia E. Andrews, Esq.
/s/ Louise A. Herman, Esq.
Patricia E. Andrews, #4321
Louise A. Herman, #6430
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 277-4110
(401) 421-0964
PEAndrews@verizon.net
LAHermanlaw@verizon.net.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed electronically on this 28th day of January, 2008, and is available for viewing and downloading to the ECF registered counsel of record.

Ly Nguyen, Esq.
LyNguyen@usdoj.gov

/s/ Patricia E. Andrews, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ROSEZOLA SELLERS,<br>Plaintiff,<br>v.<br>UNITED STATES DEPARTMENT OF DEFENSE and ROBERT M. GATES, SECRETARY OF THE DEPARTMENT OF DEFENSE,<br>Defendants. | C. A. No. 05-381S |

## MOTION IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff files a Motion in Opposition to Defendants' Motion for Summary Judgement. Plaintiff is also filing a Memorandum in Support of her Objection to Defendants' Motion for Summary Judgment.

Plaintiffs,

By her attorneys,

/s/ Patricia E. Andrews, Esq.
/s/ Louise A. Herman, Esq.
Patricia E. Andrews, #4321
Louise A. Herman, #6430
129 Dyer Street
Providence, Rhode Island 02903
(401) 421-0966
(401) 277-4110
(401) 421-0964
PEAndrews@verizon.net
LAHermanlaw@verizon.net.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed electronically on this 28th day of January, 2008, and is available for viewing and downloading to the ECF registered counsel of record.

Ly Nguyen, Esq.
LyNguyen@usdoj.gov

/s/ Patricia E. Andrews, Esq.