UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROSEZOLA SELLERS,

vs. C.A. No. 05-381S

UNITED STATES DEPARTMENT OF DEFENSE, et al,

DEPOSITION OF MARY GIBSON, a witness in the above-entitled cause, taken on behalf of the Plaintiff, before Devin J. Baccari, CSR, a Notary Public in and for the State of Rhode Island, at the Law Office of Law Office of Patricia E. Andrews, 129 Dyer Street, Providence, Rhode Island, on July 25, 2007 scheduled at 10:00 a.m.

PRESENT:

FOR THE PLAINTIFF

LAW OFFICE OF PATRICIA E. ANDREWS
BY: PATRICIA E. ANDREWS, ESQUIRE

FOR THE DEFENDANT

U.S. DEPARTMENT OF JUSTICE
BY: LY T. NGUYEN, ESQUIRE
DULCE DONOVAN, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

GOVERNMENT EXHIBIT 44

# I N D E X


| WITNESS | PAGE |
|---|---|
| MARY GIBSON | |
| EXAMINATION BY MS. ANDREWS.............. | 3 |


# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| (Plaintiff's) | | |
| 1 | HANDWRITTEN STATEMENT BY CLARENCE RHODES.. | 58 |
| 2 | 10/17/05 NOTICE OF PROPOSED REMOVAL SIGNED BY MR. FURTADO..................... | 129 |
| 3 | AUGUST 29, 2005 STATEMENT GIVEN BY BRENDA VENABLE........................... | 153 |
| 4 | STATEMENT BY RICHARD WALSH................ | 162 |
| 5 | STATEMENT BY STEPHANIE LOPEZ.............. | 167 |
| 6 | 12/14/04 STATEMENT BY MARY GIBSON......... | 168 |
| 7 | 11/11/04 STATEMENT BY WILLIAM McCOLLUM.... | 183 |
| 8 | 11/11/04 STATEMENT BY WILLIAM MCCOLLUM.... | 188 |
| 9 | 11/24/04 STATEMENT BY MR. MCCOLLUM........ | 191 |
| 10 | 12/14/04 STATEMENT........................ | 192 |
| 11 | 12/14/04 STATEMENT WHICH BEGINS "JUST A LITTLE MORE NONSENSE".................... | 193 |
| 12 | STATEMENT BY SEAN JACKSON................. | 207 |
| 13 | STATEMENT BY LUKE MAGNESON................ | 208 |
| 14 | PAGES 40 TO 45 OF THE MCCOLLUM DEPOSITION................................ | 244 |


QUESTION MARKED ON PAGE 198

Page 74

Q. And what did she say?
A. She said she was not wearing somebody else's clothes.
Q. And what did you say when she said that?
A. I'm trying to think. I don't really remember that I said anything. I know that everybody does wear them but I don't remember what I said back in return.
Q. Well, what did you do next?
A. After -- next that I can recall I went to Mr. Blythe and spoke to him about how I should handle that and he gave me the guidance and so I went back and asked her again and then that's when she told me her hand was injured and she was on a profile and couldn't go there.
Q. On what?
A. On a profile.
Q. What is a profile?
A. Sometimes if you're injured they'll give you a profile stating light duty, that you can only lift so much or you have to sit down for a certain period of time, things like that.
Q. And what did you say in response?
A. That I was not aware that she was on any type of profile and that if that was the case she

Page 75

couldn't lift anything I would assist her by loading a U-boat for her so she didn't have to lift any cases at all. All she would have to do is cut them open and stock the product and that avoided any heavy lifting.
Q. And what did she say?
A. She still refused.
Q. She said no?
A. Yes.
Q. And what did you say?
A. She -- well, she refused, she said no and then she said she was going to talk to Mr. Blythe. And I said that was perfectly up to her, she could go talk to him but I needed her in the chill at that certain time, I'm not sure when it was, and that I would be there to help and she went one direction, I went the other and I never saw her again.
Q. And what did you do?
A. I went to -- immediately went to my office, typed up the memorandum, saved it and then I went to the chill department to help put out milk and eggs.
Q. What did you do next about this?
A. After I had helped stock that morning, because

Page 76

it was the priority, then I went -- I went back and I printed out the letter and I sent it for preaction.
Q. Did you take any other action with regard to this what you've just been describing?
A. I'm sorry. I --
Q. Did anything else happen about this incident?
A. I guess I don't understand what you're saying about it.
Q. Were there any other conversations about this incident that took place?
A. Not after the -- that day.
Q. What did Mr. Blythe say during the times that you talked to him about this incident?
A. When I had talked to him he had told me that I had, you know, given her a direct order, if she failed to obey to go back and ask once again, and if she still refused then she was failing to follow instructions and I would need to take her to task.
Q. Anything else?
A. No.
Q. Did you ever check to see if she did have a profile?
A. I had went and looked after I had done my

