UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

ROSEZOLA SELLERS, :
:
Plaintiff, :
vs. :
: C.A. No. 05-381S
UNITED STATES DEPARTMENT :
OF DEFENSE, et al., :
Defendants. :

DEPOSITION OF BRENDA VENABLE

Friday, March 9, 2007

10:00 a.m.

Law Office of Patricia E. Andrews

129 Dyer Street

Providence, Rhode Island

---------- Ellen Zappia, RPR ----------
Capitol Court Reporting, Inc.
931 Jefferson Boulevard
Warwick, Rhode Island 02886

(401) 739.3600

GOVERNMENT EXHIBIT 45

APPEARANCES:

PATRICIA E. ANDREWS, ESQ.
LAW OFFICE OF PATRICIA E. ANDREWS
129 Dyer Street
Providence, Rhode Island 02903
for Plaintiff

MICHAEL IANNOTTI, ESQ.
U.S. DEPARTMENT OF JUSTICE
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
for Defendants

ALSO PRESENT:

Rosezola Sellers

Sandy Mascola

# I N D E X

WITNESS: BRENDA VENABLE


| EXAMINATION BY: | PAGE: |
|---|---|
| Ms. Andrews | 4 |

| EXHIBITS MARKED: | PAGE: |
|---|---|
| 1 Statement from Robert Klein | 33 |
| 2 Memo from John Blythe, dated September 16, 2005 | 138 |
| 3 Diagram drawn by Ms. Venable | 139 |
| 4 E-mails, dated August 9, 2004 | 142 |
| 5 Statement from Clarence Rhodes, Dated February 13, 2007 | 156 |
| 6 Note to Steve from Rose, dated 1/9/03, with attachment | 158 |
| 7 Memo from John Blythe, dated July 14, 2004 | 160 |
| 8 Memo from Mary Gibson, dated October 7, 2004 | 163 |
| 9 Document entitled "Letters of Reprimand, Feb 25, 2002-Feb 25, 2004 | 173 |
| 10 Memo from Stephanie Lopez, dated May 13, 2005 | 183 |
| 11 Statement from Stephanie Lopez To Mr. Blythe | 185 |
| 12 Statement from Brenda Venable, Dated 3/5/2005 | 185 |
| 13 Memo from Brenda Venable, dated August 29, 2005 | 190 |

Q. And who didn't give you the opportunity to train?
A. My supervisor, who was Mr. Blythe.
Q. And did you ever talk to him about your wanting to train for the two weeks?
A. I mean, I initially told him I wanted to train in it. I didn't get the opportunity. Nor did I apply for it when it came -- when it was posted on the board. So I just kind of let it go.
Q. Did you ever talk to Mr. Blythe about why you weren't getting that opportunity to train?
A. No. I just kind of let it go. I just wasn't going to pursue it.
Q. Did he in any way discourage you?
A. No.
Q. Did he say that what he thought your chances were of getting it if you applied?
A. No.
Q. Did you have any talks with Mr. Furtado at all about that?
A. No. I don't recall.
Q. Do you know who else expressed an interest in that second KO position?
A. I just know that Mary Bucolo was per se



Q. Is it possible that you did, you just can't remember sitting here?
A. I don't remember honestly.
Q. You don't remember doing that.
A. No.
Q. Did you swear at Mr. Blythe?
A. Yes.
Q. How many times did you swear at Mr. Blythe?
A. Maybe two to three times.
Q. Could it have been more than two to three times?
A. I don't think so.
Q. Why do you believe it's only two or three times?
A. Well, because I recall one incident very well, and I'm -- I know in behind his closed doors I've sworn at him. I mean, I remember two incidents.
Q. But my question to you is I know that -- you said two to three. So could it be three?
A. I'm just -- I don't recall how many, but I know a minimum of a few.
Q. And using your definition of discipline, did you ever get disciplined for swearing at



Mr. Furtado -- I'm sorry, Mr. Blythe?
A. I received a letter of reprimand.
Q. And when was that?
A. The year I do not remember.
Q. And that was for swearing at Mr. Blythe?
A. Yes.
Q. You said that you recall one incident in particular. Can you tell us about that incident.
A. It was in the break room at the commissary. In the front break room.
Q. And who was present?
A. I don't remember who was present. I know it was me and Mr. Blythe definitely.
Q. Do you recall other people, other employees being there, but you just don't remember who they are?
A. I don't even remember.
Q. So tell me what happened.
A. I don't remember who was in the room or how it went down. All I know is it was in reference to hiring somebody. I can't even think of the guy's name. And I made a comment, why don't you just hire all his fucking relatives."
Q. And did you yell that?



A. I had a loud voice. I was mad. I was angered and I said that. Yes, I did.
Q. And is that what you got reprimanded for?
A. The whole incident is what I got reprimanded on.
Q. Well, okay. So that wasn't the whole incident?
A. Well, it kind of like got carried out into the break room into his office and he said -- he yelled back at me and then I yelled back. I don't even remember what he said to me. But it was in reference to somebody that was hired. I can't even -- I'm trying to think of the kid's name. But and it was all -- it was based on hiring somebody.
Q. Was it Tim?
MS. SELLERS: Timothy.
Q. Timothy?
A. I need a last name.
Q. So irrespective of the name, you're saying that it started in the break room and then he told you to come into his office or did you follow him?
A. Well, he went that way and then my desk is of course outside his door. So it just kind of continued.

Page 110

A. I used leave if I left early.
Q. Did you ever leave early and not --
A. No.
Q. -- use leave?
A. No. More like working late and not getting paid for it maybe.
Q. What about William McCollum, did you ever see him come in late?
A. I have no idea what Bill McCollum's schedule was. What his hours were. He usually came in I mean before anybody ever opened the store so, you know, when -- he was the store opener so...
Q. How about Ava, do you know if she ever came in late?
A. Sure. She came in late, leave, come back. She was free to roam.
Q. And what about Iva?
A. Same thing.
Q. Was there anyone else who was, as you put it, free to roam?
A. I just know the people that I worked with.
Q. Well, who else did you work with?
A. Winnie Dennis. She was probably the more punctual one in the office. She would probably

Page 116

idiot?
A. I don't recall that.
Q. Did you think he was an idiot?
A. I didn't say that, no.
Q. Did you think he was not terribly smart?
A. No, I don't think so.
Q. Did you ever criticize him because of the way that he didn't know how to spell?
A. Probably, yes.
Q. And who did you criticize to?
A. I do not recall.
Q. Did it bother you that he couldn't spell?
A. Didn't bother me personally, no.
Q. Well, did it make you --
A. If I'm correcting his document, it would bother me. Yes, it would.
Q. And did you have to correct his documents?
A. Maybe on occasions.
Q. And you're saying you never -- did you ever -- strike that. Did you ever call him any -- did you ever call him anything other -- strike that. Did you ever refer to him as anything other than his name?
A. I don't recall.

CERTIFICATE OF COURT REPORTER

I, Ellen Zappia, Registered Professional Reporter and Commissioner of the State of Rhode Island and Providence Plantations, hereby certify that on March 9, 2007, at the time and place specified above, BRENDA VENABLE, the deponent herein, was duly sworn by me to testify to the truth and was thereafter examined under oath by counsel.

I certify that the questions asked of the deponent and the answers given were taken down by me stenographically and transcribed using computerized translation software; and that the foregoing is a true and accurate transcript thereof; and that a review of the transcript by the deponent was not requested.

I certify also that I am not counsel, attorney, or relative of any party litigant, nor otherwise interested in the event of this suit.

________________________

Ellen Zappia, RPR

My commission expires: April 8, 2007