UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROSEZOLA SELLERS,                 :
                    Plaintiff,    :
                                  :
          v.                      :      CA 05-381 S
                                  :
UNITED STATES DEPARTMENT          :
OF DEFENSE AND SECRETARY OF       :
OF THE DEPARTMENT OF DEFENSE,     :
ROBERT M. GATES,[1]               :
                    Defendants.   :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

        Before the Court is Defendants' Motion for Summary Judgment
(Doc. #32) ("Motion for Summary Judgment" or "Motion").  The
Motion has been referred to me for preliminary review, findings,
and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).
After reviewing the filings, listening to oral argument, and
performing independent research, I recommend that the Motion be
granted for the reasons stated below.

**Index**

I.  Overview  . . . . . . . . . . . . . . . . . . . . . . . .  3

II. Facts  . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        A.  Actors  . . . . . . . . . . . . . . . . . . . . .  5

        B.  Promotion to CAO  . . . . . . . . . . . . . . . .  5

        C.  Annual Leave Requests . . . . . . . . . . . . . .  6

_____

        [1] Pursuant to Fed. R. Civ. P. 25(d), Robert M. Gates has been
substituted for Donald Rumsfeld as a Defendant in this action.  See
Fed. R. Civ. P. 25(d)(1) ("An action does not abate when a public
officer who is a party in an official capacity dies, resigns, or
otherwise ceases to hold office while the action is pending.  The
officer's successor is automatically substituted as a party.  Later
proceedings should be in the substituted party's name ....").

    D.   Request for Restoration of Leave . . . . . . . . 10

    E.   Letter of Reprimand . . . . . . . . . . . . . 12

    F.   Change in Schedule . . . . . . . . . . . . . 17

    G.   Fourteen Day Suspension . . . . . . . . . . 19

    H.   Administrative EEO Complaints . . . . . . . . . 20

        1.  First EEO Complaint . . . . . . . . . . . 20

        2.  Second EEO Complaint (Subject of this Case) . 21

III.  Travel . . . . . . . . . . . . . . . . . . . . 23

IV.  Summary Judgment Standard . . . . . . . . . . . . 25

V.  Defendants' Objection to "Surreply" . . . . . . . 27

VI.  Claims against Dep't of Defense . . . . . . . . . 29

VII.  Count I - Disparate Treatment . . . . . . . . . . 30

    A.   Employment Discrimination Law . . . . . . . . 30

    B.   Administrative Exhaustion . . . . . . . . . . 32

        1.  Annual Leave Requests . . . . . . . . . . 33

        2.  Promotions and Pay . . . . . . . . . . . 35

        3.  Fourteen Day Suspension . . . . . . . . . 38

    C.   Prima Facie Case . . . . . . . . . . . . . . 40

        1.  Less Favorable Treatment . . . . . . . . 42

           a.  Annual Leave Requests . . . . . . . . 42

           b.  Restoration of Leave . . . . . . . . 44

           c.  Change in Work Schedule . . . . . . . 44

        2.  Adverse Action . . . . . . . . . . . . . 45

           a.  Denial of Annual Leave Requests . . . . . 46

           b.  Change in Schedule . . . . . . . . . 49

        3.  Summary Re Prima Facie Case . . . . . . . 50

    D.   Non-discriminatory Reasons . . . . . . . . . . 50

    E.   Pretext . . . . . . . . . . . . . . . . . . 50

        1.  Comparative Evidence . . . . . . . . . . 51

           a.  William McCollum . . . . . . . . . . 53

           b.  Mike Texeira . . . . . . . . . . . . 55

c.   Ryan Diego . . . . . . . . . . . . . . 57

d.   Richard Walsh . . . . . . . . . . . . 58

e.   Charles Cloud and Thelma Edens . . . . . 58

2.   Pretext Analysis Re Specific Claims . . . . . 59

a.   Denial of Annual Leave Requests . . . . . 59

b.   Denial of Restoration of Leave . . . . . 60

c.   Letter of Reprimand . . . . . . . . . . 62

d.   Promotion and Change in Schedule . . . . 63

VIII.   Count II – Hostile Work Environment . . . . . . . . 68

A.   Law . . . . . . . . . . . . . . . . . . . . . . . . 68

B.   Application . . . . . . . . . . . . . . . . . . . . 69

IX.   Count III – Retaliation  . . . . . . . . . . . . . . 72

A. Law . . . . . . . . . . . . . . . . . . . . . . . . 72

B. Application  . . . . . . . . . . . . . . . . . . . . 74

1.   Adverse Employment Action  . . . . . . . . . . 74

2.   Causal Connection  . . . . . . . . . . . . . . 75

a.   Temporal Proximity . . . . . . . . . . . 75

b.   Gibson's Lack of Knowledge  . . . . . . . 76

X.   Summary  . . . . . . . . . . . . . . . . . . . . . . 76

A.   Count I - Disparate Treatment  . . . . . . . . . . 76

B.   Count II - Hostile Work Environment  . . . . . . . 77

C.   Count III - Retaliation  . . . . . . . . . . . . . 78

XI.   Conclusion  . . . . . . . . . . . . . . . . . . . . 78

## I.  Overview

Plaintiff Rosezola Sellers ("Plaintiff" or "Sellers"), who is black, formerly worked at the Navy commissary in Newport, Rhode Island.  <u>See</u> Defendants' Corrected Statement of Facts as to Which There Is No Genuine Dispute (Doc. #37) ("Statement of Undisputed Facts" or "SUF") ¶¶ 1, 6.  The commissary is operated by the Defense Commissary Agency ("DeCA"), an independent agency

3

within the United States Department of Defense ("Department of Defense"). <u>See</u> <u>id.</u> ¶ 2. Plaintiff alleges that while employed at the commissary she was subjected to disparate treatment (Count I) and a hostile work environment (Count II) because of her race and that, after complaining about this discrimination and harassment, she was subjected to retaliation (Count III). <u>See</u> First Amended Complaint (Doc. #2) ("Amended Complaint") ¶¶ 10, 12, 17-25. Plaintiff avers that the disparate treatment and harassment are evidenced by the different treatment she received with respect to promotions, pay, time off, work hours, and work assignments compared to similarly situated white employees.[2] <u>See</u> <u>id.</u> ¶ 11. She claims that the retaliation included disciplining her for no legitimate reason.[3] <u>See</u> <u>id.</u> ¶ 13. The Department of Defense and the Secretary of the Department of Defense ("Defendants") deny these allegations, <u>see</u> Answer (Doc. #4), and by the instant Motion seek summary judgment, <u>see</u> Motion.

---

[2] While not specifically alleged in her First Amended Complaint ("Amended Complaint"), Plaintiff also argues that the she was subjected to disparate treatment and a hostile work environment with respect to discipline. <u>See, e.g.</u>, Plaintiff's Memorandum in Support of Her Objection to Defendants' Corrected Memorandum in Support of Their Motion for Summary Judgment ("Plaintiff's Mem.") at 12 (disputing that Plaintiff is unable to establish a prima facie case of discrimination with respect to, among other claims, the letter of reprimand of February 25, 2004); <u>id.</u> at 39 (asserting in support of her hostile work environment claim that she was "unjustifiably disciplined and suspended for two weeks").

[3] Although Plaintiff contends that her termination in December 2005 was also due to unlawful discrimination and retaliation, that claim is not part of the instant action. <u>See</u> Opinion and Order (Doc. #45) (denying appeal of this Magistrate Judge's Memorandum and Order Denying Plaintiff's Motions to Amend and to Compel (Doc. #28)); <u>see also</u> <u>Sellers v. United States Dep't of Defense, et al.</u>, CA 07-418 S, Complaint (Doc. #1) ¶ 14 (alleging that Plaintiff's removal from federal service was due to racial discrimination and/or unlawful retaliation).

## II.   Facts

### A.   Actors

Plaintiff began working as a laborer at the Newport commissary in 1988.  SUF ¶ 6.  Sometime thereafter she went to work at the commissary in New London, Connecticut.  SUF ¶ 8.  In 1993, she was reassigned to the Newport commissary.  SUF ¶ 9.  John T. Blythe, Sr. ("Blythe"), became store director of the Newport commissary in 1994.  SUF ¶ 10.  Plaintiff was promoted to store worker in 1997.  SUF ¶ 11.  Three years later, Steven J. Furtado[4] ("Furtado") became store administrator, the position immediately below store director.  Id.; see also Appendix of Exhibits and Exhibits in Support of Defendants' Motion for Summary Judgment ("Defendants' App."), Ex. 1b at D-0161 (Organizational Chart).  In August of 2003, Mary Gibson ("Gibson") became the grocery manager.  SUF ¶ 35.  In the store hierarchy, Gibson reported to Furtado and Furtado reported to Blythe.[5]  See Defendants' App., Ex. 1b at D-0161.  Thus, Gibson was Plaintiff's supervisor, Furtado was Plaintiff's second-level supervisor, and Blythe was Plaintiff's third-level supervisor.  See id.; see also SUF ¶ 4.

### B.   Promotion to CAO

In 2003 Plaintiff applied for and was selected over two other applicants for the position of Commissary Management Specialist trainee.  SUF ¶ 12.  This position is commonly referred to as "CAO," apparently because its full title is

---

[4] Mr. Furtado's first name is spelled in the record as both "Stephen," Appendix of Exhibits and Exhibits in Support of Defendants' Motion for Summary Judgment ("Defendants' App."), Ex. 4 (Furtado Declaration ("Decl.")) and "Steven," id., Ex. 4e (Memorandum for Record).  Based on his signature, the Court uses the latter spelling.

[5] An organizational chart for the Newport commissary shows Blythe at the top, Furtado directly beneath him, and Gibson as one of four managers beneath Furtado.  See Defendants' Ex. 1b at D-0161 (Organizational Chart).

"Commissary Management Specialist in charge of Computer Assisted Ordering."  Defendants' App., Ex. 1d at 26 (identifying position by this title).  Both Blythe and Furtado believed that Plaintiff was the best candidate for the job at the time.[6]  SUF ¶ 13.  Plaintiff was chosen over Mary Bucolo ("Bucolo"), a white employee.[7]  SUF ¶ 14.  At the time Plaintiff was selected for the CAO position, Blythe was aware that Plaintiff had previously engaged in Equal Employment Opportunity ("EEO") activity as he had been contacted a few years earlier by an EEO representative with reference to Plaintiff.  SUF ¶ 15.  Plaintiff's promotion to CAO became effective on September 9, 2003.  SUF ¶ 16.

### C.  Annual Leave Requests

On July 11, 2003, Plaintiff submitted three applications for leave.  SUF ¶ 18.  The first application sought annual leave for August 7 and 8, 2003; the second for August 28 and 29, 2003; and the third for August 31, 2003.  SUF ¶¶ 19-21.  On July 13, 2003, Furtado advised Plaintiff that she needed to submit a leave

---

[6] Plaintiff denies this fact, see Plaintiff's Statement of Disputed Facts ("PSDF") ¶ 13, but the portion of the record which Plaintiff cites fails to support her denial, see id.; see also Sellers Dep. at 91-92.  To the extent that Plaintiff may contend that her denial is supported by other "facts set forth in her memorandum in opposition to her [sic] motion for summary judgment," PSDF at 1 n.1, the Court rejects this attempt to circumvent the requirements of the Local Rules.  Local Rule Cv 56(a)(3) requires a party contesting the movant's SUF to "identify the evidence establishing the dispute in accordance with the requirements of paragraph (a)(2)," DRI LR Cv 56(a)(3), and those requirements mandate reasonable specificity, see DRI LR Cv 56(a)(2).  A general reference to Plaintiff's 39 page memorandum does not meet this standard.

[7] Plaintiff denies this fact, see PSDF ¶ 14, but provides no citation to evidence in the record which supports her denial, see n.5.  It is therefore deemed admitted.  See Carrasquillo v. Puerto Rico, through Its Justice Dep't, 494 F.3d 1, 4 (1st Cir. 2007)("[N]on-compliance with [Local Rule 56(c)], as manifested by a failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.")(alterations in original).

planner which was required by the Master Labor Agreement
("MLA").[8]   SUF ¶ 22.   Prior to 2003, Plaintiff had submitted a
leave planner every year in her fourteen year career.   See
Sellers Deposition ("Dep.") at 26.

On July 14, 2003, Blythe wrote a note to Plaintiff that
stated:

> I am still waiting for your required leave planner.   I
> will not approve any leave requests until the planner is
> submitted.   All employees are required to do this.

Defendants' App., Ex. 1b at D-0185.   That same day Blythe denied
Plaintiff's leave applications because she had not submitted a
leave planner.[9]   See SUF ¶ 27; see also Defendant's App., Ex. 1b

---

[8] Plaintiff denies that the leave planner was a requirement of
the Master Labor Agreement ("MLA").   See PSDF ¶ 22.   However, the
evidence which Plaintiff cites to support her denial only establishes
that an employee who did not submit a leave planner could still take
time off if it did not result in the store being short-handed.   See
id.; see also Furtado Deposition ("Dep.") at 116.   This does not
contradict the fact that the leave planner was a requirement of the
MLA.   See Defendants' App., Ex. 4 (Furtado Decl.) ¶¶ 5-6; see also
id., Ex. 15 (MLA) at 30 ("Employees will submit their annual leave
plan on DeCA Form 30-14 by 1 February of each year to identify
employees' annual leave desires and to resolve conflicts among
employees' annual leave plans.").

[9] Plaintiff denies this fact.   See PSDF ¶ 27.   However, the only
evidence she cites with the specificity required by LR Cv. 56(a) to
support the denial is Blythe's deposition testimony at "269-70."   PSDF
¶ 27.   Blythe testified in 2007, four years after the fact, that he
had denied Plaintiff's leave requests (without reference to any
particular requests) "[b]ecause the other employees had already put in
for those days, and she wouldn't submit a leave plan so that we could
determine her days."   Blythe Dep. at 270.   The documentary evidence,
created contemporaneously, reflects that the three applications for
leave in August 2003 were all denied on July 14, 2003, and a notation
made on one of them states: "No leave planner submitted."   Defendants'
App., Ex. 1b at D-0189 (Three Applications for Leave).   Plaintiff
subsequently submitted two applications for leave in November 2003
which were denied with the notation "Already people on leave this
week[.]"   Id., Ex. 1b at D-0190 (Two Applications for Leave).   The
Court is unpersuaded that the deposition testimony which Plaintiff
cites supports her denial of SUF ¶ 27.
   It also bears noting with respect to the reason the three

at D-0189 (Three Applications for Leave); Blythe Dep. at 270.

On July 15, 2003, Furtado directed Plaintiff to submit her annual leave planner by July 23, 2003.  SUF ¶ 29.  A similar directive was conveyed by Blythe two days later in a written memorandum addressed to Plaintiff and four other employees.  See Defendants' App., Ex. 1b at D-0187 (Memorandum from Blythe to Sellers, et al., of 7/17/2003).  The memorandum stated:

> At a meeting I held with all department managers in January, I discussed the requirement for all employees to submit an annual leave planner.  If you are receiving this memorandum, I have either not received one or the leave you have annotated on the planner does not equal your use or lose balance.  I cannot over emphasize the importance of you submitting the planner as instructed. Failure to comply could result in disapproval of your request and forfeit of any unused balances at the end of the leave year.  Please note no leave will be granted the week of Thanksgiving, Christmas and New Years.
>
> Deadline for submission is July 22, 2003.

Id.[10]

Subsequent to the issuance of this instruction, the other four employees submitted leave planners, but Plaintiff did not. See Blythe Dep. at 270.  On July 22, 2003, she wrote a handwritten response on the bottom of the memorandum which

_____

requests for leave were denied on July 14, 2003, that Furtado had written a memorandum the previous day stating:

> On July 13, 2003, I advised Rose Sellers that she needed to put in a leave planner as requested by all employees.  She stated that she had no intentions of doing so.  She stated that she does not know what dates that she wanted to take from now till the end of the year.

Defendants' App., Ex. 4b (Furtado 7/13/03 Memorandum for Record).

[10] Despite these written communications from Blythe and Furtado regarding the importance of submitting a leave planner, Plaintiff testified at her deposition that she "didn't know it was that big of a deal."  Sellers Dep. at 31.

stated:

> Leave planners was [sic] given out in <u>June</u>, not <u>January</u>.
> Sense [sic] <u>I</u> am held strictly to what I put down – I'm
> not sure of my dates.  I don't want what happened last
> year to happen again.

Defendants' App., Ex. 1b at D-0187.  Plaintiff was the only
employee at the Newport commissary who did not submit a leave
planner for 2003.  SUF ¶ 33.

On October 15, 2003, Plaintiff submitted a request for
annual leave during the period October 22-24, 2003.  SUF ¶¶ 36-
37.  Although she had not submitted a leave planner listing these
dates, Plaintiff's leave request was approved by Furtado on
October 20, 2003.  SUF ¶ 38.

On November 3, 2003, Plaintiff submitted two applications
for leave.  SUF ¶ 39.  The first application sought annual leave
for November 14-15, 2003, and the second sought annual leave for
November 18-22, 2003.  SUF ¶¶ 40-41.  Furtado denied the
applications for leave on the dates Plaintiff requested, SUF ¶
42, because there were already people on leave during these
weeks, SUF ¶ 43.[11]  William McCollum ("McCollum"), the other CAO,
was not scheduled to work on November 15, 2003, and November 22,

---

[11] Plaintiff denies SUF ¶ 43, <u>see</u> PSDF ¶ 43, but the evidence she
cites either does not dispute SUF ¶ 43, <u>see</u> PSDF ¶ 43 (citing "Exhibit
17. Furtado Deposition at 115 ..."), or its location in the record is
not stated with sufficient specificity to enable the Court to find it
without searching through the voluminous exhibits, <u>see</u> PSDF ¶ 43
(citing "Affidavits of Bythe and Furtado in response to 2004 Charge").
    To the extent that Plaintiff may have intended to cite to
Plaintiff's Exhibit ("Plaintiff's Ex.") 16 instead of Plaintiff's Ex.
17, it appears from Ex. 16 that other employees took leave during all
or part of both periods of leave identified in the applications
Plaintiff submitted on November 3, 2003.  <u>See</u> Plaintiff's Ex. 16 at
129-31, 133-35.  Thus, Plaintiff's Ex. 16 also does not support the
denial.