Page 118

Q. -- after about four months?
A. Yeah, in that range.
Q. Could it have been longer?
A. I don't think so. I mean, it's a time frame. I -- I don't think so.
Q. And how many -- was this -- strike that.
Was this happening every day that he wasn't listening to what you told him to do?
A. Not every day. You know, twice a week I would say.
Q. And tell me what he would say to you. I'm talking about Mr. Texeira.
A. He would say okay and tell me he was going to do it, however, as soon as Mr. Furtado came in at 9 o'clock he would go to Mr. Furtado and Mr. Furtado would find someone else to do it.
Q. And did you ever speak to Mr. Texeira when you found out that this was happening?
A. Yes, and he explained to me, "Well, I have receiving details to do," which I understood that he had receiving details to do. However, I didn't feel that they always went right to 2:30 when it was his scheduled time to leave. And he said, "Well, I spoke to Mr. Furtado and we found someone else to do it, the task is done, what's

Page 119

the problem."
Q. And how many times did you -- strike that.
Did you ever confront Mr. Texeira about what he was doing?
A. No, I generally -- I was in the warehouse enough that I could see he was doing his receiving duties.
Q. And not what you told him?
A. Correct.
Q. And did you ever raise your voice to him about any of these times when he did not follow your directives?
A. Not that I'm aware of.
Q. Did he raise his voice ever with you?
A. No.
Q. Are you sure about that?
A. Not that I'm aware of. We talked normally like this.
Q. Is it possible --
A. I mean --
Q. -- that there were times when he raised his voice when he spoke to you?
MS. NGUYEN: Objection. That's been asked and answered.
MS. ANDREWS: Go ahead.

Page 124

A. Correct.
Q. And you testified that Mike Texeira did it twice a week for three to four months, correct?
A. Correct.
Q. Okay. Would you agree with me that Mike Texeira failed to follow your directives more than Rose Sellers?
A. Correct.
Q. Okay. And yet you wrote her up and not him?
A. Yes.
Q. Okay. Did you write up any other employees?
A. Ryan Diego. He got a letter of reprimand.
Q. And what was that for?
A. The exact charge I don't remember without seeing it. It was for using government equipment, I believe, to do something. He was on my computer and he wasn't supposed to be.
Q. Well, wasn't he -- was that the -- strike that.
Did he ever look at pornography on the computer?
A. No.
Q. Do you recall what he was looking at on the computer?
MS. NGUYEN: Objection.
A. He wasn't looking at anything. He was -- he had drew something on the computer.

Page 213

don't.
Q. So Tina claimed that Mr. McCollum did something that she didn't like, is that --
A. I have no idea, that's what I'm saying. I just know there was an incident. However, I know she took it right to Mr. Furtado because that was his supervisor at that time.
Q. And do you know whether either Mr. McCollum or Tina was disciplined for this?
A. I have no idea.
Q. So are you aware of -- strike that.
Did any other employee ever refuse to do anything you asked them to do?
MS. NGUYEN: Objection.
A. I think they have on occasion. I can't say one in particular. However, most of them have said -- it's been, "Well, I don't want to do this," but then they've turned around and done it.
Q. Who?
A. I mean, all of them. I can't really pinpoint. It's not a -- it's just a -- on a daily I might say, "okay, these are the tasks I need done" and one might say, "well, I don't want to do that today," you know, why can't so-and-so do it.

"Okay. We've got a whole eight-hour day. We need to do this." And then it would -- it would be done by the end of their shift, so it wasn't -- they didn't want to do it, but they did it anyhow.
Q. And did that happen often?
A. No, I mean, not on a daily basis or anything like that.
Q. Well, how often?
A. Just every now and then. It could be -- could have been a Saturday where nobody felt like being there.
Q. And who did that? That's what I'm trying to find out.
MS. NGUYEN: Objection.
A. Any -- they have all said it from time to time. It's not just one specific person.
Q. William McCollum?
A. Even him.
Q. How about Mary Bucolo?
A. Yes.
Q. Did you ever have any work-related problems with her?
A. With who?
Q. Mary Bucolo.