2003.[12]  SUF ¶ 44.  McCollum also had scheduled and eventually took annual leave on November 18, 2003.[13]  SUF ¶ 45.

On November 25, 2003, Plaintiff submitted an application for forty hours of sick leave for the dates of November 18-22, 2003. SUF ¶ 46.  Furtado approved Plaintiff's leave request the same day.  SUF ¶ 47.

Although Plaintiff was denied leave for certain dates in 2003, there were many occasions on which she was approved both annual and sick leave for 2003, even though she failed to include these dates on a leave planner.  SUF ¶ 48.  An audit of Plaintiff's leave in 2003 revealed that Plaintiff was approved and took 66 hours of annual leave and 129 hours of sick leave. SUF ¶ 49.  Thus, Plaintiff was granted 195 hours of leave in the course of one year.  SUF ¶ 50.

### D.  Request for Restoration of Leave

On March 4, 2004, Plaintiff submitted a request for restoration of annual leave, requesting that 99 hours of annual leave be restored from 2003.[14]  SUF ¶ 78.  The four criteria that Plaintiff was required to meet to have leave restored were:

   (1)   The restoration request covers leave in excess
         of 240 hours[;]

   (2)   The employee scheduled leave in writing before
         the beginning [of] pay period #24[;]

   (3)   The employee's leave was cancelled for mission

---

[12] Plaintiff denies this fact, see PSDF ¶ 44, but her denial fails for essentially the same reasons as stated in n.11.

[13] See n.11.

[14] If a federal employee has "accumulated leave in excess of the maximum accumulation permitted by 5 CFR Section 630 ...," Defendants' App., Ex. 1b at D-0192 (Request for Restoration of Annual Leave), and does not use that leave by the end of the calendar year, the leave is lost.  However, an employee may request to have the leave restored. See id..

             essential reasons[; and]

    (4)     Due to mission essential reasons, the employee's leave could not be rescheduled before the end of the leave year[.]

Defendants' App., Ex. 1b at D-0192 (Request for Restoration of Annual Leave).  For leave to be considered "schedule[d] in writing," <u>id.</u>, it must be both requested and approved.[15]  SUF ¶ 80.

On Plaintiff's request for restoration of annual leave form, Furtado checked off two of the four criteria, SUF ¶ 81, and recommended approval of Plaintiff's request for restoration of leave, SUF ¶ 82.  However, Blythe did not sign off on the form because Plaintiff did not meet all four criteria to have her leave restored.[16]  SUF ¶ 83.  Blythe found that there was no prior scheduled leave that had been canceled, that Plaintiff had time to schedule her leave, and that there was no prior scheduled leave which was canceled for mission essential reasons.[17]  SUF ¶ 84.  Although Furtado had originally recommended approval of Plaintiff's request for restoration of leave, he later became aware that Plaintiff did not meet the criteria to have her annual

---

[15] Plaintiff denies this fact, <u>see</u> PSDF ¶ 80, but the evidence she cites in support of her denial, "Defendants' Exhibit 1b," <u>id.</u>, consists of more than fifty pages.  Plaintiff does not indicate where in this collection of documents the pertinent evidence can be found.  Thus, her denial is rejected for failure to comply with DRI LR Cv 56(a)(3).

[16] Plaintiff denies this fact, <u>see</u> PSDF ¶ 83, but the evidence she cites does not contradict SUF ¶ 83.

[17] Plaintiff denies this fact, <u>see</u> PSDF ¶ 84, but the evidence she cites, "Furtado Deposition at 123-124, <u>id.</u>, only establishes that Furtado believed that Plaintiff met two of the four criteria and that at the time he mistakenly believed this was sufficient to enable him to approve Plaintiff's request, <u>see</u> Furtado Dep. at 120-23.  The fact that Plaintiff did not meet all four criteria, which was necessary to have her request approved, is not disputed by his testimony.

leave restored.[18]   SUF 85.

### E.  Letter of Reprimand

On December 5, 2003, Plaintiff was in the health and beauty aids ("HBA") aisle, placing products contained in boxes on the shelves.  SUF ¶ 54.  Gibson instructed Plaintiff to go to "chill" to stock.  SUF ¶¶ 51-52.  The "chill" area was the area in the store that held boxes of cold products such as cheese, butter, milk, and eggs.  SUF ¶ 53.  Plaintiff refused.[19]  See SUF ¶ 55. According to Plaintiff, she told Gibson that she was "still having problems with [her] hand," Sellers Dep. at 48, and that she was not dressed to work in chill, id.  Gibson's version of this initial exchange was that Plaintiff only mentioned her lack of appropriate clothing.  See Defendants' App., Ex. 18 (Gibson Declaration ("Decl.") of 12/1/04) at D-0145.  Gibson told Plaintiff that there were two jackets hanging on the wall for her to wear.[20]  SUF ¶ 58.  Plaintiff replied that she was not wearing

---

[18] Plaintiff denies this fact, see PSDF ¶ 85, but the evidence she cites, "Furtado Dep. at 124," id., does not contradict SUF ¶ 85.  It is true that Furtado testified at his July 31, 2007, deposition that he had only realized the day before his deposition that all four criteria had to be satisfied, see Furtado Dep. at 122-23, but stated in his December 1, 2004, declaration: "I am aware that the Complainant did not meet the criteria to have her annual leave restored." Defendants' App., Ex. 5 (Furtado Decl. of 12/1/04 at 3).  However, this conflict as to when Furtado became aware that it was necessary for Plaintiff to meet all four criteria does not contradict the basic fact that all the criteria had to be met and that Plaintiff did not meet them.

[19] Plaintiff denies this fact, see PSDF ¶ 55, but the evidence she cites does not support the denial, see id.  Moreover, the evidence cited by Defendants to support this fact is Plaintiff's own declaration.  See Defendants' App., Ex. 14 (Plaintiff's Decl. of 2/15/05) at D-0106 ("Yes, I did refuse to report to the chill area.").

[20] Plaintiff denies that there were two jackets and that they were hanging up.  See Sellers Dep. at 55 ("It's not jackets.  It was one and it was that one that was kept -- just thrown on the floor.").

other people's clothes.[21]   SUF ¶ 59.

Gibson then spoke to Blythe who told Gibson to give Plaintiff another opportunity to follow her instructions.  SUF ¶ 60.  Gibson then instructed Plaintiff to report to chill.[22]   SUF ¶ 61.  Plaintiff responded that she had an injury.  SUF ¶ 62. Gibson told Plaintiff that there was nothing in Plaintiff's personnel file indicating any current restrictions.[23]   SUF ¶ 63.

---

[21] Plaintiff denies this fact, see PSDF ¶ 59, but the evidence she cites (her deposition testimony) does not contradict Defendants' evidence that Plaintiff replied "that she was not wearing other people's clothes."  SUF ¶ 59.

[22] Plaintiff admits this fact except for the word "then."  PSDF ¶ 61.  However, Plaintiff cites no evidence to support her refusal to admit the entire statement.  See id.  Given that Plaintiff admits that Gibson consulted Blythe regarding Plaintiff's refusal to go to chill and that he directed Gibson to give Plaintiff another opportunity to comply, SUF ¶ 60, the Court finds SUF ¶ 61 to be undisputed in its entirety.

[23] Plaintiff denies this fact, see PSDF ¶ 63 (citing "Gibson Deposition at 77-78"), but the evidence she cites does not contradict the fact which Defendants state is undisputed.  The evidence only indicates that when Gibson was deposed (more than three and a half years after the incident) she could not recall what the document in Plaintiff's personnel file reflected.  See Gibson Dep. at 77 ("Without seeing the document, ma'am, I couldn't even be sure what I saw that day.").  However, in a memorandum prepared the same day of the incident, Gibson described the entire exchange, including what occurred after she had consulted Blythe:

> At 9:55 a.m. I advised Ms. Sellers, who then was working on the HBA aisle, that she needed to report to the Chill Department at 10:00 a.m. to help stock.  Ms. Sellers was immediately defensive and loud.  She told me that she refuses to go there and stock.  I told her fine.  She continued with the fact that she had just had an injury, and she was not going to lift anything as to damage it again.  I informed Ms. Sellers that she would not have to lift anything.  I would load a cart for her and then she could stock it.  As I have no Dr.'s note stating that she is on any kind of profile.  She again refused to go to the Chill department and wished to speak to the Commissary Officer.

Defendants' App., Ex. 1b at D-0195.  Similarly, in a declaration executed only a year after the incident, Gibson stated:

Gibson claims that she told Plaintiff that she would assist
Plaintiff in loading the cart so that she would not have to lift
heavy objects, <u>see</u> Defendants' App., Ex. 1b at D-0195, but
Plaintiff denies that Gibson made this statement, <u>see</u> Sellers
Dep. at 50.  In any case, Plaintiff became loud and told Gibson
that she would not report to the chill area.[24]  SUF ¶ 65.

The medical documentation in Plaintiff's file shows that the
last time Plaintiff had any medical restriction was in October
2003 when she was instructed not to lift over ten pounds.[25]  SUF
¶ 66.  Although in November 2003 Plaintiff's orthopedic doctor,
Dr. Maher, recommended that she be out of work for one week, he
did not provide any lifting restrictions upon her return to work.
SUF 67.

In addition, at the time Gibson instructed Plaintiff to work
in the chill area, there was at least one jacket available to all
employees to be worn in the chill area.[26]  SUF ¶ 68.  The

---

She again refused and this time said she had an injury and
could not work in the chill area.  I was aware that she had an
injury in October 2003 and was placed on a one week
restriction because of the injury.  I told Complainant her
restriction was only for one week back in October and there
was nothing in her files indicating that she had another
injury or was on any restrictions.

<u>Id.</u>, Ex. 18 (Gibson Decl. of 12/1/04) at D-0145.  Even putting this
evidence aside, Plaintiff points to nothing in the record which
contradicts the statement that "Gibson told her that there was nothing
in Plaintiff's personnel file indicating any current restrictions."
SUF ¶ 63.  Moreover, Plaintiff does not identify any evidence in the
record which indicates that she had a medical restriction on December
5, 2003.

[24] Plaintiff denies this fact, <u>see</u> PSDF ¶ 65, but the evidence she
cites, Sellers Dep. at 50, does not contradict it.  Even assuming
Plaintiff disputes that she became loud, she admits that she refused
to report to the chill area.  <u>See</u> n.19.

[25] <u>See</u> n.24 (first sentence).  In addition, Plaintiff was unsure
of the ending date for her light duty.  <u>See</u> Sellers Dep. at 50.

[26] <u>See</u> n.20.

jacket(s) was available for use by all employees and had been worn by other DeCA employees while in the chill area.[27]  SUF ¶ 69.  The employees who used the jacket(s) included white employees such as Blythe, Gibson, Bucolo, McCollum, and Nathan Fields.[28]  SUF ¶ 70; Defendants' App., Ex. 32 (McCollum Decl.) ¶ 3.

After Plaintiff refused to report to the chill area to stock, Gibson went to the chill area to stock as it was a priority.[29]  SUF ¶ 71.  Gibson loaded boxes of product to a cart, cut the boxes open, and stocked the products one at a time on the shelf.[30]  SUF ¶ 72.  The products stocked included items such as

_____

[27] Although Plaintiff denies this fact, the evidence she cites only disputes that there were two jackets.  See PSDF ¶ 69 (citing Sellers Dep. at 55).

[28] See n.27.  While Plaintiff testified that she thought the jacket "was mainly ... for the truck drivers," Sellers Dep. at 55, this evidence does not contradict the sworn declarations of Blythe, Gibson, Bucolo, McCollum, and Furtado, see SUF ¶ 70; Defendants' App., Ex. 32 (McCollum Decl.) ¶ 3, that the jacket(s) was used by them and/or other commissary employees when working or entering the chill area.

[29] Plaintiff denies this fact, see PSDF ¶ 72, but vaguely cites to "Cloud Affidavit," PSDF ¶ 71, without providing any indication as to where in the record this document can be found and which paragraph(s) of the affidavit contradict SUF ¶ 71.  Assuming that the Cloud Affidavit is Plaintiff's Ex. 9 (Cloud Aff.) and that Plaintiff intended to cite to ¶ 54 of the Cloud Aff. ("I read a statement by Mary Gibson which is dated December 14, 2004.  This never happened."), this paragraph does not contradict SUF ¶ 71.  As far as the Court can determine, there is no December 14, 2004, statement from Gibson in the record.  If the statement to which Cloud intended to refer is the Gibson Decl. of 12/1/04, see Defendants' App., Ex. 18, that statement contains numerous facts – none of which reference Cloud.  Thus, the Court has no idea what it is that Cloud asserts "never happened" or the basis for his claimed knowledge.  Plaintiff's remaining citation to support her denial is "Gibson Deposition at 75," but that testimony directly supports SUF 71, see Gibson Dep. at 75 ("I went to -- immediately went to my office, typed up the memorandum, saved it and then I went to the chill department to help put out milk and eggs.").

[30] Although Plaintiff disputes this fact, the Court deems it admitted for essentially the same reasons stated in n.29.

cheese, milk, and eggs.  SUF ¶ 73.  When placing the product on
the shelf, the heaviest item Gibson had to put on the shelf was
one gallon of milk.[31]  SUF ¶ 74.

On February 25, 2004, Gibson issued Plaintiff a letter of
reprimand for her failure to follow instructions and
disrespectful conduct.  SUF ¶ 75.  Gibson was not aware of
Plaintiff's EEO activity at the time she issued the Letter of
Reprimand on February 25, 2004.[32]  SUF ¶ 76.  The Letter of

---

[31] Plaintiff disputes this fact, but the evidence she cites,
"Gibson Affidavit dated December 1, 2004," PSDF ¶ 74, does not
contradict Defendants' App., Ex. 20 (Gibson Decl. of 11/30/07) ¶ 5,
which is the stated basis for SUF ¶ 74.

[32] Plaintiff denies this fact, see PSDF ¶ 76, but the "Bucolo
Deposition at 163," id., to which she cites, does not support the
denial.  Plaintiff's additional citation, "See Exhibit 1," id., does
not comply with the Local Rules.  Pursuant to DRI Cv 56(a)(3),
Plaintiff is required to provide "the page and line of any document to
which reference is made ...."  DRI LR Cv 56(a)(2).  Plaintiff's Ex. 1
is a hodgepodge of documents consisting of approximately 175 pages.
The Court is not required to rummage through them for evidence
supporting Plaintiff's denial.  See Ashley v. Paramount Hotel Grp.,
Inc., 451 F.Supp.2d 319, 323 (D.R.I. 2006)("Any parties who fail to
observe local rules of the district in which they practice do so at
their own peril.")(citing Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st
Cir. 2000)); see also Estate of Bennett v. Wainwright, 548 F.3d 155,
165 (1st Cir. 2008)("We have previously lauded the purpose behind local
rules such as this one, which is to relieve overworked district courts
by placing the burden on litigants to identify the truly disputed
material facts in the record."); Ríos-Jiménez v. Principi, 520 F.3d
31, (1st Cir. 2008)("Local Rule 56 is intended to prevent parties from
shifting to the district court the burden of sifting through the
inevitable mountain of information generated by discovery in search of
relevant material."); Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46,
51 (1st Cir. 2005)("District courts are not required to ferret through
sloppy records in search of evidence supporting a party's case."); cf.
Carrasquillo v. Puerto Rico, through Its Justice Dep't, 494 F.3d 1, 4
(1st Cir. 2007)("[N]on-compliance with [Local Rule 56(c)], as
manifested by a failure to present a statement of disputed facts,
embroidered with specific citations to the record, justifies the
court's deeming the facts presented in the movant's statement of
undisputed facts admitted and ruling accordingly.")(alterations in
original); Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 (1st Cir.
2001)(finding plaintiff's fact-dependent hostile work environment
claim waived for failure "to cite to any record fact material to this

16

Reprimand stated:

> You are hereby reprimanded for failure to follow instructions and disrespectful conduct.
>
> Specifically, on December 5, 2003, I directed you to report for duty in the chill area to stock. I told you that jackets were available and that I would assist you by loading the cart with the items that you would stock. You became loud and told me that you would not report to that area. Although I repeatedly instructed you to report to the chill area, you still refused.

Defendants' App., Ex. 1b at D-0194; see also SUF ¶ 77.

### F.  Change in Schedule

Plaintiff's schedule prior to December 12, 2004, was from 6:00 a.m. to 2:30 p.m.[33]  SUF ¶ 87.  In a memorandum dated December 6, 2004, Plaintiff was advised by Gibson that effective December 12, 2004, her work schedule would be Monday through Friday, 10:00 a.m. to 6:30 p.m.  SUF ¶ 88.  According to Blythe, he told Plaintiff that her schedule was being changed because there were "afternoon functions which have to be completed in CAO."  Defendants' App., Ex. 3a (Email from Blythe to Cook of 12/13/04).  Plaintiff, however, denies that she was given a reason for the schedule change.  See Sellers Dep. at 38.  In an e-mail dated December 13, 2004, to DeCA Zone Manager Richard Cook, Blythe stated that he needed to know whether or not Plaintiff could do the afternoon functions of her job before he

_____

factual inquiry").