Q. How about Mary Bucolo?
A. No.
Q. How about Ryan Diego?
A. No.
Q. Is Ryan Diego white?
A. Yes.
Q. Do you know a Christine Seymore?
A. No.
Q. Okay. Did you ever overlap with Al Felton, F-E-L-T-O-N?
A. I'm sorry. Christine?
Q. Yes.
A. I don't think I ever knew her last name, and she wasn't there long and then she -- she went on to Avon, another government agency. She was my receiver when I first came in.
Q. Did she ever have an attitude with you?
A. I think maybe twice and we -- I called her into the office, we talked about it. It was a misunderstanding and that was it. That was the end of it. We, you know, agreed that, okay, if one of us misunderstands each other then we come to each other and we talk about this so that we can understand, you know, what each other interpreted and after that we never -- it was



Q. I'm going to represent to you -- strike that.
Did Mr. McCollum have problems with you? Do you know?
A. From time and again we had our discussions, yes.
Q. And what were they about?
A. That he would speak to me in a certain manner and I would explain to him that I did not think that was appropriate. "I don't speak to you that way, there's no need to speak to me that way."
Q. And what do you mean he was speaking to you in a certain way? Well, how was he speaking to you?
A. Rudely.
Q. In what way?
A. Just if I would ask him something, he was very rude back to me, "well, I don't know" and "find out for yourself" or -- I mean, things that pertained to his job that I would ask him about were the kind of comments that every now and then I would get back from him. And I would ask him what the problem was and we would solve it and that would be that. But Billy's way was that either you talk to him or he just didn't talk to you at all unless he had to, so --
Q. Did it get to a point where he didn't talk to



you?
A. I think there was a point, at some point, there he did and I noticed that. So then right -- I finally said, "okay, we need to have a discussion because I'm not understanding." And after that discussion -- he didn't really talk to me a whole lot anyhow outside of what his job duties were and his details. And then after that, you know, he -- then if he needed something, he would ask me. But outside of that, we didn't have a whole lot of conversation. Therefore, I didn't have a whole lot of conversation with any of my employees. We were all busy during the day.
Q. So when you had a conversation with him about why he wasn't talking to you, what did he say?
A. He had misunderstood something that I had asked him and he took it the wrong way and we both apologized and that was the end of the conversation.
Q. Did he ever tell you that you were lazy?
A. No, not that I can remember.
Q. Did you ever hear that he thought that you were lazy?
A. No, I don't recall hearing it.

Q. Well, you said we made statements to get information. Isn't that what you did with Rose?
A. Yes.
Q. Okay. So you kept a paper trail on her?
A. I kept my own trail. I kept a trail on anyone and everyone.
Q. Who did you keep a paper trail on?
A. On Ryan, Nathan, Mike Texeira.
Q. Anyone else?
A. No, that's about it.
Q. And of the people you kept a paper trail on, is it not the case that Rose is the only one who was fired?
A. No, that's not -- that's not the case.
Q. Oh, who else was fired?
A. I'll retract that. I did a paper trail on Richard and Richard did end up being terminated.
Q. So Richard and Rose?
A. Yes.
Q. And what is the purpose of a paper trail?
MS. NGUYEN: Objection. That's been asked and answered.
A. I --
Q. Go ahead.
A. I just explained it's a trail to keep a



supposed to be to work at 6:00 a.m., but because they all come through the back gate they wait for the guard at 6:00. So that makes them at least five minutes late for work.
Q. Every day?
A. Yes.
Q. And who was that?
A. Mr. Texeira, Mr. McCollum, Ms. Sellers, Mary Bucolo. No, she never -- she was always came the front way around.
Q. And it's your testimony that Ms. Sellers came in late because she was waiting at that gate?
A. Yes, ma'am. She lived outside the back gate.
Q. Well, when did she work? 6:00 a.m.?
A. She was working 6:00 a.m. when I first got there, arrived at Newport, and she -- outside of her one schedule change, I'd say most of my tour there she was 6:00 to 12:30.
Q. You're sure about that?
A. Yes, ma'am.
Q. Okay. And why didn't you write Rose Sellers up for this?
A. They -- they all had gotten -- they had all gotten warnings and they had all got a copy of the original time and attendance that was signed



C E R T I F I C A T E

I, Devin J. Baccari, a Certified Shorthand Reporter and Notary Public within and for the State of Rhode Island, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of this Court, especially, but without restriction thereto, under Rule 30 of said Rules; that the witness was first sworn by me; that the foregoing 255 pages contain a true recording of the proceedings.

I further certify that the exhibits are attached and copies furnished to counsel.

I further certify that I am not counsel, attorney or relative of either party or clerk or stenographer of either party, or of the attorney of either party, or otherwise interested in the event of this suit.

I have enclosed with the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I hereunto set my hand this 7th day of August, 2007.

DEVIN J. BACCARI, CSR, NOTARY PUBLIC
My Commission Expires 8/17/10

DATE: JULY 25, 2007
IN RE: SELLERS VS. US DEPARTMENT OF DEFENSE
WITNESS NAME: MARY GIBSON