[33] Plaintiff denies this fact, see PSDF ¶ 87, but the exhibit she cites, "Plaintiff's Exhibit 19," id., does not exist.  To the extent that Plaintiff may have intended to cite to Plaintiff's Ex. 18 (Plaintiff's Answers to Defendants' First Set of Interrogatories), that exhibit consists of 55 pages, and the Court declines to search through it looking for evidence which Plaintiff is required to cite with specificity.  See DRI LR Cv 56(a)(3).

could promote her.[34]  See SUF ¶ 90; see also Defendants' App.,
Ex. 3a.  A month later, on January 16, 2005, Plaintiff's schedule
was changed back to 6:00 a.m. to 2:30 p.m.  SUF ¶ 91.

Plaintiff's position description provides that CAOs "[m]ay
work uncommon tours of duty as required to meet [the] demands of
effective mission accomplishment."[35]  Defendants App., Ex. 1b at
D-0181.  Further, the Performance Plan for the CAO position
states a "Performance Element," Defendants' App., Ex. 25
(Civilian Performance Plan), of the job as being: "Utilizing
morning and afternoon daily checklist [to] provide an accurate
daily assessment of all comp[o]ne[n]ts of the Computer Assisted
Ordering System."[36]  Defendants' App., Ex. 25.  In addition, the

---

[34] Plaintiff disputes this fact, see PSDF ¶ 90 (citing "Bucolo
Deposition at 42"), but the evidence she cites does not contradict the
fact that Blythe sent the email or that the email stated in part:
"[O]n the training plan, there are functions which are only on the ...
afternoon part of the checklist.  I have to know whether or not she
can do any of these functions before we sign off on the next level."
Defendants' App., Ex. 3a (Email from Blythe to Cook of 12/13/03).
Bucolo, a GS-5 level employee, see Bucolo Dep. at 25, appeared to
testify that there was no second shift for the CAO, see id. at 42, and
that there were no CAO duties which had to be performed during the
second or third shift, see id. at 43.

    Q.   And there was a second shift for a [CAO] person?

    A.   No.  We worked in the morning.  So I would say no.

    ....

    Q.   So again, prior to the time that you began working just
         the third shift, there were no [CAO] duties that had to
         be performed during the second or third shift?

    A.   Yeah.  Correct.

Bucolo Dep. at 42-43.

[35] Plaintiff disputes this fact, see PSDF ¶ 93, but the evidence
she cites does not contradict the fact that Defendants have accurately
quoted the document they reference.

[36] See n.35.

Training Plan for Computer Assisted Ordering (CAO), states:

> Stores that have two CAOS assigned should provide overlap coverage using a work schedule for these general time frames (0600 hours through 1500 hours or 1000 hours through 1900 hours).  At locations with two CAOS assigned, a later schedule when the store is not open for business[] is the preferred arrangement, especially when CAO is first deployed to reduce/work down overwrites in the backroom.[37]

Id., Ex. 1d at 32 (CAO Functions).  In addition, the Training Plan provides "a 'model' task list that identifies CAO processing that will occur throughout the day and when store operational tasks should be accomplished to use the system most effectively."[38]  Id., at 33.  These tasks include tasks between the hours of 10:00 a.m. and 6:00 p.m.[39]  Id. at 35-38.

### G.  Fourteen Day Suspension

In April of 2005, Plaintiff was suspended for fourteen days for disruptive behavior, disrespectful conduct involving a supervisor, and failure to comply with supervisory instructions. See Defendants' App., Ex. 1e (Memorandum from Furtado to Plaintiff of 4/11/05).  The disruptive behavior was based on complaints from three employees, McCollum, Bucolo, and Johnnie Spencer, that Plaintiff had harassed them by making derogatory, disparaging, threatening, or false statements to or about them and by making offensive sounds or facial expressions when they were in Plaintiff's presence.  See id., Ex. 1f (Notice of Proposed Suspension) at D-0408.  The disrespectful conduct involved three incidents in which Plaintiff yelled or became loud and was excessively demonstrative (e.g., banging hand on chest,

---

[37] See n.35.

[38] See n.35.

[39] See n.35.

rolling eyes, storming out of office) during meetings with Gibson or Gibson and Furtado. _See id._ at D-0408, D-0409. The failure to comply with supervisory instructions stemmed from Plaintiff's disregard of Gibson's instructions on October 5, 2004, to provide Mike Texeira, the receiver, with a list of ordered items and failure to comply on January 24, 2005, with Gibson's instruction to assist McCollum with a task. _See id._ at D-0409.

Plaintiff was an employee covered by a collective bargaining agreement. SUF ¶ 17. The negotiated grievance procedure outlined in the MLA allows an employee to grieve "any matter relating to the employment of the employee[.]" Defendants' App., Ex. 15 (MLA) at 63. Plaintiff filed a grievance on April 26, 2005, concerning her fourteen day suspension. _See id._, Ex. 1g at D-0404 (Grievance Form). Plaintiff was represented by her union in this grievance.[40] _See id._ In Step 1 of the grievance procedure, Plaintiff's grievance was denied by Blythe, the store director. _See id._, Ex. 1g at D-0402 (Letter from Blythe to Ware of 5/3/05). Subsequently, the Union requested mediation, but the matter was not resolved. _See id._, Ex. 1g at D-0394 (Letter from Cook to Ware of 6/28/05). The Union filed a "Step 2 grievance," _id._ at D-0394, on June 20, 2005, but the grievance was denied on June 28, 2005, by Zone Manager Cook, _see id._ Thereafter, the grievance was not pursued by going to the next step which was arbitration. _See id._, Ex. 1g at D-0393 (Email from Ware to Blythe of 7/28/05); _see also id._, Ex. 15 at 67.

## H.  Administrative EEO Complaints

### 1.  First EEO Complaint

On or about May 7, 2001, Plaintiff filed her first EEO

---

[40] Plaintiff was a member of Local 190 of the American Federation of Government Employees. _See_ Defendants' App., Ex. 1g at D-0401 (Letter from Ware to Covington of 5/12/05); SUF ¶ 17.

complaint.[41]   SUF ¶ 97.   Plaintiff alleged that she was
discriminated agaist on the basis of race (African American) and
disability (stomach ulcers) in that:

> she was subjected to harassment when she was continuously
> switched from work assignment to work assignment; she was
> continuously assigned unfavorable assignments that
> required working in a freezer (without a coat) and heavy
> lifting (without a back brace); she was assigned to work
> nights, 3:00 pm to 11:30 pm or 6:00 pm to 2:00 am while
> others were not; and she was denied the use of annual
> leave on April 24, 2001.

Defendants' App., Ex. 7 (Decision); see also SUF ¶ 98.[42]   On May
21, 2003, Administrative Judge Kevin J. Berry issued a decision
finding no discrimination.   Defendants' App., Ex. 7.   The
decision was sent to Plaintiff and Attorney Steven Coaty, who was
representing Plaintiff at that time.   SUF ¶ 100.   This decision
was not appealed, and the time for appealing the decision has
long passed.   SUF ¶ 101.

### 2.  Second EEO Complaint (Subject of this Case)

On December 18, 2003, Plaintiff contacted an EEO counselor
with respect to the denial of her annual leave application by
Blythe on July 14, 2003, and by Furtado on November 4, 2003.[43]
SUF ¶ 102; see also Defendants' App., Ex. 1b at D-0064
(Memorandum from Johnson to Deputy EEO Officer of May 3, 2004, at
2), D-0071 (Counselor's Intake Sheet); Sellers Dep. at 35-36.   On

---

[41] Plaintiff denies this fact, see PSDF ¶ 97, but she cites to
"Plaintiff's Exhibit 1," id., to support her denial.  As already
noted, this citation lacks the specificity required by LR Cv 56(a)(3).
Accordingly, the fact is deemed admitted.  See n.32.

[42] See n.41.

[43] Plaintiff denies this fact, but she cites "Defendants' Exhibit
12," PSDF ¶ 102, without identifying where in this 47 page exhibit the
contradictory information may be found.  Thus, Plaintiff's denial
fails to comply with LR CV 56(a)(3), and the Court deems SUF ¶ 102 to
be admitted.

February 26, 2004, Plaintiff contacted an EEO counselor concerning the Letter of Reprimand issued to her on February 25, 2004.[44]  SUF ¶ 103.  On or about April 14, 2004, Plaintiff filed her second EEO complaint, id.,[45] which is the subject of this case, see Plaintiff's Memorandum in Support of Her Objection to Defendants' Corrected Memorandum in Support of Their Motion for Summary Judgment ("Plaintiff's Mem.") at 3.

In a letter dated June 22, 2004, Plaintiff's claims were defined as follows:

> a.   Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, from July 14, 2003[,] to November 4, 2003, the Commissary Officer, Mr. John Blythe, Sr., denied her requests for annual leave on the following dates: August 7, 8, 28, 29, and 31, 2003[,] (40 hours) and November 14, 15, and 18-22, 2003[,] (56 hours)?
>
> b.   Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on February 25, 2004, her supervisor, Ms. Mary Gibson, issued her a Letter of Reprimand for failure to follow instructions and disrespectful behavior?
>
> c.   Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on or about March 4, 2004, the Commissary Officer, Mr. John Blythe, Sr., disapproved her Request for Restoration of Annual Leave (96 hours)?

SUF ¶ 104.

---

[44] Plaintiff denies this fact, see PSDF ¶ 103, but she provides no citation to the record to support her denial or her assertion that "Sellers contacted the EEO about retaliation, race discrimination and different treatment by Mary Bucolo among other things," id. Plaintiff's denial, therefore, fails to comply with LR Cv 56(a)(3), and the Court deems SUF ¶ 103 to be admitted.

[45] See n.44.

The letter further advised Plaintiff that "[i]f you believe the issues in your complaint is [sic] not correctly defined, please notify me, in writing, within 5 calendar days after you receive this letter, and specify why you believe the issues are not correctly defined.  If you fail to contact me, I will conclude you agree that the issues are properly defined."  SUF ¶ 105 (alterations in original).  Plaintiff did not disagree that these were the defined issues in the EEO complaint, nor did she seek to amend her EEO complaint to include claims relating to promotions and pay.[46]  SUF ¶ 106.  The only time Plaintiff sought to amend her EEO Complaint was to add a claim with respect to "[w]hether the complainant was discriminated against based on reprisal (prior EEO activity) when, on December 13, 2004[,] her duty hours and work assignments were abruptly changed with no explanation?"[47]  SUF ¶ 107 (quoting Defendants' App., Ex. 1b at D-0099 (Letter from Hill to Plaintiff of 12/22/04 at 1)).

On June 10, 2005, DeCA issued a final agency decision finding no discrimination based on race or retaliation regarding the EEO complaint which is the subject of this case.  SUF ¶ 108.

## III.  Travel

On September 2, 2005, Plaintiff filed her Complaint in this Court.  See Docket.  Subsequent to the Complaint being filed, on or about December 10, 2005, Plaintiff was removed from her employment with the Defense Commissary.[48]  Plaintiff filed her

---

[46] Plaintiff denies this fact, but cites to "Plaintiff's Exhibit 2," PSDF ¶ 106, to support her denial.  Plaintiff's Exhibit 2 consists of more than 65 pages, and Plaintiff fails to identify which page(s) support her denial.  Thus, Plaintiff's denial fails to comply with LR Cv 56(a)(3), and the Court deems SUF ¶ 106 to be admitted.

[47] The Court deems SUF ¶ 107 admitted for the reasons stated in n.46.

[48] See n.3.

Amended Complaint on January 25, 2006.  <u>See id.</u>  The amended
pleading eliminated previous counts that alleged violation of the
Civil Rights Act, 42 U.S.C. § 1981.  <u>See</u> Amended Complaint.
Defendants filed the instant Motion for Summary Judgment on
November 30, 2007.  <u>See</u> Docket.  Plaintiff filed her response to
the Motion on January 29, 2008.  <u>See</u> Motion in Opposition to
Defendants' Motion for Summary Judgment (Doc. #41).  Defendants
filed a reply memorandum on February 29, 2008.  <u>See</u> Defendants'
Reply in Support of Their Motion for Summary Judgment (Doc. #46)
("Defendants' Reply").

On March 10, 2008, Plaintiff's counsel sent a letter to this
Magistrate Judge, the body of which stated:

> As you know, plaintiff did not previously provide
> deposition pages to which she made reference in her
> Opposition to Defendant's [sic] motion for summary
> judgment.  This is because Plaintiff does not believe the
> applicable rules include such a requirement.  However,
> Defendant's [sic] reply makes an issue of this.  Given
> this, Plaintiff is enclosing the relevant transcript
> pages for the Court's convenience.

Letter from Andrews to Martin, M.J., of 3/10/08.  Accompanying
the letter were hundreds of pages of excerpts from the
depositions of Sellers, Blythe, Furtado, Gibson, Bucolo,
McCollum, and B. Venable.

Defendants viewed Plaintiff's communication as an improper
surreply and filed an objection to it.  <u>See</u> Defendants' Objection
to Plaintiff's Surreply in Support of Her Opposition to
Defendants' Motion for Summary Judgment and Attached Transcripts
Improperly Submitted to This Court (Doc. #47) ("Defendants'
Objection to Surreply" or "Defendants' Objection").  Defendants
accurately noted that "[t]he surreply and deposition transcripts
were submitted to United States Magistrate Judge David L. Martin
and there is no indication that these documents were filed with
the Clerk as no certificate of service was attached to these

24

documents as required by Federal Rule of Civil Procedure 5(d)."
Defendants' Memorandum in Support of Their Objection to
Plaintiff's Surreply in Support of Her Opposition to Defendants'
Motion for Summary Judgment and Attached Transcripts Improperly
Submitted to This Court ("Defendants' Objection Mem.") at 1 n.1.
Because the documents had been submitted by Plaintiff without
leave of the Court,[49] Defendants "object[ed] to the surreply and
deposition transcripts being made a part of the record."  Id. at
2.

On April 7, 2008, the Court conducted a lengthy hearing on
the Motion for Summary Judgment and Defendants' Objection to
Surreply.  Thereafter, the Court took both matters under
advisement.

## IV.  Summary Judgment Standard

"Summary judgment is appropriate if 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law.'"  Commercial Union
Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006)(quoting Fed.
R. Civ. P. 56(c)); accord Kearney v. Town of Wareham, 316 F.3d
18, 21 (1st Cir. 2002).  "A dispute is genuine if the evidence
about the fact is such that a reasonable jury could resolve the
point in the favor of the non-moving party.  A fact is material
if it carries with it the potential to affect the outcome of the
suit under the applicable law."  Santiago-Ramos v. Centennial

---

[49] Local Rule Cv 7(b) provides in relevant part:

(3)   No memorandum other than a memorandum in support of
      a motion, a memorandum in opposition, and a reply
      memorandum may be filed without prior leave of the
      Court.

DRI LR Cv 7(b)(3).

<u>P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000)(quoting <u>Sánchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." <u>Feliciano de la Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000)(citing <u>Mulero-Rodríguez v. Ponte, Inc.</u>, 98 F.3d 670, 672 (1st Cir. 1996)).  "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." <u>Coyne v. Taber Partners I</u>, 53 F.3d 454, 460 (1st Cir. 1995).  Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial.  If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." <u>Gannon v. Narragansett Elec. Co.</u>, 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

The non-moving party, however, may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial.  <u>See</u> <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d at 53 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S.Ct. 2505 (1986)).  "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir. 2002)(quoting <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d

836, 842 (1st Cir. 1993))(alteration in original)(internal
quotation marks omitted).

**V.  Defendants' Objection to "Surreply"[50]**

      Defendants' Objection to Plaintiff's surreply is well
founded.  See Defendants' Objection Mem. at 2-3 (citing case law
which supports striking unauthorized surreply filings).
Defendants point out that Plaintiff submitted approximately 134
pages of her deposition testimony but that in her memorandum (in
opposition to the Motion for Summary Judgment) Plaintiff only
cites to seven pages of her deposition transcript.  See id. at 3-
4.  Defendants validly observe that "Plaintiff's submission of
hundreds of pages of deposition transcripts, to which she does
not even cite, can hardly be said to be 'for the Court's
convenience' as Plaintiff so states in her surreply."  Id. at 4.

      Nevertheless, after consideration, the Court concludes that
Defendants' Objection should be overruled for the following
reasons.  First, to the extent that Defendants argue that the
depositions should be excluded because Plaintiff is in effect
asking that the Court "sift through the record in search of
evidence to support a party's opposition to summary judgment,"
Defendants' Objection Mem. at 4 (quoting Stults v. Conoco, Inc.,
76 F.3d 651, 657 (5th Cir. 1996)), the Court has already
determined that it will not undertake that task, see, e.g., n.11,
n.15, n.32, n.33.  As reflected in the footnotes in the Facts
section, Plaintiff's failure to cite with specificity to evidence
in the record, as required by LR Cv 56(a)(3), has resulted in the
Court finding that many facts alleged in Defendants' SUF are
established notwithstanding Plaintiff's denials.  Accordingly, it
is unnecessary for the Court to exclude the depositions on this

_____

[50] For purposes of this discussion, the "Surreply" is the letter
of Plaintiff's counsel to this Magistrate Judge of 3/10/08 and the
deposition pages which accompanied that letter.

27

basis.

Second, in some instances the Court has found it less cumbersome to cite directly to a deponent's deposition testimony rather than to an exhibit within Defendants' App. which contains an excerpt from that deposition.  Also, the print used for some of the deposition pages submitted by Plaintiff is larger than the print used in the compressed versions of the deposition excerpts found in Defendants' App.  Thus, Plaintiff's pages are easier to read.[51]

Third, as counsel for Plaintiff noted at the hearing, Defendants themselves are guilty of a procedural misstep by filing the Motion for Summary Judgment without first requesting a conference with the Court as required by the Pretrial Order.[52] See Pretrial Order (Doc. #5) at 1.  While the parties' transgressions are not comparable,[53] the Court sees little prejudice to Defendants if the deposition filings are allowed.

---

[51] In making this observation, the Court is not suggesting that the submission of compressed versions of depositions should be avoided.  It is easier to work with compressed versions as they are less cumbersome.  The Court simply finds it more convenient in this instance to cite to the non-compressed version.

[52] By way of mitigation, counsel for Defendants explained that she was the third attorney on the case for the Government and appeared to indicate that she was unaware of this particular requirement of Judge Smith's Pretrial Order.

[53] While Defendants' counsel overlooked a single sentence in the Pretrial Order, Plaintiff's noncompliance with the rules is considerably greater.  Her claim that she "does not believe the applicable rules include ... a requirement [to provide deposition pages to which she has made reference in her Motion in Opposition to Defendants' Motion for Summary Judgment]," Letter from Andrews to Martin, M.J., of 3/10/08, flies in the face of the plain wording of LR Cv 56(a)(3) (requiring objecting party to "identify the evidence establishing the dispute[] in accordance with the requirements of paragraph (a)(2).").  Plaintiff's omission of a certificate of service as required by Fed. R. Civ. P. 5(d) and her failure to identify in the letter which depositions were being provided to the Court are also significant lapses.

28

Fourth, the Court has ultimately determined that the Motion for Summary Judgment should be granted.  The Court deems it preferable that the record in this matter be as complete as possible.

Accordingly, as reflected in a separate order issued this same date, Defendants' Objection is overruled, and the Clerk is directed to make the deposition excerpts, which accompanied the March 10, 2008, letter from Plaintiff's counsel to this Magistrate Judge, part of the record in this case.

## VI.  Claims against Dep't of Defense

Defendants initially request dismissal of all claims against the Department of Defense because it is not a proper defendant. The Court agrees.  The only appropriate defendant in an employment discrimination action brought pursuant to Title VII against the federal government or any of its instrumentalities is the head of the agency in which the alleged discriminatory acts occurred.  42 U.S.C. § 2000e-16(c); see also Soto v. U.S. Postal Serv., 905 F.2d 537, 539 (1st Cir. 1990)(citing § 2000e-16(c) and stating that "[i]n cases brought against the Postal Service, the Postmaster General is the only properly named defendant"); Mahoney v. U.S. Postal Serv., 884 F.2d 1194, 1196 (9th Cir. 1989) (same).  Accordingly, I recommend that the Department of Defense be dismissed as a defendant in this action.[54]  See Morales v. Mineta, 220 F.Supp.2d 88, 91 n.1 (D.P.R. 2002)(holding that Secretary of Transportation is the correct defendant for plaintiff's Title VII claims against the United States Department of Transportation and the United States Coast Guard and dismissing claims against them).

---

[54] Counsel for Plaintiff agreed at the hearing that the only proper defendant in this case is Robert M. Gates and that the Department of Defense should be dismissed.

## VII.  Count I - Disparate Treatment

### A.  Employment Discrimination Law

Employment discrimination claims arising under Title VII are analyzed under the burden-shifting method of proof outlined by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25 (1973), and further delineated in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-60, 101 S.Ct. 1089, 1093-97 (1981), and <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506-24, 113 S.Ct. 2742, 2747-56 (1993).[55]  <u>See Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 53 (1st Cir. 2000); <u>Domínguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424, 430-31 (1st Cir. 2000); <u>Smith v. Stratus Computer, Inc.</u>, 40 F.3d 11, 15-16 (1st Cir. 1994)(explaining application of <u>McDonnell Douglas</u> and <u>Burdine</u>). The method employs a three stage framework.  <u>See Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 176 (1st Cir. 2008).

The Plaintiff bears the initial burden of establishing a prima facie case of discrimination.  <u>See id.</u>  A plaintiff meets this burden by showing that: 1) she is a member of a protected class; 2) her employer took an adverse employment action against her; 3) she was qualified for the employment she held; and 4) and her position remained open or was filled by a person whose qualifications were similar to hers.  <u>Douglas v. J.C. Penney Co.</u>, 474 F.3d 10, 13-14 (1st Cir. 2007); <u>see also Rodriguez-Torres v. Caribbean Forms Mfr., Inc.</u>, 399 F.3d 52, 58 (1st Cir. 2005)

---

[55] The <u>McDonnell Douglas</u> burden-shifting analysis is applicable in cases where there is no direct evidence of discrimination and a plaintiff relies upon circumstantial evidence.  <u>See Weston-Smith v. Cooley Dickinson Hosp., Inc.</u>, 282 F.3d 60, 64 (1st Cir. 2002); <u>see also Smith v. Stratus Computer, Inc.</u>, 40 F.3d 11, 15 (1st Cir. 1994) ("When a Title VII plaintiff is unable to offer direct proof of her employer's discrimination-as is usually the case ... -we allocate the burden of producing evidence according to the now-familiar framework set forth in <u>McDonnell Douglas</u> ....").

(explaining that "[b]ecause employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case").  The burden for establishing a prima facie case is not onerous.  Douglas v. J.C. Penney Co., 474 F.3d at 14; Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000); Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000); see also Che v. Massachusetts Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003)("the prima facie case is 'a small showing that is not onerous and is easily made'")(quoting Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (citations and internal quotation marks omitted)).

After the plaintiff establishes a prima facie case, the burden shifts to the employer to establish a legitimate, non-discriminatory reason for its adverse employment action.  Douglas v. J.C. Penney Co., 474 F.3d at 14; Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 119 (1st Cir. 2005); Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d at 384.  If the employer demonstrates such a reason, the burden returns to the employee to show that the proffered reason was mere pretext and that the true reason was prohibited discrimination.  Douglas v. J.C. Penney Co., 474 F.3d at 14; Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d at 384 (stating that after employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, "it falls to the plaintiff to show both that the employer's proffered reason is a sham, and that discriminatory animus sparked [its] actions")(alteration in original)(internal quotation marks omitted); Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998)("a plaintiff must show both that the employer's articulated reason is false[] and that discrimination was the actual reason

for its employment action")(internal quotation marks omitted).[56]

## B.  Administrative Exhaustion

A federal employee alleging employment discrimination must exhaust her administrative remedies before bringing a court action.  See Brown v. Gen. Servs. Admin., 425 U.S. 820, 832, 96 S.Ct. 1961 (1976)(noting "preconditions" before an aggrieved employee may file a civil action in a federal district court to review his claim of employment discrimination); Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990)("Title VII requires exhaustion of administrative remedies as a condition precedent to suit in federal district court"); see also Velazquez-Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000)(holding that fire fighter employed by Department of Navy had not exhausted administrative remedies for discrimination claim "since there had been no contact with an [EEOC] counselor within 45 days" of the date of the alleged discrimination)(citing 29 C.F.R. § 1614.105(a)(1)); id. ("a federal employee's failure to contact an EEOC counselor within the limitations period causes him to lose his right to pursue a later de novo action in court")(citing Roman-Martinez v. Runyon, 100 F.3d 213, 216-18 (1st Cir. 1996)).  In order to exhaust her administrative remedies, a plaintiff must contact an EEO counselor within 45 days of the allegedly discriminatory incident.  29 C.F.R. § 1614.105(a)(1); see also Machado v. Frank, 767 F.Supp. 416, 419 (D.R.I. 1991)("Failure to contact an EEO counselor within the allotted time period bars a civil action

---

[56] The First Circuit also stated in Dichner, however, that "the Supreme Court's decision in Hicks leaves open the possibility that '[w]hen the prima facie case is very strong and disbelief of the proffered reason provides cause to believe that the employer was motivated by a discriminatory purpose, proof of pretext [alone] "may" be sufficient.'"  Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998)(quoting Lattimore v. Polaroid Corp., 99 F.3d 456, 465 (1st Cir. 1996)(quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993)))(alterations in original).

based on that event.").

## 1. Annual Leave Requests

Plaintiff's three leave requests, which sought leave for the dates of August 7, 8, 28, 29, and 31, 2003, were denied on July 14, 2003.  See Defendants' App., Ex. 1b at D-0189.  Thus, Plaintiff was required to contact an EEO counselor by August 28, 2003.  However, Plaintiff did not contact an EEO counselor regarding the July 14, 2003, denial of her leave until December 18, 2003.  SUF ¶ 102;[57] see also Defendants' App., Ex. 1b at D-064; Sellers Dep. at 35-36 (stating that she first sought EEO counseling regarding the denial of this leave at "[t]he end of the year").

Plaintiff attempts to argue that the doctrine of accrual enables her to avoid the preclusive effect of her failure to contact an EEO counselor within the required forty-five day period.  See Plaintiff's Mem. at 5 (citing Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir. 1990)("Accrual is the date on which the statute of limitations begins to run.  It is not the date on which the wrong that injures the plaintiff occurs, but the date – often the same, but sometimes later - on which the plaintiff discovers that he has been injured.")).  However, Plaintiff does not identify any date after July 14, 2003, as being the date on which she "discover[ed]," Cada, 920 F.2d at 450, that she had been injured.  Rather, she asserts somewhat vaguely in her memorandum that "she was concerned, not so much with the fact that she could not take the days selected in August, but whether she was ultimately going to lose her leave by the end of the year."  Id. at 6.

This assertion is problematic for two reasons.  First, the evidence Plaintiff cites in support thereof either fails to do so

---

[57] See n.43.

or has not been provided.  See id. (citing Plaintiff's Ex. 14 and
Sellers Dep. at 35-37, 240).  Plaintiff's Ex. 14[58] is a
certificate showing that Sellers completed "DeCA East CAO
Training 2004," Plaintiff's Ex. 14, and provides no support for
the assertion.  Plaintiff has not provided page 240 of her
deposition, and pages 35-37 merely reflect her testimony that she
first sought EEO counseling regarding the denial of leave when
she "lost a hundred -- 99 hours," Sellers Dep. at 36, at "[t]he
end of the year," id.  It does not indicate that Plaintiff
attached a greater importance to avoiding the loss of leave than
to being able to take leave on the days she selected in August.
Indeed, Plaintiff was unable to recall if she had even attempted
to take leave on other dates, see Sellers Dep. at 36-37, a matter
which presumably would have stood out in her mind if her primary
concern was avoiding the loss of "use or lose" leave.

    Second, even if the Court were to accept Plaintiff's
unsupported assertion, it provides an insufficient basis for
application of the doctrine of accrual.  A party seeking to
invoke that doctrine must at least provide a coherent explanation
of why the party did not know or have reason to know of the
injury until a particular date.  Cf. Nieves-Márquez v. Puerto
Rico, 353 F.3d 108, 119-20 (1st Cir. 2003)("the time of accrual

---

    [58] To the extent that Plaintiff may have intended to cite to
Plaintiff's Ex. 13 (Plaintiff's Affidavit) instead of Ex. 14,
Plaintiff's citation fails to comply with LR Cv 56(a)(3) in that it
lacks a paragraph or page number.  To the extent that Plaintiff
contends that ¶ 2 of her affidavit supports the assertion, see
Plaintiff's Ex. 13 ¶ 2 ("After my leave was denied in July, 2003, I
was under the impression that I could still use up my leave by the end
of the year because of our 'use or lose policy.'"), the Court is not
so persuaded.  Plaintiff's statement does not indicate that she was
more concerned with losing her leave than with not being able to take
leave on the days selected in August.  Furthermore, the fact that
Plaintiff could not even remember if she attempted to take leave on
other dates casts doubt on her assertion that her primary concern was
being able to avoid losing leave.  See Sellers Dep. at 36-37.

of a civil rights action is when the aggrieved party knows or has reason to know of the injury which is the basis for his action or when facts supportive of a civil rights action are or should be apparent to a reasonably prudent person similarly situated.") Here Plaintiff has failed to do so.[59]

Accordingly, I find that Plaintiff's discrimination claim based on the denial of her leave requests on July 14, 2003, is barred by her failure to exhaust administrative remedies.[60]  To the extent that the Motion seeks summary judgment on such basis, it should be granted.  I so recommend.

### 2.  Promotions and Pay

Defendants argue that Plaintiff also failed to exhaust her administrative remedies as to her disparate treatment claim with respect to promotion and pay.[61]  In support of this argument, Defendants note the following facts.  The EEO Counselor Intake Sheet, which Plaintiff signed and dated, shows that Plaintiff did not seek EEO counseling with respect to promotions and pay.  See Defendants' App., Ex. 1b at D-0071 to D-0075.  Rather, the February 4, 2004, Intake Sheet shows that Plaintiff sought EEO counseling with respect to the disapproval of leave.  See id., Ex. 1b at D-0071.

---

[59] At the hearing, Plaintiff's counsel appeared to argue that Plaintiff did not know that she had been injured (with respect to the leave requests which were denied on July 14, 2003) until her request for restoration of annual leave was denied.  However, this argument proves too much.  Plaintiff's request for restoration of annual leave was denied in March of 2004.  If Plaintiff did not know or have reason to know of the injury until that date, she could not have brought it to the attention of the EEO counselor on December 18, 2003.  Yet, she did.  See SUF ¶ 102; see also n.43.

[60] To the extent that Plaintiff's hostile work environment claim is based on the denial of these same requests, such claim is similarly barred.

[61] Plaintiff admits that her claim with respect to promotion and pay is "one and the same."  Plaintiff's Mem. at 6 n.8.

35

The March 5, 2004, Intake Sheet shows that Plaintiff sought EEO counseling with respect to a Letter of Reprimand issued on February 25, 2004.  See id., Ex. 1b at D-0074.  Moreover, the EEO Counselor's Report shows that Plaintiff did not raise any claims with respect to promotions and pay.  See id., Ex. 1b at D-0063-70.

Defendants further note that at her deposition Plaintiff could not remember whether or not she contacted an EEO counselor with respect to these issues.

> Q.  And when did you seek EEO counseling regarding the denial of the promotion?
>
> ...
>
> A.  I don't remember going because I was rejected.  It was just a combination of that, plus being suspended.  I think that's when all this was coming up.  It was when I was suspended.
>
> Q.  Did you file an EEO complaint regarding the denial of a promotion?
>
> ...
>
> A.  I don't recall if I did.

Sellers Dep. at 21-22.

In addition, Defendants point out that in her second EEO Complaint, Plaintiff did not mention any claims with respect to promotions and pay.  See Defendants' App., Ex. 12 at D-0045. Defendants also note that Plaintiff never amended her second EEO complaint to include those issues even though she was given the opportunity to do so.  See id., Ex. 1b at D-0096 (Letter from Hill to Sellers of 6/22/04).

Plaintiff responds by citing "the scope of the investigation rule," Plaintiff's Mem. at 6 (internal quotation marks omitted), which holds that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can

36

reasonably be expected to grow out of the charge of discrimination," <u>Sanchez v. Standard Brands, Inc.</u>, 431 F.2d 455, 466 (5th Cir. 1970); <u>see also</u> <u>Johnson v. Gen. Elec.</u>, 840 F.2d 132, 139 (1st Cir. 1988)("A complaint related to that brought before the EEOC, but which was not itself made the subject of a separate EEOC complaint, must reasonably be expected to have been within the scope of the EEOC's investigation in order to meet the jurisdictional prerequisite."), <u>abrogated by</u> <u>Clockedile v. New Hampshire Dep't of Corr.</u>, 245 F.3d 1, 4 (1st Cir. 2001).[62] Plaintiff asserts that "[i]n light of the numerous instances where plaintiff's failure to be promoted to a GS-7 was raised both by plaintiff and by management in the course of the EEOC investigation, clearly the EEOC's investigation should have uncovered this claim."  Plaintiff's Mem. at 8 (footnote omitted).

This assertion is unpersuasive because Plaintiff fails to identify where in the record evidence of these "numerous instances" can be found other than the inadequate citation "See Plaintiff's Exhibit 2," Plaintiff's Mem. at 7-8.  The Court has already noted that such a general citation is inadequate.  <u>See</u> n.46 <u>supra</u>; <u>cf.</u> <u>Suprenant v. Rivas</u>, 424 F.3d 5, 21 (1st Cir. 2005)("It is counsel's job ... to mine the record and prove the alleged error, not to offer suggestive hints and leave the rest of the work to a busy court.").  Thus, Plaintiff has not shown that her race claim with respect to the denial of promotions and

---

[62] Although in <u>Clockedile v. New Hampshire Department of Corrections</u>, 245 F.3d 1 (1st Cir. 2001), the First Circuit abandoned the rule stated in <u>Johnson v. General Electric</u>, 840 F.2d 132, 139 (1st Cir. 1988), with respect to retaliation claims, <u>see</u> <u>Clockedile</u>, 245 F.3d at 4, 6, the Court declined to take a position for non-retaliation claims or additional claims of discrimination which were never presented to the administrative agency, <u>Russell v. Enter. Rent-A-Car Co. of Rhode Island</u>, 160 F.2d 239, 263 n.6 (D.R.I. 2001); <u>cf.</u> <u>id.</u> ("Therefore, while the <u>Clockedile</u> decision is authoritative in resolving the motion for summary judgment on plaintiff's retaliation claim, it has no effect on the Court's decision to dismiss plaintiff's disparate impact claim.").

pay falls within the scope of the EEOC investigation.  <u>See</u>
<u>Lattimore v. Polaroid Corp.</u>, 99 F.3d 456, 464 (1st Cir.
1996)("[I]n employment discrimination cases, [t]he scope of the
civil complaint is ... limited by the charge filed with the EEOC
and the investigation which can reasonably can be expected to
grow out of that charge.")(quoting <u>Powers v. Grinnell Corp.</u>, 915
F.2d 34, 38 (1st Cir. 1990))(second and third alterations in
original); <u>Ladenheim v. American Airlines, Inc.</u>, 115 F.Supp.2d
225, 233 (D.P.R. 2000) ("A plaintiff in his administrative charge
must describe the essential nature of the claim and ... identify
the core facts on which it rests.")(alteration in original)
(internal quotation marks omitted).

Even if the Court were to overlook Plaintiff's non-
compliance with the Local Rules, Plaintiff's argument that the
EEOC should have uncovered Plaintiff's failure to promote claim
is unpersuasive.  <u>See</u> <u>Kenney v. MML Investors Servs., Inc.</u>, 266
F.Supp.2d 239, 247 (D. Mass. 2003)(rejecting plaintiff's argument
that the scope of her civil action should not be determined by
the agency charge but by what the EEOC "was given the opportunity
to do").  Accordingly, except to the extent that the denial of
promotions and pay is part of Plaintiff's retaliation claim, <u>see</u>
<u>Clockedile</u>, 245 F.3d at 6, Plaintiff has failed to exhaust her
administrative remedies.  Thus, her promotions and pay claim is
otherwise barred.

### 3.  Fourteen Day Suspension

Defendants argue that Plaintiff failed to exhaust her
remedies as to any race or retaliation claim concerning her
fourteen day suspension because she elected to pursue the
negotiated grievance procedure concerning it and failed to take
the grievance to arbitration, the final step of such process.
<u>See</u> Defendants' Corrected Memorandum in Support of Their Motion
for Summary Judgment ("Defendants' Mem.") at 24; <u>see also</u> <u>Frasure</u>

v. Principi, 367 F.Supp.2d 245, 252 (D. Conn. 2005)(explaining
that "[t]he Federal Labor-Management Relations Act provides that
a federal employee may raise claims of discrimination under a
negotiated grievance procedure or in a Title VII complaint, but
not both")(citing 5 U.S.C. § 7121(d)); id. at 253 ("Whichever
route the employee chooses, she must then exhaust that
administrative remedy before pursuing her claim in court.");
O'Dwyer v. Snow, No. 00CIV8918 (LTD)FM, 2004 WL 444534, at *8
(S.D.N.Y. Mar. 10, 2004)("These formal, written grievances ...
constituted irrevocable elections to pursue those issues through
the union procedures.  Thus, for these claims to be actionable in
this Court, Plaintiff must have exhausted the grievance procedure
set out in her union's collective bargaining agreement.")
(internal citation omitted); accord Guerra v. Cuomo, 176 F.3d
547, 548-49 (D.C. Cir. 1999)(interpreting § 7121(d) and affirming
district court's dismissal of plaintiff's complaint where she
"failed to exhaust her remedies under the grievance procedures
...").

     Petitioner responds to this argument by asserting in a
footnote that "[i]t was the union – and not Sellers – who decided
not to pursue her grievance to the final step of arbitration."
Plaintiff's Mem. at 10 n.10.  Plaintiff cites no evidence to
support this assertion.[63]  Accordingly, the Court rejects
Plaintiff's assertion for lack of support.

     Even if the Court were to assume that Plaintiff sought to

_____

     [63] To the extent that Plaintiff may contend that Defendants' App.,
Ex. 1g at D-0393 (Email from Ware to Blythe of 7/28/05) supports her
assertion that it was the union and not Plaintiff that decided not to
pursue the grievance, the Court finds this evidence insufficient.
There is nothing in the memorandum from Ware to Blythe of 7/27/05
which indicates that the union's action was contrary to Plaintiff's
wishes or made over her objection.  See Defendants' App., Ex. 1g at D-
0393 ("Since the letter of reprimand is still being litigated, this
local is choosing not to pursue this case at this time.").

take her grievance to arbitration and that the union refused,
Plaintiff still failed to exhaust her administrative remedies
because she never argued on her grievance form that the
discipline imposed was due to race or retaliation.  <u>See</u>
Defendants' App., Ex. 1g at D-0404.  Therefore, she failed to
exhaust her administrative remedies as to any race or retaliation
claim concerning the suspension.  <u>See</u> <u>Redmon v. Mineta</u>, No. 06-
5272, 2007 WL 1837134, at *4-5 (6th Cir. June 25, 2007)(holding
that plaintiff failed to exhaust her administrative remedies
where she did not raise her Title VII claims in the union
grievance procedure).  Accordingly, Plaintiff is barred from
litigating these claims in this Court, <u>see</u> <u>id.</u> at *5 (finding
summary judgment properly granted where plaintiff failed to
exhaust her administrative remedies).[64]

    **C.  Prima Facie Case**

    In setting out her prima facie case, Plaintiff must show: 1)
she is a member of a protected class; 2) she was performing
satisfactorily so as to meet her employer's legitimate job-
performance expectations; 3) she suffered some adverse employment
actions at the hands of her employer; and 4) she was treated less
favorably than similarly situated persons outside her protected

---

    [64] Defendants also argue that even if Plaintiff had alleged
discrimination and retaliation claims in the union grievance procedure
and that she petitioned the union to pursue arbitration and the union
denied her request, Defendants are still entitled to summary judgment
because Plaintiff provides no evidence that she filed a timely appeal
with the EEOC after DeCA denied her grievance in Step 2 of the
grievance procedure.  <u>See</u> Defendants' Reply in Support of Their Motion
for Summary Judgment (Doc. #46) ("Defendants' Reply") at 8 (citing 5
U.S.C. § 7121(d); 29 C.F.R. § 1614.401(a)); <u>see also</u> <u>Quint v. A.E.</u>
<u>Staley Mfg. Co.</u>, 172 F.3d 1, 8 n.2 (1st Cir. 1999)(noting that prior to
filing suit plaintiff had filed a timely claim with the Equal
Employment Opportunity Commission after her union declined to proceed
with arbitration with respect to her grievance).  The Court agrees
that Plaintiff's claims based on her fourteen day suspension are
barred for this additional reason.

class.[65] <u>Ashley v. Paramount Hotel Grp., Inc.</u>, 451 F.Supp.2d
319, 330 (D.R.I. 2006); <u>see also</u> <u>Rathbun v. AutoZone, Inc.</u>, 361
F.3d 62, 71 (1st Cir. 2004)("The elements of the plaintiff's
prima facie case vary according to the nature of her claim.");
<u>Lehman v. Prudential Ins. Co. of America</u>, 74 F.3d 323, 328 n.4
(1st Cir. 1996)("[T]he facts necessary to establish a prima facie
case of discrimination will vary depending on the circumstances
of each case.")(alteration in original).  With the exception of
Plaintiff's claim based on the fourteen day suspension (which the
Court finds is barred for failure to exhaust her administrative
remedies and which the Court elects not to discuss further),
Plaintiff's claims are discussed within the following sections

---

[65] Plaintiff seemingly takes issue with this formulation,
asserting that the First Circuit has explicitly rejected the notion
that a Plaintiff is required to proffer comparable evidence in order
to establish her prima facie case.  <u>See</u> Plaintiff's Mem. at 12 (citing
<u>Fernandes v. Costa Bros. Masonry, Inc.</u>, 199 F.3d 572, 584 (1st Cir.
1999)); <u>see also</u> <u>Conward v. Cambridge Sch. Comm.</u>, 171 F.3d 12, 19 (1st
Cir. 1999)(agreeing that "the time to consider comparative evidence in
a disparate treatment case is at the third step of the burden-shifting
ritual, when the need arises to test the pretextuality <i>vel non</i> of the
employer's articulated reason for having acted adversely to the
plaintiff's interest").  However, Plaintiff's formulation of the
elements of her prima facie case is inapplicable to this action which
does not involve her dismissal.  <u>See</u> Plaintiff's Mem. at 12 (stating
the third and fourth elements of a prima facie case as "(3) she was
nevertheless dismissed; and (4) after her departure, the employer
sought someone of roughly equivalent qualifications to perform
substantially the same work").  This Court concludes that the
formulation stated in <u>Ashley v. Paramount Hotel Group, Inc.</u>, 451
F.Supp.2d 319, 330 (D.R.I. 2006), is correct for the circumstances of
this case.  If the Court were to limit the formulation to the first
three elements stated in <u>Ashley</u>, there would be no basis for an
inference of discrimination from such a showing, and a prima facie
case raises an inference of discrimination.  <u>See</u> <u>Ingram v. Brink's,
Inc.</u>, 414 F.3d 222, 230 (1st Cir. 2005)("If a prima facie case is made
out, an inference of discrimination is raised ..."); <u>cf.</u> <u>Storey v.
Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3rd Cir. 2004)(stating that
while prima facie elements of a discrimination claim vary depending on
the particular facts of the case, "the plaintiff must generally
present evidence that 'raises an inference of discrimination.'")
(quoting <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510, 122 S.Ct. 992
(2002)).

only to the extent that a particular claim fails to satisfy the
particular prong of the McDonnel Douglas burden shifting test
being discussed.

### 1.  Less Favorable Treatment

Defendants argue that Plaintiff is unable to show that she
was treated less favorably than similarly situated non-black
employees and that therefore she is unable to establish a prima
facie case.  In considering this argument, the Court bears in
mind that a plaintiff's burden in establishing a prima facie case
is a modest one.  Cardona Jimenez v. Bancomercio de Puerto Rico,
174 F.3d 36, 41 (1st Cir. 1999); see also Texas Dep't of Cmty.
Affairs v. Burdine, 450 U.S. at 252, 101 S.Ct. 1089 ("The burden
of establishing a prima facie case of disparate treatment is not
onerous."); Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 (1st
Cir. 1994)(describing burden as "relatively light").  "All that
is needed is the production of admissible evidence which, if
uncontradicted, would justify a legal conclusion of
discrimination."  Sanchez v. Puerto Rico Oil Co., 37 F.3d 712,
719 (1st Cir. 1994).

### a.  Annual Leave Requests

Plaintiff cannot show that she was treated less favorably
than those outside of her protected class with respect to the
denial of her annual leave requests because all employees were
required to submit leave planners,[66] see SUF ¶ 24; see also
Defendants' App., Ex. 15 at 30, and Plaintiff was the only
employee who failed to submit a leave planner as required, see
Defendants' App., Ex. 17 (Furtado Decl. of 12/1/04) at D-0153
("The Complainant was the only person under my supervision who
did not submit a leave planner."); Blythe Dep. at 270.  Thus,
Plaintiff cannot show that any other employee outside her

---

[66] See n.8.

protected class was treated more favorably than she with respect to annual leave requests.  Smith v. Stratus Computer, Inc., 40 F.3d at 17 ("In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from persons similarly situated *in all relevant aspects*.")(internal quotation marks omitted).

Plaintiff argues that the leave planner was only a "guide" to ensure that employees working in the same job and same department would not be taking leave at the same time and that an employee could still take leave even if she had not submitted a leave planner.  See Plaintiff's Mem. at 34-35.  Plaintiff attempts to distinguish herself from McCollum, "a similarly situated white person[,]" id. at 35, who in fact "was denied leave because he sought to take days off previously selected by Sellers," id.  Plaintiff asserts that "unlike Sellers, McCollum was not denied leave.  Rather, he [was] only not allowed to take leave on the dates he selected."  Id.  However, in making this statement, Plaintiff apparently overlooks the fact that she requested and was granted annual leave from October 22-24, 2003. SUF ¶¶ 37-38.  Thus, just like McCollum, Plaintiff was not denied annual leave, but only denied leave on some of the dates she selected.[67]

Accordingly, with respect to the denial of Plaintiff's leave requests, I find that Plaintiff has failed to establish a prima facie case of discrimination because she is unable to present

_____

[67] Plaintiff states that she "agrees that she should not have been able to take leave in either August or November[] 2003 if William McCollum – who was in her department and did her job – had previously selected her dates."  Plaintiff's Mem. at 35.  However, she claims that "defendants submitted to the EEO a document reflecting the leave taken by employees during 2003," id., and that "[t]his document does not reflect that McCollum was on leave the days selected by Sellers," id.  Plaintiff provides no citation as to where this document can be found in the record, and the Court finds Plaintiff's claim to be unsupported.

43

evidence which raises an inference of racial discrimination. There is simply nothing in the fact that her requests for leave were denied which "would justify a legal conclusion of discrimination." <u>Sanchez v. Puerto Rico Oil Co.</u>, 37 F.3d at 719.

### b.  Restoration of Leave

Plaintiff similarly cannot establish a prima facie case with respect to the denial of her request for restoration of leave because she cannot point to competent evidence of similarly situated employees outside of her protected class who were treated more favorably with respect to the restoration of annual leave.  Furtado has never recommended, nor denied, approval of a request for restoration of annual leave other than for Plaintiff. <u>See</u> Furtado Dep. at 123.  Thus, Plaintiff has failed to establish a prima facie case with respect to the denial of her restoration of leave request.

### c.  Change in Work Schedule

Defendants argue, and the Court agrees, that Plaintiff cannot establish that she was treated less favorably than those outside her protected class with regard to the schedule change on December 12, 2004.  Both McCollum and Bucolo, who were both white, had their work schedules changed numerous times in the CAO position.  <u>See</u> Defendants' App., Ex. 9 (Bucolo Decl.) ¶ 4;[68] <u>Id.</u>, Ex. 32 (McCollum Decl.) ¶ 2.[69]  There is nothing in the record to

---

[68] Bucolo states that:

While I have been in the CAO position, I have worked these hours: 8:30 p.m. to 5:00 a.m., 6:00 a.m. to 2:30 p.m., 6:00 p.m. to 2:30 a.m., 9:00 a.m. to 5:30 p.m., and 10:00/10:30 p.m. to 6:00/6:30 a.m.

Defendants' App., Ex. 9 (Bucolo Decl.) ¶ 4.

[69] McCollum states that:

I have worked afternoon hours as CAO.  My schedule has changed so much that I do not remember all the hours that they were

which Plaintiff can point relative to the change in her hours which "would justify a legal conclusion of discrimination." Sanchez v. Puerto Rico Oil Co., 37 F.3d at 719.

### 2.  Adverse Action

An adverse employment action is one which materially alters a term or condition of employment.  See Bishop v. Bell Atl. Corp., 299 F.3d 53, 59 (1st Cir. 2002).

> Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999)(quoting Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996)); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257 (1998)("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  Although actions short of termination may constitute adverse actions within the meaning of Title VII, not everything that makes an employee unhappy is an actionable adverse action.  Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997); see also Box v. Principi, 442 F.3d 692, 696 (8th Cir. 2006)("A materially adverse action must be more disruptive than a mere inconvenience or an alteration of

---

> changed to.  Some of the hours that I have ... worked as CAO were 6:00 a.m. to 2:30 p.m., 10:00 p.m. to 6:30 a.m., 8:00 a.m. to 4:30 p.m., 5:00 p.m. to 1:00 p.m., and 4:00 a.m. to 12:30 p.m.

Id., Ex. 32 (McCollum Decl.) ¶ 2.

job responsibilities.")(internal quotation marks omitted).

Determining whether an action is materially adverse necessarily requires a case-by-case inquiry. <u>Simas</u>, 170 F.3d at 49. Moreover, the inquiry must be cast in objective terms. <u>Id.</u> at 50. "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." <u>Bishop v. Bell Atl. Corp.</u>, 299 F.3d at 59 (quoting <u>Blackie v. Maine</u>, 75 F.3d at 725).

### a. Denial of Annual Leave Requests

As already noted, <u>see</u> Part VII.C.1.a. <u>supra</u> at 43, the Court rejects Plaintiff's suggestion that she was denied permission to take any leave. Rather, Plaintiff was simply denied permission to take leave on some of the days she requested. She was not denied the ability to use her allotted leave time. Indeed, Plaintiff could not even remember if she attempted to take leave on other dates after Furtado denied her leave request on November 4, 2003. <u>See</u> Sellers Dep. at 37.

Given Plaintiff's failure to schedule her leave earlier (by submitting a leave planner as required by the MLA) and in the context of her leave record showing numerous times where she had been granted annual leave,[70] the denial of Plaintiff's leave requests does not constitute an adverse action. <u>See</u> <u>Box v. Principi</u>, 442 F.3d at 697 (holding that plaintiff's claim regarding her denial of annual leave on one date "fall[s] short of showing an adverse employment action"); <u>Allen v. Potter</u>, 115 Fed. Appx. 854, 861 (7th Cir. 2004)("When the several denials of leave are considered in the context of [plaintiff's] entire leave

---

[70] In the prior EEO complaint, Plaintiff alleged that she was wrongfully denied annual leave in 2001. The Administrative Law Judge who addressed her complaint wrote that: "The record shows that the Complainant was granted and used more annual leave in the previous year than only one other worker." Defendants' App., Ex. 7 at P-0138.

record, the four denials in 1991 and the one denial in each of the other years (1992, 1999, and 2000) cannot be said to be anything more than 'a mere inconvenience.'"); <u>Pitchford v. Potter</u>, No. 3:30CV00374, 2007 WL 1020467, at *10 (E.D. Ark. Mar. 30, 2007)(holding that "[a] reasonable person in plaintiff's position would have scheduled his leave earlier and avoided any harm.  But for plaintiff's inaction there would have been no denial of leave"); <u>Mihalko v. Potter</u>, Civil Action No. 00-2076, 2003 WL 23319594, at *6 (W.D. Pa. Dec. 12, 2003)("Plaintiff's allegations that he was denied annual and family leave ... -even when construed in the most favorable light to the [p]laintiff-simply do not constitute adverse employment actions.").

The cases cited by Plaintiff in support of her contention that the denial of her leave requests constitutes an adverse employment action are distinguishable or otherwise unpersuasive. In <u>Allah v. City of New York Department of Parks & Recreation</u>, 47 Fed. Appx. 45 (2nd Cir. 2002)(unpublished opinion), the plaintiff suffered the loss of vacation days and pay as a result of being found guilty at a disciplinary proceeding.  <u>See</u> <u>id.</u> at 47.  In contrast, here Plaintiff suffered no loss of pay, and the denials were not part of any discipline imposed on her.  Similarly, in <u>Coffman v. Tracker Marine, L.P.</u>, 141 F.3d 1241 (8th Cir. 1998), the plaintiff had previously been allowed to take all federal holidays off with pay and the denial of these vacation days was functionally equivalent to a loss of pay.  <u>See</u> <u>id.</u> at 1243, 1245.

The court in <u>Mendoza v. Sysco Food Services of Arizona, Inc.</u>, 337 F.Supp.2d 1172 (D. Ariz. 2004), did not actually hold that denying an employee's vacation preference is an adverse employment action.  <u>See</u> <u>id.</u> at 1192.  Rather, the court only inferred that it could be, based on <u>Brooks v. City of San Mateo</u>, 229 F.3d 917 (9th Cir. 2000).  In <u>Brooks</u>, the Ninth Circuit affirmed the district court's rejection of plaintiff's

retaliation claim (which was based on the city's rescheduling plaintiff to an unfavorable shift and denial of her vacation preference) because the city accommodated plaintiff's preferences by allowing her to switch shifts and vacation dates with other employees.  See id. at 930.  Thus, the inference the Mendoza court made is based entirely on the fact that the Ninth Circuit in Brooks failed to also state that a denial of a vacation preference cannot constitute an adverse employment action.  This is too slender a reed to be persuasive to this Court.

The vacation time at issue in Dimitrov v. Seattle Times Co., No. 98-36156, 2000 U.S. App. LEXIS 22402 (9th Cir. Aug. 29, 2000) (unpublished opinion), an additional case cited by Plaintiff, is also factually distinguishable from the annual leave requested by Plaintiff in the instant case.  In Dimitrov, the employer changed its policy with respect to vacation credit for time off-work due to on-the-job injuries.  See id. at *10.  Under the former policy, employees, including the plaintiff, who suffered on-the-job injuries received vacation credit for those periods of time that they were unable to work.  See id.  After the dispute with the plaintiff arose, the employer changed the policy so that injured workers would not receive vacation credit for time missed due to injuries.  See id.  Thus, the change resulted in a direct financial loss to the plaintiff.

Similarly, in Donaldson v. Governors State University, Case No. 98 C 4988, 2001 U.S. Dist. LEXIS 20697 (N.D. Ill. Dec. 13, 2001), the plaintiff, a college professor, was assigned to teach a summer class which cut into his scheduled vacation time.  See id. at *4.  The assignment resulted in an actual financial loss to the plaintiff as evidenced by the fact that an arbitrator subsequently ruled that the university had to compensate plaintiff for working during his scheduled vacation time.  See id. at *4 n.1.  The court noted that the arbitrator's decision

48

weakened the plaintiff's prima facie case, <u>see</u> <u>id.</u> at *7 n.2, and
found that he was "just barely ... able to show that the loss of
vacation and personal development time was an adverse employment
action," <u>id.</u> at *7.  Given that here the denial of Plaintiff's
requests to take annual leave on particular days in 2003 did not
necessarily mean she would suffer a final loss of leave time,
this Court finds <u>Donaldson</u> to be distinguishable and
unpersuasive.

Thus, the Court finds that the denial of annual leave on the
dates requested does not constitute an adverse action.

### b.  Change in Schedule

Prior to December 12, 2004, Plaintiff worked from 6:00 a.m.
to 2:30 p.m.[71]  SUF ¶ 87.  For a period of four weeks, her
schedule was changed to 10:00 a.m. to 6:30 p.m.  SUF ¶¶ 88, 91.
A four hour change in working hours for a period of only four
weeks is not sufficient to rise to the level of an adverse
employment action.  <u>See</u> <u>Grube v. Lau Indus., Inc.</u>, 257 F.3d 723,
729-30 (7th Cir. 2001)(holding that transfer of plaintiff from
first to second shift did not constitute an adverse employment
action); <u>id.</u> at 729 ("Title VII simply was never intended to be
used as a vehicle for an employee to complain about the hours she
is scheduled to work"); <u>Bennington v. City of Houston</u>, 157 F.3d
369, 377 (5th Cir. 1998)(rejecting plaintiff's argument that
transferring her to the night shift constitutes an adverse
employment action);[72] <u>see also</u> <u>Keeton v. Flying J, Inc.</u>, 429,

---

[71] <u>See</u> n.33.

[72] In <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, the
Supreme Court observed that "[a] schedule change in an employee's work
schedule may make little difference to many workers, but may matter
enormously to a young mother with school age children."  548 U.S. 53,
69, 126 S.Ct. 2405, 2415 (2006).  Here, however, Plaintiff has not
pointed to any evidence suggesting that the schedule change imposed
any special hardship on her.

F.3d 259, 268 (6th Cir. 2005)("These business decisions may be
adverse employment actions but only if they are more disruptive
than a mere inconvenience or an alteration of job
responsibilities.")(internal quotation marks and citations
omitted).

### 3.  Summary Re Prima Facie Case

Plaintiff is unable to establish a prima facie case of
disparate treatment with respect to the denial of her requests
for annual leave and restoration of leave and the change in her
work schedule because she is unable to show that she was treated
less favorably than those outside her protected class with
respect to those matters.  In addition, Plaintiff is unable to
show that the denial of her requests for leave on particular
dates and the change in her schedule for four weeks constitute
adverse employment actions.

### D.  Nondiscriminatory Reasons

At the second step of the McDonnell Douglas burden-shifting
framework, Defendants have the burden of articulating a
legitimate, nondiscriminatory reason for the adverse action.  See
Conward v. Cambridge Sch. Comm., 171 F.3d at 19 (citing McDonnell
Douglas, 411 U.S. at 802-03, 93 S.Ct. 1817).  They have done so.
The Court discusses Defendants' reasons in the context of
Plaintiff's arguments regarding pretext.

### E.  Pretext

Although Plaintiff has failed to establish a prima facie
case with respect to certain claims identified in the "Summary"
above, the Court will, nevertheless, continue to include them in
its analysis of Plaintiff's claim of disparate treatment.  The
Court does so to provide an alternative basis for its holding in
this matter.  See Conward v. Cambridge Sch. Comm., 171 F.3d at 20
(affirming summary judgment on race discrimination claims where
district court's alternative holding that plaintiff's evidence

"was too weak to show *at the third step of the progression* that the defendants' stated reason for firing him masked a racially discriminatory animus").

Because Defendants have provided nondiscriminatory reasons for their actions, Plaintiff must offer evidence showing that each of Defendants' proffered reasons is a sham and that discriminatory animus sparked Defendants' actions. <u>See</u> <u>id.</u> at 19 (citing <u>McDonnell Douglas</u>, 411 U.S. at 804-05, 93 S.Ct. 1817).

### 1. Comparative Evidence

Evidence of past treatment towards others can be used to demonstrate intent in a race discrimination suit. <u>Dartmouth Review v. Dartmouth Coll.</u>, 889 F.2d at 19. However, parties offering such evidence must "identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently." <u>Id.</u> (quoting <u>Smith v. Monsanto Chem. Co.</u>, 770 F.2d 719, 723 (8th Cir. 1985)). In general, this requires that the other incidents' circumstances be "reasonably comparable" to those surrounding the adverse action taken against plaintiff. <u>See</u> <u>id.</u> "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. ... Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." <u>Id.</u>; <u>see also Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d 15, 21 (1st Cir. 1999)("[I]n offering ... comparative evidence, [plaintiff] bears the burden of showing that the individuals with whom he seeks to be compared 'have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'")(quoting <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992)); <u>Perkins v. Brigham & Women's Hosp.</u>, 78

F.3d 747, 751 (1st Cir. 1996)("A claim of disparate treatment
based on comparative evidence must rest on proof that the
proposed analogue is similarly situated in material respects.")

Plaintiff devotes a substantial portion of her memorandum to
arguing that non-whites were treated differently with respect to
discipline at the Newport commissary.  See Plaintiff's Mem. at
17-30.  Plaintiff cites incidents involving other employees and
Blythe and/or Furtado and the discipline (or lack thereof) such
employees received for the alleged misconduct.  However, the only
discipline which remains at issue is the letter of reprimand
issued by Gibson.  See Part VII.B.3. supra at 40 (finding claim
based on fourteen day suspension barred for failure to exhaust
administrative remedies); Part VII.C. supra at 41 (declining to
discuss fourteen day suspension further).  Accordingly, incidents
which do not involve the imposition or withholding of discipline
by Gibson are not comparable.  Gibson was a first-level
supervisor, and Blythe and Furtado were, respectively, third and
second level supervisors.  Their positions were not equivalent to
Gibson's. See Dartmouth Review v. Dartmouth Coll., 889 F.2d at
19; see also Walker v. Ohio Dep't of Rehab. and Corr., 241 Fed.
Appx. 261, 266 (6th Cir. 2007)(unpublished opinion)(quoting
Mitchell v. Toledo Hosp., 964 F.2d at 583); Mejias Miranda v.
BBII Acquisition Corp., 120 F.Supp.2d 157, 165 n.7 (D.P.R.
2000)(quoting Mitchell v. Toledo Hosp., 964 F.2d at 583).

Thus, the Court will discuss only the incidents Plaintiff
cites which involve Gibson and other employees.[73]  See Ineichen

---

[73] Plaintiff asserts that "this Court has held that a plaintiff
does not have to limit her comparison only to other employees
disciplined by the same supervisor," Plaintiff's Mem. at 16, but cites
no authority for this statement, see id.  From the context, it appears
that Plaintiff actually has in mind the court in Petsch-Schmid v.
Boston Edison Co., 914 F.Supp. 697, 705 n.17 (D. Mass. 1996)(rejecting
contention that employee must compare herself with other employees
disciplined by the same supervisor where "a company has instituted

v. Ameritech, 410 F.3d 956, 960-61 (7th Cir. 2005)(holding that to satisfy "similarly situated" requirement Plaintiff must "show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish ... the employer's treatment of them'")(quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000))(alteration in original); Childs-Pierce v. Util. Workers Union of Am., 383 F.Supp.2d 60, 70 (D.D.C. 2005) (holding that "the co-workers must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it")(internal quotation marks omitted).  As explained in the following discussion, the Court does not find such incidents to be comparable.

### a.  William McCollum

Plaintiff cites the fact that Gibson testified that McCollum was rude to her on "maybe, four times," Gibson Dep. at 221, but Gibson did not "write him up," id.  Plaintiff also asserts that Gibson testified that McCollum refused to do things she asked him.  See Plaintiff's Mem. at 20.  However, this assertion overstates Gibson's testimony.  Gibson indicated that as far as she could recall McCollum always complied with her directives although he may not have done so immediately.[74]  Plaintiff

---

company-wide standards of discipline ... intended to provide guidance to all company supervisors").  Plaintiff has cited no evidence that would permit the Court to make a finding equivalent to the one made by the Petsch-Schmid court, and this Court is unpersuaded that that holding should be applied in the instant circumstances.

[74] Gibson testified:

Q.  And did [McCollum] ever refuse to do anything that you told him to do?

identifies no incident where McCollum ever flatly refused to comply with a direct order from Gibson and was openly disrespectful in the process.

Plaintiff describes an incident involving a verbal altercation between McCollum and another employee whose first name was Tina.  <u>See</u> Plaintiff's Mem. at 21.  According to Plaintiff, a few after days after the incident, Gibson told McCollum that they were going to have a meeting with the store director.  Plaintiff continues:

> McCollum – who did not believe that Gibson should be present – walked away from Gibson without saying a word. McCollum went directly to the Store Director's office and told him that he was not going to attend any meeting with Gibson.  Significan[t]ly, McCollum testified that neither he nor Tina were disciplined.

Plaintiff's Mem. at 21.  Plaintiff provides no citations to support her description of this entire incident.  Thus, the Court is unable to determine whether the facts are as alleged by

---

A.   Not to my knowledge.

Q.   Even for a short time?

A.   Yeah.  He did no more than what any other employee, "well, I don't want to do it," but he would go and do it before the end of his shift.

...

Q.   Are you telling me that he always did what you told him to do?

...

A.   From what I can recall, yes.

Q.   Is it possible he did not?

A.   There could be a possibility he did not.

Gibson Dep. at 222-23.

Plaintiff and whether there are factors which distinguish the
conduct of McCollum and Tina.

Plaintiff cites the fact that Gibson heard from different
employees that McCollum, who was supposed to start work at 4:00
a.m., was not coming in until almost six o'clock.  See
Plaintiff's Mem. at 21; see also Gibson Dep. at 173-76.  Gibson
spoke to Furtado about the reports, and as a result McCollum's
shift was changed back to 6:00 a.m. to 2:30 p.m.  See Gibson Dep.
at 177.  McCollum was not disciplined.  See id. at 178.
Plaintiff suggests that the fact that McCollum was not
disciplined, but she was, is evidence of pretext.  See
Plaintiff's Mem. at 21-22.  The Court does not view the two
situations as comparable.  See Phillips v. Holladay Prop. Servs.,
Inc., 937 F.Supp. 32, 37 (D.D.C. 1996)(stating that white
employee who showed up late for work without being disciplined
was not similarly situated to black colleague who was fired for
insubordination); see also Silvera v. Orange County Sch. Bd., 244
F.3d 1253, 1259 (2001)("the comparator's misconduct must be
nearly identical to the plaintiff's in order 'to prevent courts
from second-guessing employers' reasonable decisions and
confusing apples with oranges.'")(quoting Maniccia v. Brown, 171
F.3d 1364, 1368-69 (11th Cir. 1999)).  In addition, as Gibson
herself noted, the reports of McCollum's lateness were "hearsay,"
Gibson Dep. at 174, and "[n]o one could ever prove it," id.  In
contrast, Gibson personally witnessed and directly experienced
Plaintiff's insubordinate and disrespectful behavior in refusing
to stock in chill.

### b.  Mike Texeira

Plaintiff notes that Mike Texeira, a white employee, who
reported to Gibson, see Gibson Dep. at 106, 109, 111, punched
another employee in the face and "only received a suspension for
a week," Plaintiff's Mem. at 25.  However, as Gibson testified,

this incident occurred on her day off, see Gibson Dep. at 111, and the matter was handled by Blythe, see id. at 111-12.  Thus, this incident fails to advance Plaintiff's contention that Gibson did not punish white employees as harshly as she punished Plaintiff.

Plaintiff points to testimony by Furtado that he witnessed a disagreement between Texeira and Gibson during which voices were raised.  See Plaintiff's Mem. at 25; see also Furtado Dep. at 94. Plaintiff argues that "[s]ignificantly, unlike she did with Sellers, Gibson never complained to Furtado about Texeira."[75] Plaintiff's Mem. at 25 (citing Furtado Dep. at 100).  However, this incident cannot be said to be comparable to Plaintiff's refusal to go to chill.  Furtado testified that "I'm not sure what was said, but voices were raised.  Then Mary went her way, and Mike went his way."  Furtado Dep. at 94.  This evidence falls far short of showing that Texeira refused to comply with a directive from Gibson and that he was disrespectful in the process.

Plaintiff argues that Texeira refused to follow Gibson's orders about twice a week for four months but that Gibson did not discipline him.  See Plaintiff's Mem. at 25-26.  However, as Gibson explained, what was occurring was that she would tell Texeira to do something and "[h]e would say okay and tell me he was going to do it, however, as soon as Mr. Furtado came in at 9 o'clock he would go to Mr. Furtado and Mr. Furtado would find

_____

[75] Plaintiff's assertion that "Gibson never complained to Furtado about Texeira," Plaintiff's Mem. at 25, ignores Gibson's testimony that she spoke with Furtado regarding Texeira, see Gibson Dep. at 117. To the extent that Plaintiff may rely on the fact that Furtado did not recall such a conversation, see Furtado Dep. at 101, Plaintiff should have at least acknowledged Gibson's contrary testimony.  This is especially true in light of the representation which Plaintiff's counsel made to Furtado at his deposition: "I'm going to represent to you that Mary Gibson said that after this had been going on for some time she went to you and spoke to you about this issue."  Id.

someone else to do it."  Gibson Dep. at 118.  Gibson went to
Furtado and complained that he was overriding her and making it
impossible for her to reprimand Texeira for failing to follow her
instructions.[76]  Id. at 117.  After this meeting, Gibson never
had any problem with Texeira.  See id.  Again, in contrast to
Plaintiff's actions, Texeira's circumvention of Gibson's
authority did not involve either defiance of a directive or
openly disrespectful conduct.

### c.  Ryan Diego

Plaintiff cites an incident in which another white employee
supervised by Gibson, Ryan Diego, put a computerized drawing of a
penis on Gibson's computer.  See Plaintiff's Mem. at 26.  Because
Sellers was working on the CAO computer which was nearby, Gibson
asked Plaintiff to give a written statement.  See Gibson Dep. at
126-27.  Plaintiff refused.[77]  See id. at 127-28.  This incident
was among grounds cited for Plaintiff's termination.  See id. at
132-33.  Plaintiff refers to instances where other employees
allegedly refused to give statements, but were not disciplined.
See Plaintiff's Mem. at 27-28.  However, Plaintiff's termination
is not part of this case, and the comparison which Plaintiff
attempts to draw is not "apples ... to apples," Dartmouth Review
v. Dartmouth Coll., 889 F.2d at 19, given the scope of this
action.  To the extent that a comparison can be drawn between
Diego's misconduct and Plaintiff's insubordination, a proposition
which is itself dubious, see Childs-Pierce v. Util. Workers Union
of Am., 383 F.Supp.2d at 70 (noting that "[t]he nature of the

---

[76] Plaintiff asserts that Furtado denied being approached by
Gibson about overriding her instructions to Texeira.  See Plaintiff's
Mem. at 26 n.29.  However, while Furtado did not recall the
conversation, he declined to testify that it did not occur.  See
Furtado Dep. at 101.

[77] Gibson testified that Plaintiff ultimately gave a statement
which said "I have nothing to say."  Gibson Dep. at 131.

offenses committed and the nature of the punishments imposed are
the most significant variables in a case alleging discrimination
in connection with disciplinary actions"), the significant fact
is that Diego, like Plaintiff, was given a letter of reprimand
for his misconduct, see Gibson Dep. at 124-25.

### d.  Richard Walsh

Plaintiff refers to another employee, Richard Walsh, who she
alleges was instructed by Gibson to write a statement about an
incident between Gibson and Plaintiff and that Walsh refused.
See Plaintiff's Mem. at 28.  Plaintiff's citation to the record
regarding Walsh is so sketchy that the Court declines to consider
this portion of Plaintiff's argument.  Cf. Andrews v. Am. Red
Cross Blood Servs., New England Region, 251 F.Supp.2d 976, 982
(D. Me. 2003)("It is not the court's burden to sift through the
summary judgment record and compare the co-worker's alleged
conduct to the defendant's policy to determine whether this is in
fact the case [i.e., that the co-worker is similarly situated in
all relevant respects].");  see also Booker v. Mass. Dep't of Pub.
Health, 527 F.Supp.2d 216, 227 (D. Mass. 2007)("A plaintiff does
not carry her burden of demonstrating pretext on a motion for
summary judgment where she provides merely sketchy evidence
lacking a sufficient foundation for a legally relevant comparison
of allegedly similarly situated employees.")(internal quotation
marks omitted).  Even if the Court were to overlook this
deficiency, the conduct involved, an alleged refusal to provide a
written statement, is dissimilar to the conduct for which
Plaintiff received the letter of reprimand.  As the Court has
already noted, while Plaintiff's refusal to provide a written
statement may have been among the grounds for her termination,
that termination is not part of this case.

### e.  Charles Cloud and Thelma Edens

Plaintiff directs the Court to Plaintiff's Ex. 9, which

consists of twenty pages and includes several different
documents, and asserts that many of Cloud's "problems were
similar to those experienced by Sellers." Plaintiff's Mem. at
29. Plaintiff provides no explanation as to how Cloud's problems
were similar to Plaintiff's other than referring the Court to
Cloud's ten page affidavit, one of the documents contained within
Plaintiff's Ex. 9. This argument and citation are inadequate.
The Court is not required to undertake the task of sifting
through the summary judgment record in search of evidence to
satisfy Plaintiff's burden. See Andrews v. Am. Red. Cross Blood
Servs., New England Region, 251 F.Supp.2d at 982 ("it is the
plaintiff's burden to identify the factual basis in the summary
judgment for this contention [i.e., that Plaintiff was treated
differently from persons similarly situated in all relevant
respects]").

With respect to Thelma Edens, it does not appear that any of
the incidents to which Plaintiff refers involved Gibson. See
Plaintiff's Mem. at 29-30. Moreover, Plaintiff's citation to the
record is again sketchy. For example, Plaintiff invites the
Court to "See Plaintiff's Exhibit 10," id. at 30, without any
guidance as to where in the forty plus pages which comprise this
exhibit evidence supporting Plaintiff's statement can be found.
Plaintiff appears to quote from a letter written by Edens, but
provides no citation for the quote. See id. To the extent such
letter is buried within Plaintiff's Ex. 10, the Court declines to
sift through more than two score documents in search of it.

### 2. Pretext Analysis Re Specific Claims

### a. Denial of Annual Leave Requests

Defendants have offered evidence that the three requests for
leave which Plaintiff submitted in July were denied because she
had not submitted a leave planner as required by the MLA, see
Defendants' App., Ex. 15 at 30; id., Ex. 1b at D-0189, and as

59

directed by both Furtado, see id., Ex. 4 (Furtado Decl.) ¶ 6, and
Blythe, see SUF ¶ 26.  Plaintiff admits that she did not submit
the planner.  See Defendants' App., Ex. 14 (Sellers' Decl. of
12/10/04) at D-0105.  Defendants have also offered evidence that
Plaintiff's request for leave in November was denied because
other employees were on leave.  In particular, the record shows
that McCollum was either off or had approved annual leave
scheduled on at least one of the days in each of the two
groupings of dates for which Plaintiff was requesting annual
leave.  See Defendants' App., Ex. 1 (DeSantis Decl.) ¶ 5.

For essentially the same reasons that the Court previously
concluded that Plaintiff is unable to establish an inference of
racial discrimination with respect to the denial of her leave
requests, see Part VII.C.1.a. supra at 42-44, Plaintiff's attempt
to show that Defendants' reasons for such denial are pretextual
fails.  Without repeating that entire discussion here, the Court
again notes that Plaintiff is mistaken in her belief that none of
her leave requests for annual leave were approved.[78]  See Sellers
Dep. at 32, 209; SUF ¶¶ 37-38.

### b.  Denial of Restoration of Leave

Defendants denied Plaintiff's request for restoration of
annual leave because she did not meet all four criteria to have
her leave restored.  See Blythe Dep. at 272-73; see also SUF ¶

---

[78] At her deposition, Plaintiff was asked:

Q.  So, you thought it was okay not to follow Mr. Blythe's
    instructions regarding submitting an annual leave
    planner?
....
A.  I didn't feel that it was okay.  I felt that I was
    going to be able to take my leave, take whatever was
    left.  I had no idea that he was going to end up
    denying all of my leave.

Sellers Dep. at 31-32.

79.[79]  Plaintiff offers no evidence that meeting all four
criteria was not, in fact, a requirement to have a request for
restoration of annual leave granted.  Instead, Plaintiff cites
the fact that when Furtado was deposed on July 31, 2007, he
testified that he did not realize until the day prior to his
deposition, when the request form was shown to him by Defendants'
counsel, that he was mistaken in approving Plaintiff's request
for restoration of leave.  See Furtado Dep. at 122-23.  Plaintiff
points out that Furtado stated in his December 1, 2004,
declaration that he was aware by that date that Plaintiff "did
not meet the criteria to have her annual leave restored."
Defendants' App., Ex. 5 (Furtado Decl.) at D-0154.  However, this
conflict as to when Furtado became aware that it was necessary
for Plaintiff to meet all four criteria does not contradict the
basic fact that all four of the criteria had to be met and
Plaintiff did not meet them.  The Court is also unpersuaded by
this conflict that the reason offered by Defendants for the
denial was a sham and that discriminatory animus was the actual
reason.  See Conward v. Cambridge Sch. Comm., 171 F.3d at 19
(stating that in order for plaintiff to meet his burden at this
step of the McDonnell Douglas burden shifting framework he must
show that defendant's proffered reason is a sham and that
discriminatory animus sparked defendant's actions).

     In short, I find that with respect to the denial of her
request for restoration of annual leave Plaintiff has failed to
meet her burden in showing pretext.  Defendants are entitled to
summary judgment as to this claim with respect to Count I, and I

---

[79] Plaintiff denies SUF ¶ 79 and cites "Defendants' Ex. 1b," PSDF
¶ 79, to support her denial.  However, Defendants' Ex. 1b consists of
more than fifty pages and several different documents.  Plaintiff
provides no page or paragraph number to assist the Court in locating
the evidence Plaintiff contends disputes this fact.  Thus, she has
failed to comply with LR Cv 56(a)(3), and the Court finds SUF ¶ 79 to
be undisputed.

so recommend.

### c.  Letter of Reprimand

The Letter of Reprimand states that it was issued because of
Plaintiff's "failure to follow instructions and disrespectful
conduct."  Defendants' App., Ex. 1b at D-0194.  In determining
whether Plaintiff is able to show that these were not the true
reasons for the issuance of the letter, the Court bears in mind
that "the pretext inquiry is concerned with the employer's
*perception* of the employee's performance, not the employee's own
beliefs."  Hankins v. Airtran Airways, Inc., 237 Fed. Appx. 513,
522 (11th Cir. 2007)(unpublished opinion).

Here Gibson believed that Plaintiff was able to stock items
in chill because there was no medical documentation in
Plaintiff's personnel file that showed Plaintiff had any medical
restrictions on that date.  See SUF ¶ 66;[80] see also Gibson Dep.
at 74-75; Defendants' App., Ex. 1b at D-0118, D-0195; Defendants'
App., Ex. 20 (Gibson Decl. of 11/30/07) ¶ 8.  Gibson's honest
belief that this was the case is supported by the fact that at
the time she asked Plaintiff to stock, Plaintiff was already
stocking in the HBA aisle.  See SUF ¶ 54; see also Defendants'
App., Ex. 20 ¶ 3.  In addition, Plaintiff never provided Gibson
with any documentation after the fact which showed that she
actually had a medical restriction on December 5, 2003.[81]  See
id. ¶ 8.  Moreover, even if Plaintiff had some physical
disability which was not documented, Gibson offered to assist
Plaintiff so that she would not have to lift any cases in chill.
See Defendants' App., Ex. 18 at D-0146; Gibson Dep. at 74-75.

---

[80] See n.25.

[81] Defendants note that the Workers' Compensation Hearing
transcript shows that Plaintiff's claim of prior injury was to her
left wrist and that Plaintiff was right-handed.  Defendants' App., Ex.
22 (Transcript of Proceedings) at D-0681 to D-0682.

When Plaintiff still refused to comply with Gibson's direction, Gibson went to chill and performed the task herself.  <u>See</u> Defendants' App., Ex. 20 ¶ 4.

It is undisputed that there was at least one jacket available for Plaintiff to wear in chill.  Plaintiff's complaint that the jacket was "dirty" falls short of establishing pretext when other DeCA employees and contract employees used the jacket(s) when going into the chill area.  <u>See</u> Sellers Dep. at 148; Defendants' App., Ex. 3 (Blythe Decl.) ¶ 7, Ex. 20 (Gibson Decl.) ¶ 6, Ex. 4 (Furtado Decl.) ¶ 8, Ex. 9 (Bucolo Decl.) ¶ 5, Ex. 32 (McCollum Decl.) ¶ 3.  The other employees who used the jacket(s) included white employees such as Blythe, Gibson, Bucolo, McCollum, and Fields.  <u>See</u> Defendants' App., Ex. 3 (Blythe Decl.) ¶ 7, Ex. 20 (Gibson Decl.) ¶ 6, Ex. 4 (Furtado Decl.) ¶ 8, Ex. 9 (Bucolo Decl.) ¶ 5, Ex. 32 (McCollum Decl.) ¶ 3.

Plaintiff does not deny that she refused to comply with Gibson's directive to go to chill to stock.  <u>See</u> Sellers Dep. at 48.  Indeed, in a written response to the Letter of Reprimand, Plaintiff defiantly wrote: "It states in the letter what kind of corrective action I'm going to take, NONE!"  Defendants' App., Ex. 23 at D-0047.  Plaintiff argues that white employees engaged in conduct which was much worse than hers but did not receive a Letter of Reprimand or equivalent discipline.  <u>See</u> Plaintiff's Mem. at 19-30.  However, the Court has already found Plaintiff's comparative evidence wanting for the reasons discussed in Part VII.E.1. <u>supra</u> at 51-59.

### d.  Promotion and Change in Schedule

Defendants state that Plaintiff was not promoted from GS-5 to GS-7 level because she failed to complete the training requirements for the CAO position.  <u>See</u> Defendants' App., Ex. 24 (Blythe Decl. of 2/16/05) at D-0141.  Defendants explain the

change in Plaintiff's schedule in December of 2004 as being made
so that Plaintiff would learn the afternoon functions of the CAO
position.  See id. at D-0139.  Relatedly, Defendants note that
both McCollum and Bucolo, who also held CAO positions, had their
hours changed numerous times.  See id., Ex. 9 ¶ 4, Ex. 32 ¶ 2.

Plaintiff argues that these reasons are pretextual.  She
asserts that she had completed all of her training for the CAO
position and cites McCollum's deposition testimony as supporting
this assertion.  See Plaintiff's Mem. at 33 (citing McCollum Dep.
I at 111).  The cited testimony hardly supports Plaintiff's
contention that she successfully completed all her training for
the CAO position.

> Q.   So you're saying that you trained Rose for the
>      [CAO] job?
>
> A.   Right.
>
> Q.   So how long did that training take place?
>
> A.   It seemed like it took forever because she was
>      always asking, repeating the questions on how
>      to do something in CAO.
>
> Q.   But can you give me a time frame, how long it
>      took?
>
> A.   I was always -- she was always asking questions.
>      As long as she had the job she always did not
>      seem to understand what to do.

McCollum Dep. I at 111-12.

Moreover, McCollum was a co-worker and not a supervisor.
Furthermore, he did not testify that the training he provided was
the only training which Plaintiff was required to undergo or that
training alone, regardless of performance, guaranteed a promotion
to GS-7.

Plaintiff argues that the change in her schedule was
pretext.  See Plaintiff's Mem. at 37.  She again asserts that she

64

had completed her training, but the Court has already found this assertion to be unsupported for the reasons stated above.[82] Plaintiff further argues that "the letter indicating the change does not reflect that her hours are being changed for training purposes," Plaintiff's Mem. at 37, but she does not provide any citation as to where this document can be found in the record, see id.

Plaintiff cites testimony from Bucolo that up until a recent change she has always worked the first shift as CAO, see Bucolo Dep. at 42, and that prior to this shift change there were no CAO duties that had to be performed during the second or third shift, see id. at 43. As further support, Plaintiff cites McCollum's testimony that CAO tasks could be performed anytime.[83]  See McCollum Dep. I at 75.  However, Bucolo and McCollum are both low level employees who testified based on their personal experiences.  The Court does not find their testimony sufficient to contradict Defendants' strong documentary and testimonial evidence that there were afternoon CAO tasks which had to be performed and that Plaintiff's schedule was changed so that Bythe would know whether Plaintiff could perform these tasks, see Defendants' App., Ex. 1b at D-0181, Ex. 1d at 32, Ex. 3a at D-0412, Ex. 25.  In particular, the Training Plan for Computer Assisted Order ("Training Plan") specifically supports changing Plaintiff's schedule to cover afternoon functions, particularly

---

[82] Plaintiff also offers no citation for her implicit contention that she had completed her training prior to the change in her schedule.  See Plaintiff's Mem. at 37.

[83] It bears noting that McCollum did not testify that there were no CAO tasks that had to be performed at certain times of the day. See McCollum Dep. I at 75.  Rather, at the end of a multi-sentence answer he added "But you could do [CAO] any time."  Id.  The fact that there may have been some CAO tasks which could be performed "any time" does not mean that all CAO tasks could be performed at any time.

when a store has two CAOs.[84]  See id., Ex. 1d at 32.  The
Training Plan also includes a "model" task list that identifies
CAO processing that will occur throughout the day, including
during the afternoon hours.  See id., Ex. 1d at 33-38.  In
addition, the job description for the CAO position states that
CAOs "[m]ay work uncommon tours of duty as required to meet
demands of effective mission accomplishment."  Id., Ex. 1b at D-
0181.  Moreover, Blythe's sworn declaration that he changed
Plaintiff's schedule because he needed to know whether she could
perform the afternoon functions of her job before he could
promote her, see id., Ex. 3 ¶ 6, is supported by his
contemporaneously created December 13, 2004, email to Zone
Manager Cook.

     Plaintiff argues that her job performance belies Defendants'
position that she needed additional training.  See Plaintiff's
Mem. at 34.  She asserts that "Mr. Cloud – with whom she worked
in dairy and who knew the CAO job – said Sellers knew all the CAO
functions."  Id.  As previously noted, Plaintiff provides no
citation as to where this statement by Cloud can be found.  After
reading Cloud's ten page affidavit, the Court assumes Plaintiff
is relying upon paragraph 48 wherein Cloud states: "I knew how to
do the CAO system.  It was an easy system.  Based on my
experience working with Rose Sellers, she knew how to do the CAO
job."  Plaintiff's Ex. 9 (Cloud Aff.) ¶ 48.  Other than the vague
reference to his "experience working with Rose Sellers," id.,
Cloud's affidavit does not explain the degree to which he was
able to observe and evaluate Plaintiff's CAO performance or his
qualifications to make a determination that she knew how to do

_____

     [84] The Training Plan states in relevant part: "Stores that have
two CAOS assigned should provide overlap coverage using a work
schedule for these general time frames (0600 hours through 1500 hours
or 1000 hours through 1900 hours)."  Defendants' App., Ex. 1d at 32.

the job.   Plaintiff has provided no evidence that Cloud in any way supervised or evaluated Plaintiff or that he had some expertise in CAO functions.   His affidavit is, therefore, insufficient to overcome Defendants' evidence that Plaintiff was not promoted because she did not complete her CAO training and that her schedule was changed for the purpose of enabling her to learn the afternoon functions.   See Fed. R. Civ. P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

Plaintiff also contends that Furtado's deposition testimony belies Defendants' claim that she needed additional training. See Plaintiff's Mem. at 34.   While Furtado testified that on a scale of one to five, with one being the best and five being the worst, he would have rated Plaintiff's CAO skills as "probably about a two," Furtado Dep. at 126, he also noted that "[s]he was in the learning mode.  She had a lot to learn," id.   Furtado further testified that he believed that Plaintiff was not motivated "[a]t times," id. at 136, and that "her performance started going downhill," id. at 137.   Furtado did not testify that Plaintiff successfully completed her CAO training.

Plaintiff also asserts that Gibson "confirms that Sellers was more than proficient in her CAO job."  Plaintiff's Mem. at 34 (citing Gibson Dep. at 50-52).  Putting it mildly, this overstates Gibson's testimony.  Gibson testified that she did not believe Plaintiff understood the CAO job.  See Gibson Dep. at 50. While she was reluctant to draw comparisons between employees, see id. at 47-52, Gibson stated that she was "sure," id. at 51, that Plaintiff did not perform the way McCollum did, see id. at 50-51.

In short, the evidence Plaintiff cites to show that the

explanations offered by Defendants for not promoting her to GS-7 and changing her schedule are pretextual is unpersuasive. Defendants are entitled to have their motion for summary judgment granted as to this and all other claims on which Plaintiff bases her claim of disparate treatment.  I so recommend.

## VIII.  Count II - Hostile Work Environment

### A.  Law

"Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating 'against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" Torres-Negrón v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007)(quoting 42 U.S.C. § 2000e-2(a)(1)) (alteration in original). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993)(citations and internal quotation marks omitted).

To succeed in her hostile workplace environment claim, Plaintiff must show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership in the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. Torres-Negrón v. Merck & Co., 488 F.3d at 39 (citing O'Rourke v. City of Providence, 235 F.3d

68

713, 728 (1st Cir. 2001)(citing <u>Faragher v. City of Boca Ratón</u>, 524 U.S. 775, 787-89, 118 S.Ct. 2275 (1998))).  In determining whether an environment is sufficiently hostile or abusive to be actionable, courts must look at all the circumstances, including the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270-71, 121 S.Ct. 1508 (2001)(quoting <u>Faragher v. City of Boca Ratón</u>, 524 U.S. at 787-78, 118 S.Ct. 2275).

**B.  Application**

Plaintiff asserts that she was subjected to pervasive harassment based on her race, but most of the examples which she cites lack any citation to the record.[85]  <u>See</u> Plaintiff's Mem. at 38-39.  The Court therefore does not consider them.  In one instance, she alleges that "Furtado issued her a letter in which he instructed her – hour by hour - how she had to spend her day," <u>id.</u> at 38, and cites "Plaintiff's Exhibit 18," <u>id.</u>  However, the

---

[85] Plaintiff states in a footnote that she "incorporates by reference the facts in support of her disparate treatment claims." Plaintiff's Mem. at 38 n.48.  The location in the memorandum of the "facts" to which she refers is not stated, and it appears that "facts" are sprinkled throughout the thirty-six pages of the memorandum which pertain to that claim in some respect.  <u>See</u> Plaintiff's Mem. at 1-36. The Court declines to search through these pages and guess which facts Plaintiff contends support her hostile work environment claim.  <u>Cf. Ríos-Jiménez v. Principi</u>, 520 F.3d 31, 39 (1st Cir. 2008)(noting that if "blatant non-compliance" with local rule were excused, "the district court would be forced to grope unaided for factual needles in a documentary haystack")(internal quotation marks omitted); <u>Mercado-Alicea v. P.R. Tourism Co.</u>, 396 F.3d 46, 51 (1st Cir. 2005)("District courts are not required to ferret through sloppy records in search of evidence supporting a party's case.").  Moreover, as has already been noted, Plaintiff's citation to the record in support of her disparate treatment claim leaves much to be desired.  <u>See, e.g.</u>, Plaintiff's Mem. at 7-8 (citing the sixty-five plus pages of Plaintiff's Ex. 2), 21 (failing to provide any citations for entire first paragraph).

Court has already noted that Plaintiff's Ex. 18 consists of
fifty-five pages, and the Court should not have to search for the
supporting material.  <u>See</u> Part II.F. <u>supra</u> at 17 n.33.

The few examples which Plaintiff cites that have adequate
citation are not persuasive.  Plaintiff alleges that Furtado
significantly increased her duties and responsibilities at a time
when he claimed her job performance was deficient.  <u>See</u>
Plaintiff's Mem. at 38 (citing Furtado Dep. at 233-36).  To the
extent Plaintiff contends that the increase in duties and
responsibilities is evidence of harassment, Plaintiff's argument
is unpersuasive.  Furtado testified that at the time of the
increase Plaintiff "only had a small portion of the store ...,"
Furtado Dep. at 233, and he wanted to make the distribution of
work "fair to both CAOs," <u>id.</u>

Plaintiff claims that "[h]er supervisors allude to the fact
that she acted like a gorilla when they describe her banging on
her chest during meetings ...."  Plaintiff's Mem. at 39 (citing
Furtado Dep. at 167).  This mischaracterizes Furtado's testimony.
He never stated that Plaintiff acted "like a gorilla."  Rather,
he testified that Plaintiff had "banged her chest" during a
meeting[86] and at other times.  Furtado Dep. at 167.

---

[86] Furtado testified that the meeting had been called by him in an
attempt to resolve the problem between Plaintiff and Gibson.  <u>See</u>
Furtado Dep. at 152.

    Q.   The whole idea was to try to get it resolved, right?

    A.   Yes, I always try to resolve it.  When you have a
         person coming in here and beating on their chest and
         slapping their hand on the table, she's becoming
         intimidating.  She's becoming, you're kind of like,
         you're creating -- I don't know.  You're creating
         an atmosphere where nothing can get accomplished.

    Q.   So when you say she was beating her chest, was she
         hitting her chest?

Plaintiff asserts that "[s]he was excluded from meetings that even Bucolo was allowed to attend."  Plaintiff's Mem. at 39 (citing Furtado Dep. at 227).  The cited reference reflects that Furtado showed McCollum and Bucolo how to do something which apparently pertained to CAO duties.  See Furtado Dep. at 227.  Furtado testified that Plaintiff felt slighted and that as a result he "sat down with her, and I showed her how to back stuff off the record, how to adjust cycle counts."  Id.  Being excluded from a single meeting provides little support for Plaintiff's hostile work environment claim.  Cf. Whittaker v. N. Illinois Univ., 424 F.3d 640, 645 (7th Cir. 2005)("Indeed, the threshold for plaintiffs is high, as '[t]he workplace that is actionable is one that is "hellish."'"); Ford-Fugate v. Fedex Freight, No. 1:04-cv-1514-RLY-TAB, 2007 WL 79104, at *5 (S.D. Ind. Jan. 8, 2007)("Plaintiff's allegations that she was excessively monitored, excessively paged at work, given more difficult assignments than her male co-workers, and disciplined more than her male co-workers, do not amount to a working environment that

---

A.   Yes, ma'am.

Q.   So would you agree with me that there is a difference between beating your chest and hitting your chest, right?

      MS. NGUYEN: Objection.

A.   Same thing.

Q.   In your mind, it's the same.  Was she touching her chest, or was she beating it?

A.   She was beating it.

Q.   Define for me what she was doing.

A.   Beating, she was having her hand, slamming it on her chest.

Furtado Dep. at 152-53.

could be characterized as 'hellish.'")(quoting <u>Whittaker</u>).

Plaintiff also contends that the denial of her requests for annual leave and restoration of annual leave "are ... part of her hostile work environment claim."  Plaintiff's Mem. at 14 n.14. The Court has already determined that the denial of requests to take leave on particular dates is not an adverse employment action.  For the same reasons, such denial cannot be said to alter the conditions of Plaintiff's employment and create an abusive work environment.  <u>See</u> <u>Torres-Negrón v. Merck & Co.</u>, 488 F.3d at 39.  The denial also is not objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive.  <u>See</u> <u>id.</u>  Similarly, with respect to the denial of Plaintiff's request for restoration of leave, Plaintiff cannot show that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, because Plaintiff failed to satisfy all four requirements for the request to be granted.

In short, I find that Defendants' Motion for Summary Judgment with respect to Count II should be granted.  Even if the Court were to assume that Plaintiff was subjected to unwelcome harassment, she has not shown that the harassment was based on her race; that the harassment was so severe and pervasive that it altered the conditions of her employment and created an abusive work environment; that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim did perceive it to be so; and that some basis for employer liability has been established.  <u>See</u> <u>Torres-Negrón v. Merck & Co.</u>, 488 F.3d at 39.

**IX.  Count III - Retaliation**

    **A.  Law**

To sustain a claim of retaliation, a plaintiff must produce evidence on three points: 1) that she engaged in protected

conduct under Title VII; 2) that she experienced an adverse employment action; and 3) that a causal connection exists between the protected conduct and the adverse action.  Gu v. Boston Police Dep't, 312 F.3d 6, 13-14 (1st Cir. 2002).  "An employee has engaged in an activity protected by Title VII if she has either opposed any practice made unlawful by Title VII, 'or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" Torres-Negrón v. Merck & Co., 488 F.3d at 44 (quoting 42 U.S.C. § 2000e-3(a))(alteration in original).

To establish an adverse employment action a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, meaning that "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006)(quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  As the Supreme Court has observed, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Id.

An employee claiming retaliation is required to produce evidence of a causal link between his complaint of discrimination and an adverse employment action.  Holloway v. Thompson Island Outward Bound Educ. Ctr., Inc., 492 F.Supp.2d 20, 26 (D. Mass. 2007).

> There are sound reasons for the requirement that an employee claiming retaliation produce evidence of a causal link between his complaint of discrimination and an adverse employment action.  If filing a complaint about discriminatory behavior were to give an employee complete protection from workplace discipline, then any employee who had engaged in misconduct "could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint."

<u>Holloway v. Thompson Island Outward Bound Educ. Ctr., Inc.</u>, 492
F.Supp.2d at 26; <u>see also</u> <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d
816, 828-29 (1st Cir. 1991)(agreeing that statutes barring
retaliation for exercising rights guaranteed by law do "not
clothe the complainant with immunity for past and present
inadequacies, unsatisfactory performance, and uncivil conduct in
dealing with subordinates and with his peers")(internal quotation
marks omitted).

**B.  Application**

Plaintiff filed her second EEO complaint on April 14, 2004.
SUF ¶ 103.  The retaliation claim contained in that complaint, as
later defined, is that Blythe retaliated against Plaintiff for
her May 7, 2001, EEO Complaint by denying her annual leave
requests and her request for restoration of annual leave and that
Gibson retaliated against her for the same reason by issuing the
letter of reprimand.  <u>See</u> SUF ¶ 104.  Plaintiff additionally
argues that her failure to be promoted and her fourteen day
suspension are acts of retaliation which are "reasonably related
to and grow[] out of the discrimination complained of to the
agency ...," <u>Clockedile v. New Hampshire Dep't of Corr.</u>, 245 F.3d
at 6, and may be considered even though they were not mentioned
in her EEO complaint, <u>see</u> Plaintiff's Mem. at 8-9, 11 n.11.
Counsel for Defendants conceded at the hearing that the failure
to promote could be considered part of Plaintiff's retaliation
claim based on the holding in <u>Clockedile</u>.

**1.  Adverse Employment Action**

To the extent that Plaintiff relies upon the denial of her
request to take annual leave on particular dates in 2003 and the
change in her schedule for four weeks to support her claim of
retaliation, such claim fails because the denial and the change
in schedule do not rise above the level of minor annoyances.

74

### 2. Causal Connection

#### a. Temporal Proximity

As shown below, three of the actions on which Plaintiff bases her claim of retaliation occurred long after the filing of her EEO complaint in May of 2001 and cannot reasonably be attributed to retaliation:

Denial of annual leave in July 2003 - 25 months;

Letter of Reprimand in February 2004 – 33 months;

Denial of restoration of leave in March 2004 – 34 months.[87]

See Clark County Sch. Dist. v. Breeden, 532 U.S. at 274, 121 S.Ct. 1508 ("Action taken ... 20 months later suggests, by itself, no causality at all."); see also Morón-Barradas v. Dep't of Educ. of Puerto Rico, 488 F.3d 472, 481 (1st Cir. 2007) (finding no evidence of a causal connection where adverse action occurred fifteen months after EEOC charge was filed); Ramírez Rodríguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 85-86 (1st Cir. 2005)(finding two month temporal proximity between filing of discrimination complaint and plaintiff's termination insufficient to establish a causal connection); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004)("Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity.").

Even the remaining actions upon which Plaintiff relies lack sufficient temporal proximity to the filing of her second EEO complaint on April 14, 2004, to permit a reasonable jury to infer that Defendants retaliated against her for engaging in protected EEO activity.

---

[87] Plaintiff submitted her request for restoration of leave on March 4, 2004.  SUF ¶ 78.  The exact date the request was denied by Blythe is unclear, but it was the same day or shortly thereafter.  See Blythe Dep. at 272.

Failure to Promote – six months;[88]

Fourteen Day Suspension – twelve months.

In reaching this conclusion, the Court relies upon the same case law cited above.

### b. Gibson's Lack of Knowledge

Gibson, who had become grocery manager in August 2003, was unaware of Plaintiff's EEO activity at the time she issued the Letter of Reprimand to Plaintiff in February 2004. See Defendants' App., Ex. 20 ¶ 7. Thus, for this additional reason Plaintiff cannot show a causal connection between her filing of the EEO complaint in 2001 and the issuance of the Letter of Reprimand in 2004. See Sanchez v. Denver Pub. Schs., 164 F.3d 527, 534 (10th Cir. 1998)(holding that plaintiff failed to establish a prima facie case of retaliation where there was no evidence that decision maker knew of plaintiff's filing of discrimination claim); Kosereis v. Rhode Island, 331 F.3d 207, 217 (1st Cir. 2003)("It is insufficient for [plaintiff] to simply recount that he complained and that he was disciplined ....") (second alteration in original).

## X. Summary

### A. Count I - Disparate Treatment

To the extent that Plaintiff's disparate treatment claim is based on the July 14, 2003, denial of her requests for leave in August 2003 and the denial of promotions and pay, such claim is barred because she failed to exhaust her administrative remedies. To the extent that Plaintiff's claim is based on her fourteen-day

---

[88] In using the period of six months, the Court gives Plaintiff the benefit of all favorable inferences. Plaintiff completed the "DeCA East CAO Training 2004," Plaintiff's Ex. 14, on October 15, 2004. Thus, even assuming no further on the job training was necessary, October 15, 2004, would be the earliest possible date that Plaintiff completed her training and was eligible for promotion to GS-7.

suspension, such claim is barred for failure to exhaust administrative remedies because: a) Plaintiff elected to pursue the grievance through the process established by the MLA and then failed to complete that process, and b) even if Plaintiff's failure to complete the process was due to the union's unwillingness to take the matter to arbitration, Plaintiff never claimed in her grievance that her suspension was based on racial discrimination or retaliation for filing an EEO complaint.[89]

Even if the Court were to overlook these failures to exhaust her administrative remedies, Plaintiff is unable to establish a prima facie case with respect to her disparate treatment claim to the extent such claim is based on the denial of her requests for annual leave and restoration of leave and the change in her work schedule.  To the extent that Plaintiff's disparate treatment claim is based on the letter of reprimand, the Court assumes that Plaintiff has shown a prima facie case of discrimination. However, this ground for the claim is barred because Plaintiff is unable to show that Gibson's reason for issuing the letter of reprimand is a pretext for racial discrimination.  Similarly, even if Plaintiff were able to establish a prima facie case of disparate treatment with respect to: a) the denial of her requests for annual leave; b) the denial of her request for restoration of leave; c) the failure to promote her, and d) the change in her schedule, Plaintiff is unable to show that Defendants' explanations for these actions are pretextual and that the actual reason was racial discrimination.

B.  **Count II - Hostile Work Environment**

Plaintiff cannot succeed on her hostile work environment claim because, even if the Court assumes she was subjected to

---

[89] To the extent Plaintiff contends that this suspension is part of her hostile work environment and retaliation claims, it is barred for the same reasons.

unwelcome harassment, she cannot show that the harassment was based on her race; that the harassment was so severe and pervasive that it altered the conditions of her employment and created an abusive work environment; that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and Plaintiff perceived it to be so; and that some basis for Defendants' liability has been established.  See Torres-Negrón v. Merck & Co., 488 F.3d at 39.

### C.  Count III - Retaliation

Plaintiff's retaliation claim fails because, to the extent she relies upon the denial of her requests for leave and the change in her schedule, such actions do not constitute adverse employment actions.  Plaintiff is additionally unable to show a causal connection between her protected activity and any action which she contends is an adverse employment action.  All of the actions which she cites are not sufficiently near in time to the protected activity to allow an inference of retaliation to be drawn.  In addition, with respect to the Letter of Reprimand, there no evidence that Gibson was aware of Plaintiff's protected activity.  See Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997)("To make out a retaliation claim requires not only an adverse employment action and previously protected conduct, but also a colorable showing that a causal connection existed between the protected conduct and the adverse action.")(internal quotation marks omitted.

## XI.  Conclusion

For the reasons explained above, the Court recommends that Defendants' Motion for Summary Judgment be granted and that the action be dismissed.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk

of Court within ten (10) days of its receipt.[90]  <u>See</u> Fed. R. Civ.
P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections
in a timely manner constitutes waiver of the right to review by
the district court and of the right to appeal the district
court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d
4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>,
616 F.2d 603, 605 (1st Cir. 1980).


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
January 23, 2009

---

[90] The ten days do not include include intermediate Saturdays,
Sundays, and legal holidays.  <u>See</u> Fed. R. Civ. P. 6(a).